No. 24-5566

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

GARY SANCHEZ,

*Plaintiff and Appellant*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellee.*

———————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 24-cv-767-RSH-MSB
Hon. Robert S. Huie, District Judge

———————————

## APPELLEE'S ANSWERING BRIEF

———————————

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
  *Supervising Deputy Attorneys General*

KEVIN L. QUADE
  *Deputy Attorney General*
CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7693
E-mail: Kevin.Quade@doj.ca.gov
  *Attorneys for Defendant and Appellee*

December 20, 2024

# TABLE OF CONTENTS

**Page**

Introduction .................................................................... 1

Statement of Jurisdiction ................................................ 3

Statement of the Issues ................................................... 3

Addendum of Statutory Provisions ................................. 4

Statement of the Case ..................................................... 4

      A.   History of Firearm Silencers and California's Restrictions ............................................................ 4

      B.   Procedural History ........................................... 5

Summary of the Argument ............................................. 6

Standard of Review ......................................................... 8

Argument ........................................................................ 9

    I.   Plaintiff Cannot Establish that Silencers Are Presumptively Protected by the Second Amendment ...................... 9

      A.   Silencers Are Not "Arms" ........................... 11

      B.   Silencers Are Not In Common Use for Self-Defense... 16

      C.   Silencers are Dangerous and Unusual Items that May Be Banned ............................................. 20

    II.   California's Prohibition on Silencers Is Consistent with This Nation's History and Tradition of Firearms Regulation ............................................................... 23

      A.   The Supreme Court Clarified the Historical Inquiry in *United States v. Rahimi* ........................... 23

      B.   The Historical Record Reflects a Robust Tradition of Regulating Particular Weapons that Threaten Public Safety ................................................. 26

      C.   California's Prohibition on Silencers Is Consistent with Regulatory Tradition ........................... 34

Conclusion ..................................................................... 37

i

## TABLE OF CONTENTS
### (continued)

**Page**

Statement of Related Cases.............................................................38

# TABLE OF AUTHORITIES

**Page**

CASES

*B & L Prods., Inc. v. Newsom*
104 F.4th 108 (9th Cir. 2024) ...............................................*passim*

*Bevis v. City of Naperville* (*Bevis I*)
657 F. Supp. 3d 1052 (N.D. Ill. 2023).....................................28, 29, 32, 33

*Bianchi v. Brown*
111 F.4th 438 (4th Cir. 2024) ...................................................22

*Caetano v. Massachusetts*
577 U.S. 411 (2016)...........................................................18, 19

*Capen v. Campbell*
708 F. Supp. 3d 65 (D. Mass. 2023)...........................................14

*Cox v. United States*
2023 WL 4203261 (D. Alaska June 27, 2023) ...........................14

*D'Augusta v. Am. Petroleum Inst.*
117 F.4th 1094 (9th Cir. 2024) ...................................................8

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
664 F. Supp. 3d 584 (D. Del. 2023)................................31, 32, 33

*District of Columbia v. Heller*
554 U.S. 570 (2008).............................................................*passim*

*Duncan v. Bonta*
83 F.4th 803 (9th Cir. 2023) .....................................................11

*Fyock v. Sunnyvale*
779 F.3d 991 (9th Cir. 2015) .............................................13, 21

*Garland v. Cargill*
602 U.S. 406 (2024).................................................................34

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Hanson v. District of Columbia*
    120 F.4th 223 (D.C. Cir. 2024)....................................................21

*Hill v. State*
    53 Ga. 472 (1874) ......................................................................32

*Jackson v. City & Cnty. of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ......................................................13

*Nat'l Ass'n for Gun Rights (NAGR) v. Lamont*
    685 F. Supp. 3d 63 (D. Conn. 2023)...........................................20

*New York State Rifle & Pistol Ass'n v. Bruen*
    597 U.S. 1 (2022)................................................................*passim*

*Nunn v. State*
    1 Ga. 243 (1846) .......................................................................32

*Ocean State Tactical, LLC v. Rhode Island*
    95 F.4th 38 (1st Cir. 2024).........................................................35

*Or. Firearms Fed'n v. Kotek*
    682 F. Supp. 3d 874 (D. Or. 2023) ...........................19, 20, 32, 36

*Rupp v. Bonta*
    2024 WL 1142061 (C.D. Cal. Mar. 15, 2024)............................32

*Sonzinsky v. United States*
    300 U.S. 506 (1937).....................................................................4

*State v. Reid*
    1 Ala. 612 (1840) ......................................................................30

*United States v. Al-Azhari*
    2020 WL 7334512 (M.D. Fl. Dec. 14, 2020) .............................15

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023) ..............................................10, 17

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Berger*
    715 F. Supp. 3d 676 (E.D. Pa. 2024)....................................................13, 14

*United States v. Comeaux*
    2024 WL 115929 (W.D. La. Jan. 10, 2024) .......................................*passim*

*United States v. Cooperman*
    2023 WL 4762710 (N.D. Ill. July 26, 2023) .............................................14

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018) .......................................................12, 13, 14

*United States v. Grey*
    2018 WL 4403979 (C.D. Cal. Sept. 13, 2018) .........................................21

*United States v. Hasson*
    2019 WL 4573424 (D. Md. Sept. 20, 2019)..............................................15

*United States v. Jernigan*
    2024 WL 4294648 (E.D. Va. Sept. 25, 2024) ..........................................14

*United States v. McCartney*
    357 F. App'x 73 (9th Cir. 2009)................................................................21

*United States v. Perez-Garcia*
    96 F.4th 1166 (9th Cir. 2024) ...................................................................10

*United States v. Perkins*
    2008 WL 4372821 (D. Neb. Sept. 23, 2008)............................................22

*United States v. Peterson*
    2023 WL 5383664 (E.D. La. Aug. 21, 2023)...........................................14

*United States v. Rahimi*
    144 S. Ct. 1889 (2024)...........................................................................*passim*

*United States v. Saleem*
    659 F. Supp. 3d 683 (W.D.N.C. 2023)......................................................14

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Villalobos*
  2023 WL 3044770 (D. Idaho Apr. 21, 2023) ............................................ 14

*United States v. Wood*
  299 U.S. 123 (1936) ...................................................................................... 27

*Wolford v. Lopez*
  116 F.4th 959 (9th Cir. 2024) ...................................................................... 36

*Wood v. Arnold*
  321 F. Supp. 3d 565 (D. Md. 2018) ............................................................. 5

**STATUTES**

**<u>Federal</u>**

National Firearms Act of 1934 .................................................................. 4, 34

United States Code, Title 18 § 922(g)(8)(C)(i) ...................................... 23, 25

United States Code, Title 28 § 1291 ............................................................. 3

United States Code, Title 28 § 1331 ............................................................. 3

**<u>Alabama</u>**

1837 Ala. Acts 7, No. 11, § 2 ....................................................................... 33

**<u>Arizona</u>**

1889 Ariz. Sess. Laws Act 13, §§ 1–2 .................................................... 32, 33

**<u>Arkansas</u>**

1881 Ark. Acts 191, §§ 1–3 .......................................................................... 33

**<u>California</u>**

California Penal Code § 17210 ............................................................. *passim*

vi

## TABLE OF AUTHORITIES
### (continued)

Page

California Penal Code § 33410 ................................................................*passim*

1917 Cal. Stat. 221, ch. 145, §§ 1–3 ...............................................32

1933 Cal. Stat. ch. 39, pp. 329–30 ...........................................1, 4, 34

**Florida**

1868 Fla. Stat., ch. 1637, *reprinted in* Blouint et al., The Revised
  Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892) ...............31

The Revised Statues of the State of Florida 783, tit. 2, art. 5, §
  2425 (1892) ....................................................................31

**Georgia**

1837 Ga. Acts 90, §1 .........................................................32

**Illinois**

1881 Ill. Laws 73, § 1 .......................................................32

**Kentucky**

1855 Ky. Acts 96, Chapter 636, § 1 ...........................................31

**Maine**

1909 Me. L., ch. 129, p. 141 ...............................................4, 34

**Massachusetts**

1750 Mass. Acts 544, Chapter 17, § 1 .........................................29

1786 Mass. Acts 87, Chapter 38 ..............................................29

1850 Mass. Gen. Stat. ch. 194, § 2 ..........................................31

1926 Mass. Acts 256, Chapter 261 ............................................34

vii

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Michigan**

1927 Mich. Pub. Acts, No. 372, pp. 888–89.....................................................34

**Minnesota**

1913 Minn. L., ch. 64, p. 55.............................................................................4, 34

**New Jersey**

An Act Against Wearing Swords (1686) *reprinted in The Grants,*
*Concessions, and Original Constitutions of the Province of*
*New Jersey* 289–90 (1881) ...........................................................................29

1763-1775 N.J. Laws 346, Chapter 539, § 10 .................................................29

An Act to Describe, Apprehend and Punish Disorderly Persons §
2 (1799) *reprinted in* Laws of the State of New Jersey 474
(Nettleton ed., 1821) ....................................................................................29

1911 N.J. Laws, Chapter 128, p. 185...........................................................4, 34

**New York**

1849 N.Y. Laws 403–04, Chapter 278, §§ 1–2 ..............................................31

1916 N.Y. Laws 338–39, Chapter 137, § 1 .....................................................34

**North Dakota**

1877 N.D. Laws 794, § 45 ................................................................................31

**Ohio**

1788-1801 Ohio Laws 321, 323........................................................................29

**Oklahoma**

1890 Okla. Sess. Laws 475-76, §§ 18–19........................................................32

viii

## TABLE OF AUTHORITIES
### (continued)

Page

**Rhode Island**

1927 R.I. Pub. L., ch. 1052, p. 259 ................................................... 34

**South Carolina**

1903 S.C. Acts 127-28, No. 86 ......................................................... 31

**Tennessee**

1837-1838 Tenn. Pub. Act 200, Chapter 137, § 1 ........................................... 33

1879 Tenn. Pub. Acts 135, Chapter 96, § 1 ............................................. 31

1883 Tenn. Pub. Acts 17, Chapter 13, § 1 ............................................. 31

**Texas**

1871 Tex. Laws 25, § 1 ........................................................... 32, 33

**Vermont**

1849 Vt. Acts & Resolves 26, No. 36, §§ 1–2 ............................................. 31

1912 Vt. Acts & Resolves, No. 237, p. 310 .............................................. 4, 34

**England**

7 Rich. 2, ch. 13 (1383) ............................................................ 28

33 Hen. 8, ch. 6, §§ 1–2, 18 (1541) ................................................... 28

CONSTITUTIONAL PROVISIONS

United States Constitution Second Amendment ..................................... *passim*

United States Constitution Fourteenth Amendment .............................. 5, 30, 33

## TABLE OF AUTHORITIES
### (continued)

**Page**

COURT RULES

Ninth Circuit Rules 28-2.7 ................................................................. 4

OTHER AUTHORITIES

1 Blackstone, *Commentaries on the Laws of England* 139 (1769) ................ 27

Bray, *"Necessary and Proper" and "Cruel and Unusual":*
*Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688
(2016) ........................................................................................... 20

John Forrest Dillon, *The Right to Keep and Bear Arms for Public*
*and Private Defence,* 1 Cent. L. J. 259, 285 (1874) ................................ 26

Schwoerer, *Gun Culture in Early Modern England* 59 (2016) ...................... 28

Sharp, *Tracts, Concerning the Ancient and Only True Legal*
*Means of National Defence, by a Free Militia* 17–18 (1782) ................... 27

*Understanding Gun Law History After Bruen: Moving Forward*
*by Looking Back*, 51 Fordham Urb. L.J. 57, 101 (2023) ............................ 29

**INTRODUCTION**

California has prohibited the possession of firearm silencers for nearly a century.  Cal. Penal Code § 33410; *see* 1933 Cal. Stat., ch. 39, at 329–30.  These devices attach to a firearm and are designed to silence, diminish, or muffle the sound associated with discharge of the weapon.  Cal. Penal Code § 17210.  Given their inherent design and function, silencers render it more difficult for potential victims to detect and flee from a shooting and for law enforcement to locate and neutralize a shooter.  Because they are particularly dangerous firearm accessories and exacerbate the lethality of firearms, silencers have been heavily regulated by states and the federal government since the early 1900s.

Plaintiff and Appellant Gary Sanchez filed a pro se complaint in district court challenging the constitutionality of California's prohibition on silencers.  He argued that the devices are protected by the Second Amendment and that California's prohibition is contrary to the Nation's history and tradition of permissible firearms regulation.  The district court rejected plaintiff's claim and dismissed the complaint without leave to amend.

That judgment was appropriate and should be affirmed.  Under the analytical framework articulated in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)—which asks whether the challenged law burdens presumptively protected conduct and, if so, whether the law is consistent with principles of historical

firearm regulation—the district court correctly held that plaintiff's constitutional challenge failed at the threshold stage of the analysis. Silencers are neither bearable "Arms" nor integral components that are necessary for the operation of a firearm. They have no intrinsic self-defense purpose or utility in the case of confrontation. The district court's dismissal fits squarely within a uniform consensus of the federal courts that silencers are not presumptively protected by the text of the Second Amendment.

This Court need go no further. Yet plaintiff's challenge was also deficient at the threshold inquiry for reasons not addressed by the district court. The complaint did not plausibly allege that silencers are commonly used for ordinary self-defense. *See Bruen*, 597 U.S. at 32. Although the devices alter the shooting experience, their intrinsic characteristics do not evidence any utility for armed self-defense, and plaintiff made no allegations to that effect. Moreover, these inherent characteristics demonstrate that silencers are a type of "dangerous and unusual" item that is not covered by the Second Amendment's presumptive protection. *See Bruen*, 597 U.S. at 21.

And even if plaintiff could have shown that silencers are protected "Arms" at the first stage of the *Bruen* analysis, California's prohibition fits well within the Nation's historical tradition of firearms regulation. *See Bruen*, 597 U.S. at 19. Like its historical predecessors from the founding era through the twentieth

2

century, the challenged statute rests on the well-established principle that exceedingly dangerous weapons and items may be banned from public circulation, imposing a comparable burden on the right to armed self-defense and promoting comparable public-safety justifications. California's prohibition is thus constitutionally permissible because it is "relevantly similar" to an unbroken chain of historical weapons regulation. *See United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024); *Bruen*, 597 U.S. at 29–30.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal from the district court's final judgment under 28 U.S.C. § 1291. On August 28, 2024, the district court issued an order dismissing plaintiff's constitutional challenge to California Penal Code § 33410 and entered a final judgment. 1-SER-3–9. Plaintiff timely appealed the decision and judgment on September 6, 2024. 2-SER-34–39. The district court had subject matter jurisdiction over plaintiff's federal constitutional claims under 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUES

Whether California's prohibition on the possession of firearm silencers under California Penal Code § 33410 comports with the Second Amendment to the United States Constitution.

3

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief.
Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.    History of Firearm Silencers and California's Restrictions

A firearm silencer, sometimes referred to as a suppressor, is a device that,
when attached to a functioning firearm, muffles the sound of the discharge of the
firearm.  Silencers were first patented in 1908.  *United States v. Comeaux*, 2024
WL 115929, at *3 (W.D. La. Jan. 10, 2024).  Almost immediately after these
devices were patented, states began to ban their sale and possession.  *Id.*; *see, e.g.*,
1909 Me. L., ch. 129, p. 141; 1911 N.J. Laws, ch. 128, p. 185; 1912 Vt. Acts &
Resolves, No. 237, p. 310; 1913 Minn. L., ch. 64, p. 55.  Congress later included
restrictions on silencers in the National Firearms Act of 1934, requiring purchasers
to pay a fee and pass a background check.  *See Sonzinsky v. United States*, 300
U.S. 506, 511–12 (1937); *Comeaux*, 2024 WL 115929, at *3.

In California, possession of a silencer has been prohibited since 1933.  *See*
1933 Cal. Stat., ch. 39, pp. 329–30.  California Penal Code Section 33410 states,
"Any person, firm, or corporation who within this state possesses a silencer is
guilty of a felony and upon conviction thereof shall be punished by
imprisonment . . . or by a fine not to exceed ten thousand dollars ($10,000), or by
both that fine and imprisonment."  Under California law, a "silencer" is defined as

4

"any device or attachment of any kind designed, used, or intended for use in silencing, diminishing, or muffling the report [i.e., sound of the discharge] of a firearm," as well as "any combination of parts, designed or redesigned, and intended for use in assembling a silencer or fabricating a silencer and any part intended only for use in assembly or fabrication of a silencer."  Cal. Penal Code § 17210.

### B.   Procedural History

In April 2024, plaintiff filed a complaint, alleging that California Penal Code Section 33410 violates the Second and Fourteenth Amendments to the United States Constitution on its face.  2-SER-24.  He sought declaratory judgment to that effect, as well as an injunction against enforcement of Section 33410 in its entirety.  2-SER-25.  The papers attached to plaintiff's complaint indicated that he sought to create and use a homemade, 3D-printed silencer.  2-SER-26.  The proposed silencer, which plaintiff unsuccessfully sought federal authorization to fabricate and register, was intended for use with 5.56mm caliber rounds.  *Id.*[1]  The federal authorization was denied on the grounds that silencers are unlawful in California under state law.  2-SER-33.

---

[1] 5.56mm NATO rounds are commonly used with the M16 rifle (a fully automatic machinegun) and semiautomatic, assault-style rifles.  *See Wood v. Arnold*, 321 F. Supp. 3d 565, 572 n.6 (D. Md. 2018).

5

A few months later, on the Attorney General's motion, the district court ordered plaintiff's complaint dismissed without leave to amend. 1-SER-3–9. The court held that silencers are not "Arms" protected by the Second Amendment. 1-SER-6–8. A silencer, the court explained, is neither "a weapon in itself," nor an accessory that is necessary "to the essential operation of a firearm." 1-SER-8. Because "silencers are not 'bearable arms' for purposes of the Second Amendment," the court concluded that plaintiff failed to state a claim. *Id.* A final judgment closing the case was entered on the same day. 1-SER-2.

Plaintiff filed a timely notice of appeal in September 2024. 2-SER-34–39.

## SUMMARY OF THE ARGUMENT

The district court properly rejected plaintiff's challenge to California's statutory prohibition on firearm silencers, concluding that the devices are not protected as "Arms" under the Second Amendment's text. Under *Bruen*'s threshold inquiry, plaintiff was required to establish that possession of a silencer is presumptively protected by the Second Amendment. *Bruen*, 597 U.S. at 24; *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 112 (9th Cir. 2024), *pet. for cert. filed*, No. 24-598 (U.S. Dec. 3, 2024). But silencers are not bearable "Arms" under the original understanding of that term because they are not weapons of offense or defense capable of casting at or striking another. *See District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). The device merely muffles and diminishes the

6

sound and flash associated with discharging a firearm.  They have no inherent utility in ordinary self-defense.

Nor do silencers fit within the Second Amendment's text as a component integral to operation of a firearm.  Although the Second Amendment includes certain ancillary rights necessary for realization of its core self-defense right, *see B & L Prods., Inc.*, 104 F.4th at 118, a silencer is not necessary to effectuate armed self-defense.  The device merely alters the experience of shooting an otherwise operable firearm.  Like a multitude of courts both pre- and post-*Bruen*, the district court correctly held that silencers are not bearable "Arms" and thus not entitled to constitutional protection.

Plaintiff's Second Amendment claim fails as a matter of law for additional reasons not considered by the district court.  In his complaint, plaintiff did not plausibly allege that silencers are in common use for self-defense.  *See Bruen*, 597 U.S. at 32.  While he claimed that over three million silencers are privately owned in the United States and that they provide a shooter with certain benefits, plaintiff failed to allege that these devices are used with any regularity in self-defense scenarios.

In addition, silencers fit within a category of inherently "dangerous and unusual" items that, whatever their purported self-defense utility, lack presumptively constitutional protection.  *See Bruen*, 597 U.S. at 21; *Heller*, 554

7

U.S. at 627. By muffling the sound and flash associated with gunfire, a silencer renders it more difficult for potential victims to identify and flee from a shooter, as well as for law enforcement to locate and confront the threat. *See, e.g.*, *Comeaux*, 2024 WL 115929, at *3. These fundamentally dangerous characteristics have justified regulation and prohibitions on such devices for well over a century.

Even if plaintiff could show that silencers were presumptively protected at *Bruen*'s first step, California's prohibition is consistent with the Nation's historical tradition of firearms regulation. *Bruen*, 597 U.S. at 19. From the colonial and early founding eras, to the antebellum and postbellum period, and into the twentieth century, the historical record demonstrates regulation of weapons in accordance with a uniform principle: that uniquely dangerous weapons may be banned. California's prohibition on silencers, which is based on the device's exceeding dangerousness, fits well within that tradition. *See Rahimi*, 144 S. Ct. at 1901; *Bruen*, 597 U.S. at 29–30.

## STANDARD OF REVIEW

The district court entered a final judgment dismissing plaintiff's complaint without leave to amend. 1-SER-3–9. The Court reviews an order granting a motion to dismiss de novo, accepting all nonconclusory factual allegations in the complaint as true. *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100 (9th Cir. 2024).

8

## ARGUMENT

Contrary to plaintiff's claim, the district court properly dismissed his Second Amendment challenge to California's prohibition on firearm silencers.  Appellant's Informal Opening Br. (AOB) at 2–4.  Plaintiff argues that the court misapplied *Heller* and *Bruen*, and that those cases "support[] the notion that silencers are arms" protected by the Second Amendment's text.  AOB at 2, 4.  As explained below, however, the district court's conclusion that possession of silencers is not presumptively protected at *Bruen*'s threshold stage was not only analytically correct, but is consistent with the decisions of every other court that has addressed the issue.  Because plaintiff failed to satisfy his initial burden under the *Bruen* standard, this Court should affirm.  Additionally, even if the Court were to assume that silencers were presumptively protected by the Second Amendment's text, the State has shown that its prohibition on the possession of firearms is consistent with historical principles of firearm regulation.

## I.    PLAINTIFF CANNOT ESTABLISH THAT SILENCERS ARE PRESUMPTIVELY PROTECTED BY THE SECOND AMENDMENT

The Second Amendment "codified a *pre-existing* right."  *Heller*, 554 U.S. at 592.  "'[L]ike most rights, the right secured by the Second Amendment is not unlimited.'"  *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626).  It has never been understood as "'a right to keep and carry any weapon whatsoever,'" *id.*

9

(quoting *Heller*, 554 U.S. at 626), and *Heller* confirms that certain weapons and instruments "may be banned," *Heller*, 554 U.S. at 627.

Under *Bruen*, the threshold question is whether a plaintiff has carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct. *Bruen*, 597 U.S. at 24; *B & L Prods., Inc.*, 104 F.4th at 119; *United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024). To answer that question, the Court addresses whether "the Second Amendment's plain text covers" the plaintiff's proposed course of conduct. *Bruen*, 597 U.S. at 24. That inquiry considers "the normal and ordinary meaning of the Second Amendment" informed by its "historical background." *Id.* at 20 (internal quotation marks omitted).

Where a plaintiff contends that possession of a prohibited item is covered by the Second Amendment, the plaintiff bears an initial burden to establish that the item fits within the definition of "Arm," as that term was originally understood—either as a weapon itself or a component integral to the operation of a weapon. *See Heller*, 554 U.S. at 581; *see also United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (detailing different elements of threshold inquiry). Failure to do so is fatal to the constitutional claim. *Bruen*, 597 U.S. at 18. But even where a plaintiff can meet that burden, the Supreme Court has emphasized that not every "*type of weapon*" is "eligible for Second Amendment protection." *Heller*, 554 U.S. at 622.

10

In determining what types of weapons fall within the scope of the Second Amendment at step one of the *Bruen* framework, the Supreme Court has clarified that only "weapons 'in common use' today for self-defense" are eligible for protection, *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627), while "'dangerous and unusual weapons'" may be banned, *Heller*, 554 U.S. at 627; *see also Duncan v. Bonta*, 83 F.4th 803, 810 (9th Cir. 2023) (en banc) (Bumatay, J., dissenting) ("'Arms' refers to 'weapons "in common use" today for self-defense.' Such a definition excludes 'dangerous and unusual weapons.'" (citations omitted)).  Plaintiff's constitutional challenge fails *Bruen*'s initial inquiry in every respect.

### A.    Silencers Are Not "Arms"

Under *Bruen*'s text-and-history standard, a silencer is not an "Arm[]." Although the meaning of the term "Arms" is broad, *see Heller*, 554 U.S. at 581, it is "fixed according to its historical understanding," *Bruen*, 597 U.S. at 28.  To that end, *Heller* explained that an instrument need not have existed at the time of the founding to fall within the scope of the Second Amendment, but it still must fit within the founding-era understanding of an "Arm[]."  *Heller*, 554 U.S. at 581. Citing multiple dictionary definitions from the relevant time period, the Supreme Court has defined "Arms" as "'[w]eapons of offence, or armour of defence,'" *id.* (quoting 1 Dictionary of the English Language 106 (4th ed.)), and "'any thing that

a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" *id.* (quoting 1 A New and Complete Law Dictionary).

A firearm silencer falls outside that historical understanding of the term "Arms." While the complaint below did not articulate a definition of silencers, the term "silencer" is defined by statute as "any device or attachment of any kind designed, used, or intended for use in silencing, diminishing, or muffling the report of a firearm." Cal. Penal Code § 17210 (referencing Cal. Penal Code § 33410). Such a "device or attachment" necessarily cannot constitute an "Arm" within the meaning of the Second Amendment because it cannot be used to "cast at or strike another" and has no intrinsic usefulness as a weapon in the case of confrontation. *Heller*, 554 U.S. at 581. A silencer has neither inherent offensive nor defensive capability, but rather, is a firearm accessory that has no self-defense purpose. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (concluding that silencers are not "bearable arms" covered by the Second Amendment).[2]

Nor can plaintiff establish that silencers are subsumed within the textual definition of "Arms" as a protected component integral to the operation of a firearm. This Court has explained that the Second Amendment "also 'protects ancillary rights necessary to the realization of the core right to possess a firearm for

---

[2] Plaintiff explicitly acknowledged in his complaint that silencers are "accessories for arms." 2-SER-25.

self-defense.'" *B & L Prods., Inc.*, 104 F.4th at 118 (quoting *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc)).  "Ancillary rights are protected to the extent necessary to serve" the interest of keeping and bearing arms "'for lawful purposes, most notably for self-defense.'"  *B & L Prods., Inc.*, 104 F.4th at 118 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 781 (2010)). Thus, in some circumstances, courts have recognized an ancillary Second Amendment right to possess components that are necessary to the functioning of a firearm.  *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (recognizing the implied right to possess ammunition), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing "some corollary, albeit not unfettered, right to possess the magazines necessary to render . . . firearms operable"), *abrogated on other grounds by Bruen*, 597 U.S. 1.  In contrast, accessories that are not necessary to operate a firearm for self-defense are not protected by the Second Amendment. *See Cox*, 906 F.3d at 1186.

A silencer is "unnecessary to the essential operation of a firearm."  *United States v. Berger*, 715 F. Supp. 3d 676, 697–702 (E.D. Pa. 2024).  Instead, the device is designed only to muffle the byproduct of normal firearm operation after it has been discharged—namely, lessening the "report" or sound associated with discharging a firearm.  *See* Cal. Penal Code § 17210.  In other words, a silencer is

simply not necessary to render a firearm operable or effectuate the right to armed self-defense.

Accordingly, every federal court to address this issue—both before and after *Bruen*—has concluded that silencers are not protected by the Second Amendment, with the vast majority concluding that silencers are not "Arms" under the plain constitutional text. *See, e.g.*, *Cox*, 906 F.3d at 1186 ("[B]ecause silencers are not 'bearable arms,' they are outside the Second Amendment's guarantee."); *United States v. Jernigan*, 2024 WL 4294648, at *7–8 (E.D. Va. Sept. 25, 2024) ("a firearm does not require a silencer to operate, and without a silencer the right to bear arms would not be rendered meaningless"); *Berger*, 715 F. Supp. 3d at 697–702 (silencer not covered by text of Second Amendment "because it is merely an accessory which is unnecessary to the essential operation of a firearm"); *Capen v. Campbell*, 708 F. Supp. 3d 65, 89 (D. Mass. 2023) (similar); *United States v. Peterson*, 2023 WL 5383664, at *2 (E.D. La. Aug. 21, 2023) ("[S]ilencers are not bearable arms within the score of the Second Amendment even in light of *Bruen* or its progeny.");  *United States v. Cooperman*, 2023 WL 4762710, at *1 (N.D. Ill. July 26, 2023) ("The plain text of the Second Amendment does not protect accessories that are not bearable arms, such as silencers."); *Cox v. United States*, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023) (similar); *United States v. Villalobos*, 2023 WL 3044770, at *12 (D. Idaho Apr. 21, 2023) (similar); *United*

14

*States v. Saleem*, 659 F. Supp. 3d 683, 695 (W.D.N.C. 2023) (similar); *United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fl. Dec. 14, 2020) (similar); *United States v. Hasson*, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019) (similar).

As noted, plaintiff argues on appeal that the district court erred in its application of Supreme Court precedent when it dismissed his constitutional challenge. AOB at 2, 4. Yet he does not explain how the district court purportedly misapplied the pertinent cases. Indeed, the district court correctly applied *Bruen*'s two-step framework, concluding that, consistent with *Heller*, the historical definition of the term "Arms" does not include silencers, and thus such devices are not protected by the Second Amendment. 1-SER-6–8.

In the district court, plaintiff argued that "accessories for arms," like silencers, "are arms themselves." 2-SER-25. He further claimed that the device's alleged utility for improved marksmanship allowed silencers to be used in both offensive and defensive situations, consistent with *Heller*'s definition of the term "Arms." 2-SER-12. But the district court correctly held that "however desirable the silencer may be to a user in reducing noise, flash, or recoil, or in allowing the user to stay hidden while firing," such characteristics are not determinative on whether an item is covered by the text of the Second Amendment. 1-SER-8. Indeed, as this Court has repeatedly acknowledged, "'the Second Amendment does not elevate

15

convenience and preference over all other considerations.'" *B & L Prods., Inc.*, 104 F.4th at 119 (quoting *Teixeira*, 873 F.3d at 680).

Silencers have no stand-alone utility in the case of confrontation and are not necessary to exercise the right to armed self-defense. Since the district court correctly held that plaintiff's constitutional challenge fails at this threshold step, "the analysis can stop there." *Bruen*, 597 U.S. at 18 (internal quotation marks and citation omitted).

### B.    Silencers Are Not In Common Use for Self-Defense

Even if plaintiff could establish that silencers should otherwise qualify as "Arms" under the constitutional text, he failed to adequately plead that such instruments are self-defense weapons that are "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627).

The Supreme Court has repeatedly emphasized that "individual self-defense is 'the *central component*' of the Second Amendment." *Bruen*, 597 U.S. at 29, 32. Courts must therefore assess whether a weapon is "'in common use' today for self-defense" in determining whether it is presumptively protected. *Id.*; *see id.* at 81 (Kavanaugh, J., concurring) (emphasizing this "important limitation"); *Heller*, 554 U.S. at 624; *Rahimi*, 144 S. Ct. at 1897 (reiterating that "the [Second Amendment] right secures for Americans a means of self-defense"). The Ninth Circuit has followed *Bruen*'s guidance in explaining that part of the "*Bruen* step one" inquiry

is "whether the weapon at issue is '"in common use" today for self-defense.'" *Alaniz*, 69 F.4th at 1128.

In assessing common use for self-defense, the Supreme Court in *Heller* did not simply consider the *prevalence* of handguns (which was undisputed). *Heller*, 554 U.S. at 629. Instead, it examined the *objective features* of the weapon at issue (the handgun) to explain why it is a "self-defense weapon." 554 U.S. at 629. The Court explained that handguns are "easier to store in a location that is readily accessible in an emergency" due to their small size. *Id.* They are also "easier to use for those without the upper-body strength to lift and aim a long gun"; they "can be pointed at a burglar with one hand while the other hand dials the police"; and they "cannot easily be redirected or wrestled away by an attacker." *Id.* In the same opinion, the Court recognized that some types of weapons fall outside the scope of the Second Amendment—"such as short-barreled shotguns," and "M-16 rifles and the like"—without *any* discussion of their popularity or prevalence. *Id.* at 625, 627. Thus, what mattered to the Court was an "examin[ation]" of "the character of the weapon." *Id.* at 622; *see id.* at 623 ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons.").

In his complaint before the district court, plaintiff did not allege that silencers are typically used for "ordinary self-defense needs." *Bruen*, 597 U.S. at 60. Nor did he make any allegations relevant to the pertinent characteristics of a silencer as

17

they related to self-defense. Nothing in the complaint thus permits a plausible inference that the objective features of silencers render silencers useful in armed confrontation. To the contrary, as explained above, plaintiff cannot establish that the devices, as defined by California law, are themselves weapons or that they have any utility for armed self-defense. A silencer is an accessory that can be attached to an otherwise operable firearm and that simply reduces the sound associated with the discharge of the weapon. *See* Cal. Penal Code § 17210. By definition, such an instrument has no stand-alone functionality that effectuates the Second Amendment right.

In his opposition to the Attorney General's motion to dismiss, and now again on appeal, plaintiff claims that over three million silencers are owned in the United States. AOB at 2; *see* 2-SER-12–13 (comparing to *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (noting approximately 200,000 civilians who owned stun guns)). Based on this assertion, he argues that silencers are "in common use" for purposes of *Bruen*'s step-one analysis. AOB at 2. But, as explained, the common-use inquiry looks at more than mere prevalence of an item in society. *See Heller*, 554 U.S. at 629. To be covered by the text of the Second Amendment, an arm must not only be commonly possessed or in common use generally, but be commonly used for self-defense purposes. *Bruen*, 597 U.S. at 32.

18

This distinction illustrates the flaw in plaintiff's reliance on *Caetano*.  The per curiam opinion of the Supreme Court there summarily reversed a decision upholding a Massachusetts law prohibiting possession of stun guns because it failed to apply the standards set forth in *Heller*.  *Caetano*, 577 U.S. at 411–12.  In a concurrence joined by only one other justice, Justice Alito noted the prevalence of stun gun possession, citing the State's acknowledgement that approximately 200,000 stun guns were owned by civilians.  *Id.* at 420 (Alito, J., concurring).  But even that figure alone was not sufficient for the concurring justices to warrant Second Amendment protection.  In the next sentence, Justice Alito explained that stun guns as "widely owned and accepted as a legitimate means of self-defense across the country."  *Id.*

Silencers, on the other hand, are not.  Unlike a stun gun, a silencer is not itself a weapon.  It simply alters the experience of firing an otherwise operable firearm. And even assuming the truth of plaintiff's arguments below concerning silencers' benefits to marksmanship (which are not supported by any allegations in the complaint), such improvement to the gun firing experience does not inevitably establish that silencers are in common use for "ordinary self-defense."  *Bruen*, 597 U.S. at 60; *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 919 (D. Or. 2023) ("This Court reads the qualifier of 'ordinary self-defense needs' to include some consideration of how and why firearms or firearm accessories are actually used in

19

typical self-defense scenarios.").  In other words, although there may be many

silencers possessed throughout the country, plaintiff has failed to plausibly allege

that these devices are commonly used to facilitate self-defense.

### C.    Silencers are Dangerous and Unusual Items that May Be Banned

Plaintiff's constitutional challenge also fails at the threshold stage of the

*Bruen* inquiry because silencers are a type of "dangerous and unusual" item that

may be banned.  *See Bruen*, 597 U.S. at 21; *Heller*, 554 U.S. at 627.  These devices

"fall outside of the Second Amendment's protections" at the initial stage of the

*Bruen* framework.  *Or. Firearms Fed'n*, 682 F. Supp. 3d at 922 (citing *Bruen*, 597

U.S. at 21); *see Nat'l Ass'n for Gun Rights (NAGR) v. Lamont*, 685 F. Supp. 3d 63,

91 (D. Conn. 2023) (conducting "dangerous and unusual" inquiry at *Bruen* step

one); *see also Heller*, 554 U.S. at 627 (discussing "dangerous and unusual"

principle as part of its threshold discussion of what "sorts of weapons [are]

protected" by the Second Amendment).

The phrase "dangerous and unusual" in describing this historical tradition is a

hendiadys:  a rhetorical device where "two terms separated by a conjunction work

together as a single complex expression."  Bray, *"Necessary and Proper" and*

*"Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688

(2016).  In "dangerous and unusual," "unusual" conveys some heightened "level of

lethality or capacity for injury" that makes a particular type of weapon

20

"uncommonly dangerous," *Hanson v. District of Columbia*, 120 F.4th 223, 238 n.7 (D.C. Cir. 2024), not a numerical limit that bars prohibitions on a weapon as soon as a minimum number are in circulation. Silencers are "dangerous and unusual" devices that fall outside the scope of the Second Amendment. *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009); *Comeaux*, 2024 WL 115929, at *3.[3]

In both the district court and this Court, plaintiff has argued that silencers are not dangerous and unusual. However, although he claims that silencers are possessed by "over 3 million" people in the United States, AOB at 2, the mere prevalence of an item in society says nothing about whether that item has a heightened capacity for dangerousness. As several courts have previously recognized, silencers are indeed dangerous and unusual, and thus undeserving of constitutional protection. *See, e.g.*, *McCartney*, 357 F. App'x at 76 (silencers fit within category of unusually dangerous weapons); *Comeaux*, 2024 WL 115929, at *3 (various devices, including silencers, have "the potential to substantially increase the level of violence when used in connection with criminal activity"); *United States v. Grey*, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018)

---

[3] Even if the "dangerous and unusual" inquiry requires a separate showing that the weapon in question is not "commonly possessed," *Fyock*, 779 F.3d at 997, plaintiff here did not allege that silencers are commonly possessed by law-abiding citizens for ordinary self-defense, *Bruen*, 597 U.S. at 32.

("[T]he Second Amendment does not extend to 'dangerous and unusual weapons' such as silencers."); *United States v. Perkins*, 2008 WL 4372821, at *4 (D. Neb. Sept. 23, 2008) (similar).

The function of a silencer—"silencing, diminishing, or muffling the report of a firearm," Cal. Penal Code § 17210—increases the device's capability for lethality. As one court explained, a silencer "has the potential to allow a criminal to fire more shots without detection, avoid apprehension after shooting someone, or both." *Comeaux*, 2024 WL 115929, at *3. Where the sound of gunshots is muffled by a silencer, common sense dictates that it is necessarily more difficult to identify the location of a shooter, which in turn, makes it more difficult for potential victims to flee and for law enforcement to neutralize the danger. Moreover, according to plaintiff's own arguments, *see* 2-SER-12, on top of the effect on the sound of gunfire, a silencer also diminishes a firearm's muzzle flash, further aiding a shooter in concealing the location of gunfire, *see Bianchi v. Brown*, 111 F.4th 438, 455 (4th Cir. 2024) (en banc) (devices that suppress a firearm's flash help conceal the shooter's position). Indeed, these characteristics have justified heavy regulation of silencers at the federal and state level since the early 1900s. *See infra*. For these reasons, silencers are among the dangerous and unusual items that are not covered by the Second Amendment's text.

## II. CALIFORNIA'S PROHIBITION ON SILENCERS IS CONSISTENT WITH THIS NATION'S HISTORY AND TRADITION OF FIREARMS REGULATION

Even if plaintiff could satisfy his burden at the first stage of the *Bruen* inquiry to adequately allege that silencers are presumptively protected by the Second Amendment, California's prohibition on silencers is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. In conducting this "analogical inquiry"—at step two of the *Bruen* framework—a prior regulation identified by the government "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29–30). Modern laws that are "relevantly similar" to historical regulations, in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified," are constitutional. *Bruen*, 597 U.S. at 29.

### A. The Supreme Court Clarified the Historical Inquiry in *United States v. Rahimi*

The Supreme Court recently expounded on step two of the *Bruen* framework. *See Rahimi*, 144 S. Ct. at 1897–1903. In *Rahimi*, by an 8-1 vote, the Supreme Court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8)(C)(i), which prohibits individuals subject to certain domestic violence restraining orders from possessing a firearm. 144 S. Ct. at 1903. *Rahimi* reiterated that "'the right secured by the Second Amendment is not unlimited,'" does not "sweep

23

indiscriminately," and is "not a right to keep and carry any weapon whatsoever."
*Id*. at 1897.  The Court recognized that "some courts have misunderstood the
methodology of [*Bruen* and *Heller*]," which "were not meant to suggest a law
trapped in amber."  *Id*.  It criticized the Fifth Circuit (and the dissent) for
committing the "error[]" of "read[ing] *Bruen* to require a 'historical twin' rather
than a 'historical analogue.'"  *Id*. at 1903; *see also id.* at 1925 (Barrett, J.,
concurring) ("[I]mposing a test that demands overly specific analogues has serious
problems.").

The Court also explained that "the appropriate analysis involves considering
whether the challenged regulation is consistent with the principles that underpin
our regulatory tradition."  *Rahimi*, 144 S. Ct. at 1898 (majority opinion); *see also*
*id*. at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands
a wider lens:  Historical regulations reveal a principle, not a mold.").  In
ascertaining those principles, moreover, it is appropriate to consider post-
ratification laws and practices.  *See, e.g.*, *id*. at 1900 (majority opinion); *id*. at 1916
(Kavanaugh, J., concurring) ("post-ratification history" can "be important for
interpreting vague constitutional text and determining exceptions to individual
constitutional rights").  Indeed, *Rahimi* relied on surety laws enacted in the mid-
nineteenth century, long after ratification of the Second Amendment, to define the

24

relevant regulatory principle in that case.  *See id.* at 1900 (majority opinion) (citing *Bruen*, 597 U.S. at 56 & n.23 (citing laws enacted between 1838 and 1868)).

Applying this methodology, the *Rahimi* Court had "no trouble concluding" that the historical analogues invoked by the government were sufficient to justify the challenged law, *Rahimi*, 144 S. Ct. at 1902 (majority opinion), even though those analogues were "by no means identical" to section 922(g)(8)(C)(i), *id*. at 1902; *see also id* at 1897–98 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.").  Among those analogues, the Court relied on territorial regulations, confirming that such laws may be appropriately relied on in *Bruen*'s historical analysis.  *Id*. at 1900 (citing *Bruen*, 597 U.S. at 56 & n.23).

In her concurrence, Justice Barrett outlined two "serious problems" with an overly strict approach to *Bruen*'s historical analysis:  (1) it "forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber'" and (2) "it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority."  *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring); *see also id*. at 1905 (Sotomayor, J., concurring) (recognizing that under the dissent's more rigid approach, "the legislatures of today would be limited not by a distant generation's

determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary").

## B.   The Historical Record Reflects a Robust Tradition of Regulating Particular Weapons that Threaten Public Safety

As explained, the district court below held that silencers were not presumptively protected by the Second Amendment, thus finding it unnecessary to evaluate California's prohibition under the second step of the *Bruen* framework. 1-SER-8 n.3.  Still, even a cursory review of the historical record reveals that California's law fits well within the Nation's regulatory tradition.[4]  Governments have long adopted historical regulations that either curtail use or outright ban possession of particular weapons and accessories, where the instrument poses a heightened danger to society, so long as the restriction did not destroy the right to armed self-defense by leaving available other weapons for constitutionally protected uses.[5]

---

[4] As addressed above and acknowledged by plaintiff before the district court, *see* 2-SER-25, this case concerns a firearm accessory.  In conducting *Bruen*'s "analogical inquiry," where the Nation's historical tradition shows a robust state police power to limit or ban dangerous and unusual weapons, it necessarily follows that a State may also, consistent with the Second Amendment, ban an accessory that enhances the lethality of a firearm or renders it prone to criminal misuse.

[5] *See* John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874) ("It would seem to follow that . . . while society may *regulate* this right . . . so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and most odious form of tyranny."); *id.* at 287 ("On the

(continued…)

In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599). That "*pre-existing* right" was "not unlimited." *Id.* at 20-21 (quoting *Heller*, 554 U.S. at 592, 626). As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to protect the peace. 1 Blackstone, *Commentaries on the Laws of England* 139 (1769).[6] The English Bill of Rights—"the predecessor to our Second Amendment"—guaranteed a right for certain subjects to "'have Arms for their Defence suitable to their Conditions, *and as allowed by Law*.'" *Heller*, 554 U.S. at 593 (quoting 1 Wm. & Mary, ch. 2, § 7 (1689)) (emphasis added); *see also* 1 Blackstone, *Commentaries* 139. The phrase "as allowed by law" authorized governments to "restrain the use of *some particular sort of arms*." Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17–18 (1782).

---

one hand . . . society cannot justly require the individual to surrender and lay aside the means of self-protection in seasons of personal danger . . . . On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.").

    [6] *See also United States v. Wood*, 299 U.S. 123, 138 (1936) ("Undoubtedly, as we have frequently said, the framers of the Constitution were familiar with Blackstone's Commentaries.").

For example, the Crown restricted especially dangerous weapons like launcegays, pocket pistols, and crossbows to preserve the public order. *Bruen*, 597 U.S. at 41–42; *see, e.g.*, 7 Rich. 2, ch. 13 (1383); 33 Hen. 8, ch. 6, §§ 1–2, 18 (1541). The focus on launcegays in medieval England "ma[de] sense" given that "lances were generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute [of Northampton] show—to breach the peace." *Bruen*, 597 U.S. at 41. And Henry VIII's ban on the possession of crossbows and pocket pistols sought "to protect the public" from the proliferation of those weapons and their use in "detestable and shameful murders, robberies, felonies, riot and route." Schwoerer, *Gun Culture in Early Modern England* 59 (2016) (internal quotation marks omitted); *see also id.* at 55 (noting Henry VIII's concern with "the newfangled and wanton pleasure that men now have in using of crossbows and handguns" (internal quotation marks omitted)).

That English tradition continued in America throughout each of the periods that *Bruen* identified as relevant to its historical inquiry. *See Bruen*, 597 U.S. at 46–70. Colonial and state governments imposed regulations on firearms hardware, accessories, and other weapons deemed to pose threats to public safety at the time. During the colonial and founding era, most violent crimes were committed with weapons such as clubs, dirks, and daggers. *See Bevis v. City of Naperville* (*Bevis I*), 657 F. Supp. 3d 1052, 1070 (N.D. Ill. 2023) ("As early guns proved

28

unreliable, many citizens resorted to clubs and other blunt weapons.").[7]  States and

colonies "responded to the proliferation of these weapons."  *Id.*  In 1686, for

example, after a period of internal "strife and excitement," *Bruen*, 597 U.S. at 48

(internal quotation marks omitted), East New Jersey prohibited the concealed

carrying of "pocket pistol[s], skeins, stilladers, daggers or dirks, or other unusual

or unlawful weapons," An Act Against Wearing Swords (1686), *reprinted in The*

*Grants, Concessions, and Original Constitutions of the Province of New Jersey*

289–90 (1881).  Other colonies and early States prohibited the carrying of clubs

and similar weapons increasingly used as fighting instruments.  *See Bevis I*, 657 F.

Supp. 3d at 1070 (detailing restrictions).[8]  The Conductor Generalis—a founding-

---

[7] During the colonial and founding period, governments also heavily
regulated certain firearms and firearm accessories when those items posed
heightened dangers to public safety.  In 1771, for instance, New Jersey prohibited
the keeping of firearms configured as trap guns, which used string or wire so that a
loaded firearm would discharge automatically when a trap was sprung.  *See* 1763-
1775 N.J. Laws 346, ch. 539, § 10 ("Penalty for setting loaded Guns").  That "most
dangerous" (*id.*) weapon configuration "[i]nevitably . . . wound up hurting or
killing innocent[]" bystanders who set off the trap.  Robert J. Spitzer,
*Understanding Gun Law History After Bruen: Moving Forward by Looking Back*,
51 Fordham Urb. L.J. 57, 101 (2023).

[8] *See, e.g.*, 1750 Mass. Acts 544, ch. 17, § 1 (prohibited the carry of "clubs
or other weapons" in a group of 12 or more); 1786 Mass. Acts 87, ch. 38 (same);
1788-1801 Ohio Laws 321, 323 (prohibited the carry of any "dangerous weapon"
while committing a burglary); An Act to Describe, Apprehend and Punish
Disorderly Persons § 2 (1799), *reprinted in* Laws of the State of New Jersey 474
(Nettleton ed., 1821) (prohibited the carry of any pistol, hanger, cutlass, bludgeon,
or other "offensive weapon" with intent to commit assault).

era guide for justices of the peace, sheriffs, and constables that relied heavily on the 1791 treatise of William Hawkins on English law—provided that the public offense of an "affray" could be committed "where there is no actual violence," such as "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[9]

Similar restrictions on particularly dangerous weapons and devices existed during the antebellum and postbellum period, around the time that the Fourteenth Amendment was ratified. As explained in one of the most important early American firearms cases, *State v. Reid*, 1 Ala. 612 (1840), the Second Amendment left "with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals." *Id.* at 616. The Supreme Court in *Bruen* recognized as much, citing the Arkansas Supreme Court's approval of a state law (modeled on an earlier approach taken in Tennessee) that prohibited public carry of handguns broadly based on their dangerousness, while reserving an explicit exception that allowed for carry of

---

[9] The Conductor Generalis: Or, the Office, Duty, and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-Men, and Overseers of the Poor, and also The Office of Clerks of Assize, and of the Peace, & c., Albany, 1794, at 26.

military-style revolvers.  *Bruen*, 597 U.S. at 53 n.20 (citing *Fife v. State*, 31 Ark. 455 (1876)).[10]

This era also saw widespread limitations on the carry and possession of particular "melee weapons" as they became prevalent and imperiled public safety due their unique dangerousness.  *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 664 F. Supp. 3d 584, 600–01 (D. Del. 2023).  For example, among other melee weapons regulated during the nineteenth century, states heavily regulated the sale and possession of slungshots—hand-held impact weapons with a weighted object at the end of a flexible strap.  New York and Vermont passed laws in 1849 prohibiting the manufacture, sale, and possession of slungshots.[11]  Massachusetts banned the manufacture or sale of slungshots in 1850, followed by Kentucky in 1855, Florida in 1868, and the Dakota Territory in 1877.[12]  Texas and Arizona banned carry of slungshots in 1871 and 1889

---

[10] *See* 1879 Tenn. Pub. Acts 135, ch. 96, § 1 (banning types of pistols); 1883 Tenn. Pub. Acts 17, ch. 13, § 1 (banning the conveying of pistol cartridges); 1903 S.C. Acts 127–28, No. 86 (banning the carry of certain short pistols).

[11] 1849 N.Y. Laws 403–04, ch. 278, §§ 1–2; 1849 Vt. Acts & Resolves 26, No. 36, §§ 1–2.

[12] 1850 Mass. Gen. Stat. ch. 194, § 2; 1855 Ky. Acts 96, ch. 636, § 1; 1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892); 1877 N.D. Laws 794, § 45.

respectively, while Illinois banned possession and sale in 1881, and Oklahoma

banned both manufacture and carry in 1890.[13]

Another melee weapon that rose to prominence during this period was the

"Bowie knife," a weapon used by Jim Bowie in a duel that later became

widespread in the 1830s.  *See DSSA*, 664 F. Supp. 3d at 600.  The Bowie knife

"gained notoriety as a 'fighting knife.'"  *Bevis I*, 657 F. Supp. 3d at 1068; *see also*

*Or. Firearms Fed'n*, 682 F. Supp. 3d at 930–31.  By 1840, at least five states or

territories had enacted laws restricting the carrying of Bowie knives or other

fighting knives.  *Bevis I*, 657 F. Supp. 3d at 1068–69.  A 1837 Georgia law made it

unlawful "to sell, or offer to sell" a "Bowie" knife, "or to keep, or have [such a

knife] about their person or elsewhere."[14]  Other laws substantially restricted the

---

[13] 1871 Tex. Laws 25, § 1; 1889 Ariz. Sess. Laws Act 13, §§ 1–2; 1881 Ill.
Laws 73, § 1; 1890 Okla. Sess. Laws 475-76, §§ 18–19; *see* 1917 Cal. Stat. 221,
ch. 145, §§ 1–3 (banning manufacture and possession of certain weapons,
including slungshots).

[14] 1837 Ga. Acts 90, § 1.  Although the George Supreme Court held that the
law's carry restrictions as to pistols violated the Second Amendment in *Nunn v.
State*, 1 Ga. 243 (1846), "*Nunn* did not concern, let alone mention, the law's
separate prohibition addressing the sale of weapons; nor did it reach beyond
'pistols' to address dangerous-and-unusual weapons like bowie knives.  Therefore,
this separate clause of the Georgia law remains a valid analogue to modern-day
regulations on modern-day dangerous-and-unusual weapons."  *Rupp v. Bonta*,
2024 WL 1142061, at *24 (C.D. Cal. Mar. 15, 2024); *see also Hill v. State*, 53 Ga.
472 (1874) (disagreeing with *Nunn* and concluding that pocket pistols, dirks,
Bowie knives, and "those other weapons of like character" fall outside the scope of
the right to keep and bear arms).

use of Bowie knives, such as bans on sale in Tennessee and Arkansas, and an Alabama law that taxed them at a prohibitive rate.[15]  Nearly every state enacted a law restricting Bowie knives by the end of the nineteenth century, whether by outlawing their possession, carry, or sale; enhancing criminal penalties; or taxing their ownership.  *See Bevis I*, 657 F. Supp. 3d at 1069; *DSSA*, 664 F. Supp. 3d at 601–02 (Bowie knife regulations were "extensive and ubiquitous" after such knives "proliferated in civil society" (internal quotation marks omitted)).[16]

As new technologies developed, twentieth century laws continued this historical tradition of restricting access to particular weapons and accessories with heightened lethality.[17]  As to silencers specifically, the historical record indicates that such devices were considered particularly dangerous from the outset of their

---

[15] *See* 1837-1838 Tenn. Pub. Act 200, ch. 137, § 1; 1881 Ark. Acts 191, §§ 1–3; 1837 Ala. Acts 7, No. 11, § 2.

[16] *See e.g.*, 1871 Tex. Laws 25, § 1 (banning carry); 1889 Ariz. Sess. Laws Act 13, §§ 1–2 (same).

[17] In *Bruen*, the Supreme Court focused its historical analysis on the periods surrounding the ratification of the Second and Fourteenth Amendments, specifically rejecting the probative value of public carry laws passed in the twentieth century as contradictory of evidence from those earlier times.  *See Bruen*, 597 U.S. at 66 n.28.  Because there is no such contradiction with respect to dangerous and unusual weapons regulations, restrictions on newly invented twentieth century weaponry, including silencers, are relevant here.  *See Rahimi*, 144 S. Ct. at 1916 (Kavanaugh, J., concurring) (where "reasonably consistent and longstanding," "post-ratification history—sometimes referred to as tradition—can also be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights").

invention.  As the court in *Comeaux* recounted, states began to ban their sale or possession shortly after they were patented in 1908.  *Comeaux*, 2024 WL 115929, at *3; *see, e.g.*, 1909 Me. L., ch. 129, p. 141; 1911 N.J. Laws, ch. 128, p. 185; 1912 Vt. Acts & Resolves, No. 237, p. 310; 1913 Minn. L., ch. 64, p. 55; 1916 N.Y. Laws 338–39, ch. 137, § 1; 1926 Mass. Acts 256, ch. 261; 1927 Mich. Pub. Acts, No. 372, pp. 888–89; 1927 R.I. Pub. L., ch. 1052, p. 259.  California followed suit in 1933, enacting the predecessor to the ban now challenged in this lawsuit.  *See* 1933 Cal. Stat., ch. 39, pp. 329–30.  By the time the National Firearms Act was enacted in 1934—a law that, itself, placed strict restrictions on various dangerous weapons, including silencers—at least 15 states had imposed restrictions on the sale or possession of silencers.  *Comeaux*, 2024 WL 115929, at *3.[18]

## C.    California's Prohibition on Silencers Is Consistent with Regulatory Tradition

The historical regulation of particularly dangerous weapons confirms the principle that governments can, consistent with the Second Amendment, regulate particularly dangerous weapons that imperil public safety, so long as alternative weapons remain available for self-defense.  California's prohibition on silencers is consistent with that principle because it is "relevantly similar" to this unbroken history of restrictions on possession and use of particular weapons as they emerged

---

[18] Among other weapons, the National Firearms Act banned possession of fully automatic machineguns.  *See Garland v. Cargill*, 602 U.S. 406, 410 (2024).

and threatened public safety. *Bruen*, 597 U.S. at 29; *see id.* at 21; *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44–48 (1st Cir. 2024) (concluding historical regulations of particularly dangerous weapons were "relevantly similar" to modern bans on large-capacity magazines).

To the extent California Penal Code Section 33410 imposes any burden at all on the right to armed self-defense, that burden is no greater than that imposed by the historical analogues detailed above because it restricts possession of a particularly dangerous item, but otherwise allows law-abiding citizens access to a range of other weapons to exercise their right to armed self-defense. *See Bruen*, 597 U.S. at 29. The prohibition's justification is likewise "comparable" to this body of historical regulations because, like these analogues, the prohibition turns on the unique dangerousness of the regulated item, especially when used for criminal purposes. *Id.* Indeed, as explained above, the innate characteristics and function of a silencer implicate a substantially heightened risk of lethality when used as designed because it helps conceal the shooter's location and the fact that shots have been fired. *Comeaux*, 2024 WL 115929, at *3. The purpose of regulating silencers is thus highly analogous to the regulation of concealable weapons in the nineteenth century, which also "aimed at limiting what was viewed as a particularly dangerous feature of [pocket pistols]: their design as being readily

concealable, which was viewed as rendering them more deadly." *Or. Firearms Fed'n*, 682 F. Supp. 3d at 906.

Although he does not address this point in his opening brief, plaintiff argued in the district court that the historical weapons regulations detailed above are not "relevantly similar" to California's prohibition. 2-SER-13–15. He asserted, for example, that "[s]ilencers are nothing like a 'slung shot.'" 2-SER-15 (citing 1849 N.Y. Laws 403–04, ch. 278, §§ 1–2; 1849 Vt. Acts & Resolves 26, No. 36, §§ 1–2). But *Bruen*'s step-two analysis does not require that a historical analogue be a "'dead ringer,'" but rather, focuses on whether the compared regulations are supported by a consistent underlying principle. *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29–30). Possession bans for slungshots are "relevantly similar" to California's silencer ban because both stem from legislative determinations that the item in question is exceedingly dangerous and should not be possessed by members of the public. *Rahimi*, 144 S. Ct. at 1901; *Bruen*, 597 U.S. at 29–30. Moreover, even if California's prohibition is not "distinctly similar" to the historical analogues outlined above, silencers—which were first patented in 1908—constituted the type of "'dramatic technological change[]'" in firearm accessories that calls for a "'more nuanced approach'" to *Bruen*'s historical inquiry. *Wolford v. Lopez*, 116 F.4th 959, 977 (9th Cir. 2024) (quoting *Bruen*, 597 U.S. at 27). In short, the challenged prohibition is consistent with regulatory

36

tradition because it stands on a principle common among all of the historical analogues:  exceedingly dangerous weapons may be restricted and banned.

Accordingly, the historical record demonstrates that California's ban on silencers—to the extent it poses any burden on the right to armed self-defense—is constitutionally permissible.  *Bruen*, 597 U.S. at 26–31.  Plaintiff's Second Amendment challenge to California's restrictions on silencers cannot succeed as a matter of law.

## CONCLUSION

The Court should affirm the district court's judgment dismissing plaintiff's complaint.

Dated:  December 20, 2024                  Respectfully submitted,

                              /s/ Kevin L. Quade
                              _____

                              ROB BONTA
                              *Attorney General of California*
                              THOMAS S. PATTERSON
                              *Senior Assistant Attorney General*
                              R. MATTHEW WISE
                              *Supervising Deputy Attorney General*
                              KEVIN L. QUADE
                              *Deputy Attorney General*
                              *Attorneys for Defendant and Appellee*

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

Dated:  December 20, 2024        Respectfully submitted,

                 */s/ Kevin L. Quade*

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
KEVIN L. QUADE
*Deputy Attorney General*
*Attorneys for Defendant and Appellee*

38

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)**   24-5566

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[   ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ X ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Gary R. Sanchez
5941 Rio Valle Dr.
Bonsall, CA 92003
In pro per

**Description of Document(s)** *(required for all documents)*:

APPELLEE'S ANSWERING BRIEF
APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD
CIRCUIT RULE 28-2.7 ADDENDUM TO APPELLEE'S ANSWERING BRIEF

**Signature**   s/ Kevin L. Quade            **Date**   12/20/24

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-5566

I am the attorney or self-represented party.

**This brief contains** 8,913 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Kevin L. Quade   **Date** 12/20/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)**  | 24-5566

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Gary R Sanchez
5941 Rio Valle Dr.
Bonsall, CA 92003

**Description of Document(s)** *(required for all documents)*:

Appellee's Answering Brief

**Signature** | /s/ Kyle Nicholson          **Date** | Dec 20, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                              *Rev. 12/01/2018*