No. 24-5566

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GARY R. SANCHEZ,

*Plaintiff-Appellant*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California

*Defendant-Appellee.*

Appeal from the Southern District of California
Civil Case No. 3:24-cv-00767-RSH-MSB
(Honorable Robert S. Huie)

## REPLACEMENT OPENING BRIEF OF PLAINTIFF-APPELLANT

C.D. Michel
Anna M. Barvir
Konstadinos T. Moros
Michel & Associates, PC
180 E Ocean Boulevard
Suite 200
Long Beach, CA 90802
cmichel@michellawyers.com

David H. Thompson
Peter A. Patterson
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

March 28, 2025

*Attorneys for Plaintiff Gary R. Sanchez*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................. 1

JURISDICTION ............................................................................... 5

STATEMENT OF THE ISSUES ........................................................ 5

STATUTORY ADDENDUM STATEMENT ......................................... 5

STATEMENT OF THE CASE ........................................................... 5

   I.    Factual Background ................................................................ 5

      A. Firearm Suppressors Are Safe, Effective, and Widely Used by Law-Abiding Citizens. ....................................................... 5

      B. California Prohibits and Criminalizes Suppressors, Even for the Common Uses of Hearing Protection and Firearm Safety. ....................................... 9

  II.   Procedural Background .......................................................... 10

STANDARD OF REVIEW .............................................................. 11

SUMMARY OF ARGUMENT ......................................................... 11

ARGUMENT ................................................................................ 14

   I.    Firearms Outfitted with Suppressors Are Arms Entitled to Second Amendment Protection .......................................... 14

      A. Suppressors Are Entitled to Second Amendment Protection Under a Straightforward Application of Text and Supreme Court Precedent ............................................. 14

      B. Suppressors Would Satisfy Even the State's Own "Utility" Test, Which Finds No Basis in Text or Supreme Court Precedent ............. 24

i

II.     Even if Firearms Outfitted with Suppressors Are not Arms, Suppressors
        Should Still be Protected by the Second Amendment. ..................................34

III.    The State Cannot Justify Its Criminal Ban on Safe and Commonly Used
        Suppressors. ..................................................................................................37

CONCLUSION ..................................................................................................42

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Andrews v. State*,
    50 Tenn. 165 (1871) ..................................................................................36, 37

*Bondi v. VanDerStok,*
    604 U. S. ____, slip op. (2025) ...........................................................2, 16

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ..............................................................................22

*D'Augusta v. Am. Petroleum Inst.*,
    117 F.4th 1094 (9th Cir. 2024) ...........................................................11

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ........................2, 3, 4, 11, 14, 15, 21, 22, 25, 26, 27, 32

*Duncan v. Bonta*
    No. 23-55805, 2025 WL 867583
    (9th Cir. Mar. 20, 2025) .............12, 13, 16, 17, 18, 19, 20, 23, 37, 38, 39, 40

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...............................................................36

*Luis v. United States*,
    578 U.S. 5 (2016) .................................................................................34

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
    590 U.S. 336 (2020) .............................................................................36

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ........................2, 3, 4, 11, 14, 15, 25, 26, 27, 34, 35, 37, 38

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) ...........................................................22

*United States v. McCartney*,
    357 F. App'x 73 (9th Cir. 2009) .........................................................21

*United States v. Peterson*,
    127 F.4th 941 (5th Cir. 2025) .............................................................23

*United States v. Rahimi*,
    602 U.S. 680 (2024) ................................................................2, 11, 34, 35

*United States v. Saleem*,
    No. 23-4693, 2024 WL 5084523 (4th Cir. Dec. 12, 2024) ....................22, 23

*Yukutake v. Lopez*,
    No. 21-16756, 2025 WL 815429 (9th Cir. Mar. 14, 2025)....3, 33, 34, 35, 36

## Constitutional Provisions, Statutes, and Rules

18 U.S.C.
    § 921(a)(3)....................................................................................16

CAL. PENAL CODE
    § 17210......................................................................................9, 10
    § 33410 .........................................................................................9

U.S. CONST. amend. II................................................................................14

Ninth Cir. R. 28-2.7....................................................................................5

## Other Authorities

*About Us*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY,
    https://perma.cc/T364-YTFL ...................................................30

Brief of Violence Pol'y Ctr. & Police Chiefs of L.A., Minneapolis, and Seattle as
    *Amici Curiae* Supporting Petitioners, *District of Columbia v. Heller* (Jan. 11,
    2008) (No. 07-290), 2008 WL 136348 ......................................25

Colleen G. Le Prell, *An overview of HPDs, new legislation, and recommendations
    for rifles with silencers*, HEARING REV. (Dec. 2017),
    https://perma.cc/7LRE-WB92....................................................28

David Kopel, *The Hearing Protection Act and 'silencers'*, WASH. POST (June 19,
    2017), https://perma.cc/FYQ7-D7E3 .........................................6

*Do Suppressors Reduce Recoil?*, SILENCER SHOP,
    https://perma.cc/K864-N7RF ....................................................33

Edward Lobarinas et al., *Differential effects of suppressors on hazardous sound
    pressure levels generated by AR-15 rifles: Considerations for recreational
    shooters, law enforcement, and the military*, 55 INT'L J. AUDIOLOGY S59
    (2016) ...............................................................................8, 31, 32

*Firearms Commerce in the United States: Annual Statistical Update 2021*, BATFE
    (2021), https://perma.cc/9FXV-62FU......................................6, 22

Glenn Kessler, *Are firearms with a silencer 'quiet'?*, WASH. POST (Mar. 20, 2017),
    https://perma.cc/757W-YHUF .............................................7, 8, 28

*How do flashbangs work?*, CHARLOTTE EYE EAR NOSE & THROAT ASSOCS., P.A.
    (Mar. 11, 2020), https://perma.cc/3EMX-JBYT .....................32, 33

*How to Use the Noise Reduction Rating (NRR)–Fact and Fiction*, 3M EDUC. (2000), https://perma.cc/WL5V-T85S .........................................................29

Brian J. Fligor, *Prevention of Hearing Loss from Noise Exposure*, BETTER HEARING INST. (2011), https://perma.cc/TE5F-4PU8 ..........................6, 7, 40

Lila Chen & Scott E. Brueck, *Noise & Lead Exposures at an Outdoor Firing Range – California*, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH (Sept. 2011), https://perma.cc/6ED7-E99T .......................................................4, 31

Matthew P. Branch, *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, 144(6) OTOLARYNGOL HEAD NECK SURG. 950 (2011) ..............................................................................................8, 30, 31

*Maxim 9 Instruction Manual*, SILENCERCO, https://perma.cc/3VKZ-6CXN ..........15

Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*, NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://perma.cc/Q5SK-CLLT.....................................................................31

*Noise and Hearing Loss*, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH, https://perma.cc/Q47D-LJPU.................................................................7, 29

*Noise Sources and Their Effects*, PURDUE UNIV., https://perma.cc/5T4B-5JC3 .................................................................7, 27

*Noise-Induced Hearing Loss*, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH, https://perma.cc/2HKQ-UH4C ....................................................................28

Opening Brief for the United States, *United States v. Morgan*, No. 24-3141 (10th Cir. Dec. 12, 2024) ................................................................................22

Paul A. Clark, *Criminal Use of Firearm Silencers*, 8(2) W. CRIMINOLOGY REV. 44 (2007), https://perma.cc/75DJ-YP8K .........................................................40

*Relative Sound Pressure Levels in Decibels (dB) of Firearms*, NAT'L GUN TRS., (July 21, 2017), https://perma.cc/T6KB-9GWU....................................32, 33

Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations*, ATF (Jan. 20, 2017), https://perma.cc/JXF5-CULT ............19, 38, 39, 40, 41

Silencer Central Team, *How Loud is a Gunshot? Gun DB Levels Compared*, SILENCER CENT. (Sept. 11, 2019), https://perma.cc/E6PK-W2C7.................9

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33 (2016) ...................................7

*Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY (Nov. 18, 2024), https://perma.cc/A9EA-Z95P .................30

v

*Suppressor Owner Study*, NSSF (2025), https://perma.cc/Q893-JMJT .............. 6, 38

William J. Murphy et al., *Developing a Method to Assess Noise Reduction of Firearm Suppressors for Small-Caliber Weapons*, 33 POMA 1 (2018), https://perma.cc/3F7F-ZNCL ....................................................................... 29

William Murphy et al., *The reduction of gunshot noise and auditory risk through the use of firearm suppressors and low-velocity ammunition*, 57 INT'L J. AUDIOLOGY S28 (2018), https://perma.cc/FSE3-SXGR ........................ 27, 28

## INTRODUCTION

Firearm suppressors—which reduce but do not eliminate the noise emitted from a firearm—support the safe and effective use of a firearm and are commonly used for lawful purposes in the United States. They are legal to possess in the vast majority of states, and millions are possessed by law-abiding Americans for lawful purposes, including to prevent irreversible hearing damage from firearm use in training, self-defense, and hunting. Indeed, the Federal Government has described suppressors as the *only* truly effective means of preventing hearing damage while using a firearm. The hearing protection of a firearm outfitted with a suppressor serves critical self-defense functions, ensuring that an individual defending self, family, and home can prevent the temporary deafness or disorientation caused by a firearm blast. This allows an individual exercising the constitutional right to self-defense to hear an intruder and communicate effectively with family members and the authorities. Suppressors also facilitate training with firearms by reducing the sound of firearms and therefore protecting the hearing of everyone in a training facility.

Even still, California has enacted a flat prohibition on the possession of these commonly used and safe instruments—even when properly registered and taxed under the federal National Firearms Act ("NFA"), a process that requires a thorough background check. Under the NFA, which imposes a narrow definition of what

1

qualifies as a "firearm," suppressors are firearms subject to the Act's requirements. *See Bondi v. VanDerStok,* 604 U.S. \_\_\_\_, slip op. at 2 (2025) (Thomas, J., dissenting) ("The NFA defined 'firearm' narrowly. The term covered only certain short-barreled shotguns or rifles, machineguns, and silencers or mufflers."). Unfortunately, by rendering the possession of suppressors a felony crime, California has banned an entire class of arms.

Meanwhile, the Supreme Court has repeatedly explained that the Second Amendment prohibits states from banning arms in common use. *See United States v. Rahimi*, 602 U.S. 680 (2024); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Supreme Court has broadly defined the Second Amendment's reach to include all instruments of defense—which necessarily includes instruments like suppressors, which affect the functionality of a firearm.

The district court below erred in dismissing Mr. Sanchez's complaint. California's suppressor ban is unconstitutional under a straightforward application of *Bruen* and *Heller*. Under *Bruen*, the first task when confronting a Second Amendment claim is to determine whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24. Here, the relevant conduct is possessing a firearm equipped with a suppressor. And possessing a firearm equipped with a suppressor is conduct protected by the plain text of the Second Amendment

2

because a firearm equipped with a suppressor is an "arm" subject to the Second Amendment's protections.

As the Supreme Court has explained, an "arm[]" includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (quoting TIMOTHY CUNNINGHAM, 1 A NEW AND COMPLETE LAW DICTIONARY (1771)). What is more, the Second Amendment as a matter of plain text covers "*all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582) (emphasis added). Under this binding interpretation of the Second Amendment, a firearm equipped with a suppressor is an arm. And a suppressed firearm is the correct object of analysis—California bans suppressors only because of their operation with firearms; indeed, outside of that operation they have no utility. Thus, by banning suppressors, California really is banning suppressed firearms.

In the alternative, California's ban implicates the plain text of the Second Amendment because the use of a suppressor facilitates the safe and effective use of firearms and, as this Court recently confirmed, activities without which the Second Amendment "wouldn't mean much" are protected even if not within the literal words of the Amendment. *Yukutake v. Lopez*, No. 21-16756, 2025 WL 815429, at *11 (9th Cir. Mar. 14, 2025) (internal quotation marks omitted). And just as the Second

3

Amendment wouldn't mean much without the ability to acquire a firearm, it also wouldn't mean much without the ability to fire a firearm without threatening a person's hearing.

Because the State's ban implicates conduct covered by the plain text of the Second Amendment, the State bears the burden to justify its law as consistent with our Nation's history of firearm regulation. The State cannot carry that burden. Under *Heller* and *Bruen*, the *only* arms that may constitutionally be banned are certain "'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). Firearms equipped with suppressors are neither. Quite the opposite—they make firearm use *safer*. So too, they are widely popular among law-abiding Americans. The reason for the popularity of firearm suppressors is plain: they reduce the sound of a firearm and therefore protect the hearing of individuals and those around them when a firearm is used for lawful purposes such as training, self-defense, or hunting. Indeed, the Federal Government itself has described suppressors as "[t]he *only* potentially effective noise control method to reduce . . . noise exposure from gunfire." Lila Chen & Scott E. Brueck, *Noise & Lead Exposures at an Outdoor Firing Range – California* at 5, Nat'l Inst. Occupational Safety & Health (Sept. 2011), https://perma.cc/6ED7-E99T (emphasis added). Because firearms equipped with suppressors are not dangerous and unusual, they cannot be banned.

4

Because California's ban on firearms outfitted with suppressors fails Second Amendment scrutiny, this Court should reverse.

## JURISDICTION

This Court has jurisdiction over the district court's final judgment under 28 U.S.C. § 1291. The district court entered final judgment on August 28, 2024. 1-SER-003–09. The district court had jurisdiction under 28 U.S.C. § 1331. Mr. Sanchez timely noticed this appeal on September 4, 2024. 2-SER-034–39.

## STATEMENT OF THE ISSUES

1. Whether California's ban on the possession of firearm suppressors violates the Second Amendment.

## STATUTORY ADDENDUM STATEMENT

Pertinent constitutional provisions and statutes are set forth in the statutory addendum. *See* Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    Firearm Suppressors Are Safe, Effective, and Widely Used by Law-Abiding Citizens.

Suppressors are not a new technology. Historically, the first commercially successful suppressor was invented by Hiram Percy Maxim around 1902. The "Maxim Silencer" was regularly advertised in sporting goods magazines of the era, and had famous customers such as President Theodore Roosevelt, who affixed a

5

Maxim's suppressor to his Winchester rifle. *See* David Kopel, *The Hearing Protection Act and 'silencers'*, WASH. POST (June 19, 2017), https://perma.cc/FYQ7-D7E3.

Today, as the Complaint alleges, suppressors "are overwhelmingly used by law abiding citizens for lawful purposes." 2-SER-025. Suppressors are exceedingly popular in the United States. They are legal to possess in the vast majority of states, and the number registered with the ATF has increased from 2.6 million as of 2021 to nearly 3.5 million as of early 2024 and to 4.5 million as of December 2024. *See Firearms Commerce in the United States: Annual Statistical Update 2021* at 16, BATFE (2021), https://perma.cc/9FXV-62FU; Response to ATF Freedom of Information Act Request #2024-00802, 14-3 at 14 (Dec. 20, 2024); *Suppressor Owner Study*, NSSF (2025), https://perma.cc/Q893-JMJT.

Suppressors are popular for good reason. They are specifically designed to reduce the concussive force and volume of sound produced by a firearm, which helps to prevent ear damage for those near a firearm when it is fired. *See* Brian J. Fligor, *Prevention of Hearing Loss from Noise Exposure* at 8, BETTER HEARING INST. (2011), https://perma.cc/TE5F-4PU8. Sound intensity is measured in decibels, and it denotes the amount of pressure a noise produces on a listener's eardrum. Decibels operate on a logarithmic scale, so that a sound that is just three decibels louder produces twice the intensity, and a ten-decibel difference denotes a sound that

produces ten times as much intesnity. In terms of sound perception, a ten-decibel increase is perceived as a doubling of loudness. That means, for example, that a 70-decibel sound, like a vacuum cleaner, is perceived as only half as loud as an 80-decibel sound like a garbage disposal. *Noise Sources and Their Effects*, PURDUE UNIV., https://perma.cc/5T4B-5JC3.

"[D]espite movie fantasies[,] a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 36 (2016). Suppressed firearms are, in fact, still quite "loud." *Id.* at 35. For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren, Fligor, *supra*, at 8, and the 132 decibels generated by a suppressed AR-15 rifle are comparable to a jackhammer, *see* Glenn Kessler, *Are firearms with a silencer 'quiet'?*, WASH. POST (Mar. 20, 2017), https://perma.cc/757W-YHUF.

While suppressed firearms are loud, they are not as loud as their unsuppressed counterparts; in general, a suppressor will reduce sound intensity by about 30 decibels. *See id*. Given that the CDC warns that even momentary exposure to sounds over 140 decibels risks hearing loss, *Noise and Hearing Loss*, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH, https://perma.cc/Q47D-LJPU, the sound

reduction produced by suppressors is an important component of the safe use of firearms.

To be sure, personal protective equipment like earplugs or earmuffs can be worn to mitigate hearing damage. *See* Kessler, *supra*. But suppressors make the use of firearms safer for several reasons. As a practical matter, suppressors are far more effective than personal protective equipment, which can more easily be used improperly. *See* Matthew P. Branch, *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, 144(6) OTOLARYNGOL HEAD NECK SURG. 950, 951 (2011) (finding that across 20 published studies of noise suppression, "laboratory NRRs [Noise Reduction Ratings] consistently overstated the real-world NRRs by 140% to 2000%").

In addition to their greater efficacy, suppressors bring other advantages in the safe use of firearms. First, suppressors protect *other people*, not just the shooter, by reducing sound intensity at the source. Indeed, suppressors can be even more effective for bystanders than they are for shooters. *See* Edward Lobarinas et al., *Differential effects of suppressors on hazardous sound pressure levels generated by AR-15 rifles: Considerations for recreational shooters, law enforcement, and the military*, 55 INT'L J. AUDIOLOGY S59, S63 (2016) (showing greater reduction in decibels one meter to the left of the muzzle than at the shooter's right or left ear). Second, a firearm can be stored with a suppressor attached so that an individual's

8

hearing is protected in the event that the firearm is needed to repel an attacker but there is no time to locate or equip earplugs or muffs, such as during a late-night home invasion, when the need for hearing protection is at its zenith given that a firearm is being fired indoors and the noise cannot disperse as it can in an outdoor setting. *See* Silencer Central Team, *How Loud is a Gunshot? Gun DB Levels Compared*, SILENCER CENT. (Sept. 11, 2019), https://perma.cc/E6PK-W2C7 ("Shooting a gun inside can concentrate the sound and cause a greater impact on the shooter."). Third, suppressors can also aid in recoil management, ensuring that individuals can more safely put follow-up shots on target, especially in self-defense scenarios.

### B. California Prohibits and Criminalizes Suppressors, Even for the Common Uses of Hearing Protection and Firearm Safety.

California bans and criminalizes the possession of ordinary and commonly used suppressors, which are legal to possess in the vast majority of States and under federal law. The State makes no exception for suppressors used for lawful purposes, for example for hearing protection, safety, or improved self-defense capabilities. Rather, California Penal Code section 33410 imposes a flat, indiscriminate criminal ban on the possession of suppressors for any purpose in California, even when they are federally registered under the NFA.

Section 33410 provides that anyone who "within this state possesses a silencer is guilty of a felony and upon conviction thereof shall be punished by imprisonment . . . or by a fine not to exceed ten thousand dollars . . . or by both that

9

fine and imprisonment." CAL. PENAL CODE § 33410. Under California Penal Code section 17210, meanwhile, a "silencer" is defined as "any device or attachment of any kind designed, used, or intended for use in silencing, diminishing, or muffling the report of a firearm," including "any combination of parts, designed or redesigned, and intended for use in assembling a silencer or fabricating a silencer and any part intended only for use in assembly or fabrication of a silencer." *Id.* § 17210.

## II.    Procedural Background

In April 2024, Mr. Sanchez applied for federal authorization to legally fabricate and register a firearm suppressor; the ATF denied his application, citing California's criminal ban on suppressors, enacted at Section 33410. 2-SER-026–33. He then filed a pro se complaint for declaratory and injunctive relief, alleging that California's suppressors ban violates the Second and Fourteenth Amendments of the United States Constitution. 2-SER-024–25.

The district court dismissed Mr. Sanchez's pro se complaint and *sua sponte* denied leave to amend. 1-SER-003–09. The court held that suppressors do not qualify for any Second Amendment protection. 1-SER-006–08. Having dismissed all of Mr. Sanchez's claims and denied him leave to amend them, the district court entered final judgment the same day. 1-SER-002.

10

Mr. Sanchez timely appealed, 1-SER-034–35, and is now represented by undersigned counsel.

## STANDARD OF REVIEW

This Court reviews a district court's order granting a motion to dismiss de novo. In "conducting this review, [the Court must] accept all nonconclusory factual allegations in the complaint as true." *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100 (9th Cir. 2024).

## SUMMARY OF ARGUMENT

Suppressors are "arms" under a straightforward application of Supreme Court precedent, and the State cannot muster a sufficient rationale for banning and criminalizing firearm suppressors, which are in common use in the United States and far from "dangerous or unusual."

The district court's contrary holding should be reversed. The district court erred in holding that suppressed firearms are entitled to no constitutional protection whatsoever. The district court's categorical bar exempting firearm "accessories" from the Second Amendment's reach contravenes the tests laid down by the Supreme Court in its Second Amendment cases. *See generally Rahimi*, 602 U.S. 680; *Bruen*, 597 U.S. 1; *Heller*, 554 U.S. 570. The Supreme Court has broadly defined the Second Amendment's reach to include all instruments of defense. Suppressors are critical to the safe and effective use of a firearm in self-defense.

11

Protection from temporary deafness and disorientation serves a vital self-defense purpose, and suppressors are widely considered the *only* effective method for preventing hearing damage from the sound of a firearm.

This Court's recent en banc decision in *Duncan v. Bonta* does not require a different conclusion. No. 23-55805, 2025 WL 867583 (9th Cir. Mar. 20, 2025) (en banc). In fact, *Duncan* highlights the threshold analytical error in the district court's analysis. Unlike the district court, this Court's majority recognized that some firearm accessories *are* entitled to constitutional protection. *See id.* at *7 (recognizing a category of "[p]rotected [a]ccessories"). Suppressors, assuming they are "accessories," fall within that category because even if they are not "arms themselves," they are "necessary to the ordinary functioning of a firearm" because they are the only way to safely and reliably prevent temporary and permanent hearing damage to the bearer and bystanders. *Id.*

Nor does *Duncan* preclude Second Amendment protection for suppressors because suppressors are distinct from magazines capable of holding more than ten rounds (what the majority called "large-capacity magazines) in critical ways, and California's ban on suppressors is likewise distinct from the ban on magazines capable of holding more than ten rounds. Suppressors are critical to the safe use of a firearm without hearing damage, especially in self-defense situations; they are not merely an "optional" upgrade. As to the Court's emphasis on public safety and the

12

harm from mass shootings, suppressors *increase* safety—especially in defending against the criminal wrongdoing that animated the *Duncan* majority—and are rarely used for criminal means. And here, California has banned *all* suppressors, not only certain types or models with heightened or optional functions. Thus, this case is akin to the Court's hypothetical scenario in which the State banned *all* magazines. The Court was right to state that such a situation *would* implicate the Second Amendment, *id.* at *9, and California's ban does here.

Applying the Supreme Court's Second Amendment tests to suppressed firearms, the State will be unable to muster a sufficient historical analogue in our regulatory tradition from the relevant time periods. After all, governments rarely ban instruments of defense that *increase* safety for all parties, including innocent bystanders. The *Duncan* court's historical examples—none of which are even remotely analogous to California's ban at issue in this case and all of which involve an alleged dangerous threat to innocent people—place this conclusion in stark relief.

By banning suppressors, California really is banning suppressed firearms. That, the Second Amendment does not permit.

13

## ARGUMENT

## I.  Firearms Outfitted with Suppressors Are Arms Entitled to Second Amendment Protection.

### A.  Suppressors Are Entitled to Second Amendment Protection Under a Straightforward Application of Text and Supreme Court Precedent

The text of the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

The Supreme Court has articulated the test for determining what conduct falls within the Second Amendment's protection. Under *Bruen*, the first task when confronting a Second Amendment claim is to determine whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17.

In *Heller*, the Supreme Court definitively construed the word "arms" in the Amendment to mean "[w]eapons of offence, or armour of defence," 554 U.S. at 581 (quoting SAMUEL JOHNSON, 1 DICTIONARY OF THE ENGLISH LANGUAGE 106 (4th ed. 1773) (reprinted 1978)). Arms thus include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (quoting Cunningham, *supra*). And in *Bruen*, the Court reaffirmed that these definitions control the textual analysis of the Second Amendment, further noting that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that

14

facilitate armed self-defense." 597 U.S. at 28; *see also Heller*, 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

Thus, to summarize the Supreme Court's precedents: an "arm" includes "*any thing* that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (quoting Cunningham, *supra*) (emphasis added). This includes "*all* instruments that *constitute* bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582) (emphasis added).

A firearm outfitted with a suppressor fits well within this broad definition. The reason is straightforward: such a firearm is a "thing that a man wears for his defence." *Heller*, 554 U.S. at 581. And it is an "instrument[] that constitute[s] [a] bearable arm[ ]." *Bruen*, 597 U.S. at 28. A suppressor is a component part of a safe and effective firearm—sometimes an *integral* component that is not detachable from the rest of the firearm.  For example, the SilencerCo Maxim 9 has a permanently affixed suppressor built into it. Obviously, the Maxim 9 is an "arm." *See Maxim 9 Instruction Manual*, SILENCERCO, https://perma.cc/3VKZ-6CXN.  But whether detachable or not the point remains the same a suppressor is the preferred method to ensure that a firearm user and any bystanders do not suffer hearing damage from the sound emitted by a firearm.

15

Were there any doubt that suppressors fall within the Second Amendment's orbit, federal law explicitly labels suppressors as "firearm[s]." 18 U.S.C. § 921(a)(3); *see also Bondi*, 604 U.S. ____, slip op. at 16 ("The dissent must acknowledge, for example, that standalone . . . 'silencer[s]' qualify as 'firearms,' for the statute tells us so expressly." (citing 18 U.S.C. § 921(a)(3)). To be sure, a statutory definition enacted by Congress and the President cannot change the meaning of the Constitution. But this statutory evidence at least demonstrates that Congress and the Federal Executive Branch's basis for regulating suppressors under federal firearm laws—and prosecuting individuals for unlicensed possession of them—is because firearms equipped with them are a distinct class of firearms.

This Court's recent en banc decision in *Duncan*, which held that California may ban magazines capable of holding more than ten rounds is consistent with the Second Amendment, does not require a different conclusion here for several reasons. To be clear, Mr. Sanchez's does not concede that *Duncan* was correctly decided and preserves for future proceedings his ability to argue that *Duncan* was wrongly decided and is inconsistent with the Supreme Court's Second Amendment precedents. Rather, Mr. Sanchez insists that he should still prevail even under the precedent established by *Duncan*.

First, the *Duncan* majority listed "a silencer" along with certain "optional accessories" like "a high-powered scope for a rifle [and] a gun sling," that "may be

16

attached to a firearm without *necessarily* falling within the scope of the text of the Second Amendment." *Duncan*, 2025 WL 867583, at *10 (emphasis added). But that non-committal language was pure dicta, not a holding, and it is not binding on any future panel. In any case, suppressors are critically different than those accessories and are not properly defined as "optional" in the safe use of a firearm for self-defense. The Court did not consider those arguments, or any of the others at issue in this case, because the question of suppressors was not presented.

Second, *Duncan* reveals the error in the district court's threshold Second Amendment barrier. This Court's majority rejected the argument that all firearm "accessories" are categorically excluded from the Second Amendment's protections. Rather, it recognized affirmatively that some firearm accessories *are* entitled to constitutional protection. *See Duncan*, 2025 WL 867583, at *7 (recognizing a category of "[p]rotected [a]ccessories"). The Court rightly recognized that "for the right to bear arms to have meaning, the Amendment's text must carry an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm." *Id.* at *8 (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)). Thus, the question is whether the alleged right to possess falls within "the corollary right to possess accessories that are necessary for the ordinary operation of a protected weapon." *Id.* at *9. It was only "[b]ecause large-capacity magazines [we]re neither weapons *nor accessories that are necessary*

17

*to the operation of a weapon*, [that] the Second Amendment's plain text d[id] not protect possession of large-capacity magazines. *Id.* at *7 (emphasis added). That is not the situation here, where suppressors *are* "necessary for the ordinary operation of a protected weapon" conducted most safely, as explained in further detail below. Without suppressors, firearms cannot operate reliably in the safest and most effective, *i.e.* "ordinary" manner that does not injure or impair the hearing, sometimes permanently, of the firearm bearer or bystanders. *Id.* at *9. The Court's holding that certain accessories needed for ordinary use are entitled to constitutional protection is directly on point and applies in full force here.

Third, suppressors are meaningfully different from magazines capable of firing more than ten rounds on the *Duncan* majority's own terms—which, to be clear, Mr. Sanchez accepts only for purposes of argument here. The *Duncan* majority emphasized throughout its opinion its public safety concerns with the magazines at issue. *See id.* at *3. The Court concluded that a "large-capacity magazine has little function in armed self-defense, but its use by mass shooters has exacerbated the harm of those horrific events." *Id.* This is because, in the Court's view, "[m]urderers who use large-capacity magazines need not pause between shots until they have fired 20, 30, or even 100 rounds. These pauses are crucial. Victims and law enforcement personnel take advantage of short pauses in firing to flee, take cover, and fight back. A mass shooter's use of large-capacity magazines limits those precious

18

opportunities." *Id.* Suppressors do the *exact opposite.* By ensuring that an individual defending self, home, or others is not temporarily deafened or disoriented by the unsafe volume of an unsuppressed firearm, suppressors *provide* "those precious opportunities" for the ability to "flee, take cover, and fight back." *Id.* Suppressors are critical to the safe use of a firearm, as they are widely recognized as the only truly effective method of avoiding hearing damage from the sound of a firearm shot. This interest is heightened all the more in the self-defense context, where individuals generally will not have the time or wherewithal to access earmuffs or earplugs; and even if they did, they would need their hearing to monitor the attacker, contact the authorities, and communicate with family members or other potential victims. This is a dispositive difference. *See id.* (asserting that "large-capacity magazine[s] ha[ve] little function in armed self-defense.").

Fourth, the *Duncan* Court insisted repeatedly that the magazines at issue were often used for criminal means—namely, in mass shootings. *See id.* at *3–4, 14, 18–19, 21 (discussing mass shootings). The same cannot be said for suppressors. As a former ATF Deputy Director has explained, suppressors are rarely used in criminal activity because they do not actually conceal the sound of a gunshot; they only reduce the sound to a healthier level (about the level of an ambulance siren). *See* Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* at 6–7, ATF (Jan. 20, 2017), https://perma.cc/JXF5-CULT ("ATF White Paper").

Thus, suppressors are different than the magazines at issue in *Duncan* even on the *Duncan* majority's terms because (1) they *are* necessary to the safest and most effective use of a firearm, that is, one that prevents hearing loss or impairment of the bearer or bystanders; and (2) they are not generally used for criminal activities.

Fifth, California's ban on suppressors itself is meaningfully different from the ban on magazines capable of holding more than ten rounds. In *Duncan*, California banned only one sub-type of a broader category: not all magazines, but only those capable of holding more than ten rounds. 2025 WL 867583 at *3. Here, California has banned *all* suppressors—not just certain types with certain upgrades or "optional" features. *Id.* at *22. The *Duncan* Court explained that California could not constitutionally do for magazines what it has done here for suppressors. "Some (but not all) firearms require the use of a magazine in order to operate. For that reason, the Second Amendment's text necessarily encompasses the corollary right to possess a magazine for firearms that require one, just as it protects the right to possess ammunition and triggers. Otherwise, the right to bear arms, including firearms that require the use of a magazine, would be diminished." *Id.* at *9. This language is directly on point here and bars California's outright criminal ban of *all* suppressors and therefore the possession and use of *all* suppressed firearms.

In sum, the argument that suppressed firearms are entitled to some Second Amendment protection is consistent with *Duncan*'s holdings and key reasoning. If

20

anything, *Duncan* supports that holding because it: (1) establishes that some firearm "accessories" are entitled to constitutional protection; (2) demonstrates all the ways that suppressors are meaningfully different from the magazines at issue there; and (3) demonstrates all the ways California's ban here is meaningfully different from the one at issue there.

Earlier unpublished precedent from this Circuit likewise does not foreclose the straightforward conclusion that firearms outfitted with suppressors deserve Second Amendment protection. This Court's decision in *United States v. McCartney*, 357 F. App'x 73 (9th Cir. 2009), is unpublished, so it is not binding on this Court. *McCartney* also is not persuasive. The case predated *Bruen* and so did not apply the operative test to determine whether suppressors are afforded any Second Amendment protection. Rather, the Court's conclusion that suppressors are not protected by the Second Amendment rested on the Court's unsupported conclusion that "[s]ilencers . . . are not 'typically possessed by law-abiding citizens for lawful purposes,' " and "are even more dangerous and unusual than machine guns." *Id.* at 76 (quoting *Heller*, 570 U.S. at 625). That conclusion sounds in history, not plain text. And that conclusion is incorrect, as the materials we have cited support the complaint's allegation that suppressors "are overwhelmingly used by law abiding citizens for lawful purposes." 2-SER-025. Indeed, as explained above, there are 4.5 million registered suppressors in circulation, while there are just 176,000 civilian-

21

registered machine guns (and, as of 2021, approximately 740,000 total registered machine guns). *See* Opening Brief for the United States at 8, *United States v. Morgan*, No. 24-3141 (10th Cir. Dec. 12, 2024) (confirming that there are "176,000 registered civilian machineguns"); *Firearms Commerce in the United States*, *supra*, at 16.

Nor are any out-of-circuit decisions, which of course also are not binding on this Court, persuasive toward a contrary conclusion. For instance, the Tenth Circuit's opinion in *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018), like *McCartney*, predated the Supreme Court's guidance in *Bruen*. What is more, the *Cox* Court provided very little reasoning. It simply concluded that "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')," without more. *Id.* at 1186. That analysis ignores that the Second Amendment applies to all *instruments* that constitute bearable arms, not just guns. *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (citing *Heller*, 554 U.S. at 582). And it is inconsistent with this Court's reasoning in *Duncan*, which recognized that accessories can be protected in certain circumstances.

An unpublished Fourth Circuit opinion, which is not binding even in *that* circuit, erred in applying a test that finds no basis in Supreme Court precedent: it hinged Second Amendment protection on whether an item itself is "capable of casting a bullet" and a "key item for the arm's upkeep." *United States v. Saleem*, No.

22

23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024). The Fifth Circuit similarly concluded that suppressed firearms are entitled to no constitutional protection whatsoever. *See United States v. Peterson*, 127 F.4th 941, 945–47 (5th Cir. 2025). The panel adopted a broad categorical rule: certain firearm parts, which the panel labeled as "firearm accessories," are not "covered by the plain text of the Second Amendment." *Id.* at 946 ("[W]hile possession of firearms themselves is covered by the plain text of the Second Amendment, possession of firearm accessories is not."). Again, erecting such a broad threshold barrier to the Second Amendment's protections is flatly contradicted by Supreme Court precedent and foreclosed by this Court's more nuanced approach in *Duncan*, which provides constitutional protection for some firearm accessories. *See* 2025 WL 867583, at *7–9*. In any case, a petition for en banc is pending in *Peterson*, and the Fifth Circuit has called for a response. *See id.*, Court Directive Issued, *United States v. Peterson*, No. 24-30043 (5th Cir. Mar. 7, 2025), Doc. 97. Further, although the Federal Government previously took the position that suppressors were not entitled to constitutional protection in *Peterson*, the Federal Government recently filed a request that the Court temporarily stay all en ban proceedings so that the Government may reconsider its position. *Id.* at Unopposed Mot., Doc. 113 (5th Cir. Mar. 20, 2025).

23

The plain text of the Second Amendment is implicated by the banning of suppressed firearms because regulation of suppressors cannot be viewed in isolation—banning suppressors it effectively bans suppressed firearms, which indisputably are arms. Even aside from the fact that such a distinction is contrary to Supreme Court precedent, it would make no sense. After all, regulation of a component part or a mere "accessory" of a firearm is not only a regulation on that part in the abstract or in a vacuum. It is a regulation of the keeping and bearing of the firearms that function *with* that component part. If suppressors were simply metal tubes not capable of functioning with bearable firearms, it would make no sense for the State of California to ban and criminalize them. The Constitution's protections do not rise and fall on such flimsy, unworkable distinctions. This Court should not be persuaded to make the same error as a handful of non-binding opinions, many of which predate *Bruen*, in concluding otherwise.

### B.     Suppressors Would Satisfy Even the State's Own "Utility" Test, Which Finds No Basis in Text or Supreme Court Precedent.

In arguing against this straightforward application of Supreme Court precedent, the State previously supplied a test of its own invention. The State would have had this Court decide whether suppressors are "integral" to a firearm or whether they have an "intrinsic self-defense purpose or utility." Appellee's Answering Br., Doc. 13 at 2 (Dec. 20, 2024). But those terms appear nowhere in the Supreme Court's

24

precedents. Indeed, that kind of subjective "utility" balancing is flatly contradicted by the Supreme Court's Second Amendment cases.

In *Heller*, the Supreme Court was faced with a similar argument that handguns—the type of firearm that the District of Columbia had banned—were a poor choice for self-defense and that other firearms (there, shotguns and rifles) were better suited for the plaintiffs' needs. *See, e.g.*, Brief of Violence Pol'y Ctr. & Police Chiefs of L.A., Minneapolis, and Seattle as *Amici Curiae* Supporting Petitioners, *District of Columbia v. Heller* (Jan. 11, 2008) (No. 07-290), 2008 WL 136348, at *29–30. The Supreme Court refused to engage in that arbitrary and subjective line-drawing exercise. Instead, the Court noted that there were "many reasons that a citizen may prefer a handgun," but that, ultimately, the real reason was immaterial, *Heller*, 554 U.S. at 629, since handguns were popular with Americans. And in *Bruen*, the Supreme Court made *Heller*'s conclusion even more explicit: it is *not* the job of courts to determine whether an arm is useful enough for self-defense to preclude the state from banning it. 597 U.S. at 19–20. The State merely repackages an argument that the Supreme Court has twice rejected and attempts to ban an "entire class of 'arms' "—in this case suppressed firearms—just as *Heller* forbade. 554 U.S. at 628. The Court should reject it out of hand under binding Supreme Court precedent.

The district court, for its part, adopted and applied a version of the State's novel test. The court set up a threshold barrier to the Second Amendment's application based on whether the component part of the firearm is "unnecessary to the essential operation of a firearm." 1-SER-008. It did not explain what "unnecessary" means nor what is included in the "essential operation of a firearm." *Id.* ("Nor does Plaintiff dispute that, unlike ammunition, a silencer is unnecessary to the essential operation of a firearm—however desirable the silencer may be to a user in reducing noise, flash, or recoil, or in allowing the user to stay hidden while firing.").

If the Second Amendment is to mean anything, then an "arm" must include not just complete firearms but also component parts that function integrally with the firearm. Of course, a suppressor, by itself, is not capable of expelling a projectile. But *no* part of a firearm can, by itself, expel a projectile or do any casting or striking. A functioning firearm is a collection of component parts. Yet regulation of other components that support the safe and effective use of a firearm—like an ammunition magazine of any size or a shoulder stock—would be an effective regulation of firearms themselves. And this court need not tread any new ground in reaching this obvious conclusion; the Supreme Court has already said as much. Again, the Supreme Court instructed that the Second Amendment applies to "any thing that a man . . . takes into his hands . . . to cast at or strike another," *Heller*, 554 U.S. at 581,

26

and "*all* instruments that constitute bearable arms," *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582) (emphasis added). Just so here. A firearm with a suppressor, whether that suppressor is removable or permanently affixed, is a thing the user takes into his hands to cast at or strike another.

In any case, the State fails its own test. Suppressors *do* serve a necessary self-defense purpose. A basic understanding of how suppressors work—supported by countless publicly available studies—demonstrates why.

The reason a firearm makes a loud noise is relatively simple. When a firearm is fired, the barrel emits gasses along with the bullet. Those gasses, which come out exceedingly hot, rapidly cool upon contact with the air. That rapid cooling in turn creates a loud bang, which is referred to as "muzzle blast." This is the main source of noise from a firearm being fired. *See* William Murphy et al., *The reduction of gunshot noise and auditory risk through the use of firearm suppressors and low-velocity ammunition*, 57 INT'L J. AUDIOLOGY S28 (2018), https://perma.cc/FSE3-SXGR.

Sound intensity, meanwhile, is measured in decibels, which denotes the pressure a noise produces on a listener's eardrum. Because the decibel scale is logarithmic, small increases in decibel level reflect large increases in intensity—for example, a sound that is three decibels louder than another produces twice the sound intensity, and a 10-decibel difference denotes a sound that produces *ten times* as

27

much intensity. In terms of sound perception, a 10-decibel increase is perceived as twice as loud. That means that a 70-decibel sound, approximately the loudness of a vacuum cleaner, is perceived as half as loud as an 80-decibel sound like a garbage disposal. *Noise Sources and Their Effects*, *supra*. Live rock music at a concert is usually somewhere around 110 decibels (the level at which pain often begins), and the deck of an aircraft carrier registers at 140 decibels. *Id.*

The noise produced by a firearm shot is very loud. An AR-15, fired without a suppressor, produces a 162-decibel sound, and even a .22-caliber pistol, a very small firearm, produces sound approximately at the 140-decibel limit. Kessler, *supra*; *see also* Murphy et al., *supra* at S31–32. Some firearms produce sounds that register, at the shooter's ear, at over 180 decibels (or *10,000 times* the intensity of sounds that are safe for any length of time). Colleen G. Le Prell, *An overview of HPDs, new legislation, and recommendations for rifles with silencers*, Hearing Rev. (Dec. 2017), https://perma.cc/7LRE-WB92.

The CDC recommends that individuals avoid exposure to 100-decibel sounds for longer than 15 minutes and suggests avoiding sounds over 140 decibels *entirely*. At that level, even momentary exposure risks hearing loss. *Noise-Induced Hearing Loss*, Nat'l Inst. Occupational Safety & Health, https://perma.cc/2HKQ-UH4C. In light of the incredible noise caused by firearms, even minimal exposure to unsuppressed gunfire is dangerous both for the shooter and for bystanders.

There are two potential solutions to this problem—personal protective equipment like earmuffs and earplugs (sometimes both at the same time) can be worn, or firearms can be made quieter by attaching a suppressor. Attaching a suppressor to a firearm is a type of "engineering control"—or physical modification to the noise-producing equipment; it is akin to putting a muffler on a car. NIOSH rates "engineering controls" as significantly more effective than PPE (which it labels the least effective method of noise control). *Noise and Hearing Loss*, *supra.* And practice bears this out. In laboratory settings, both PPE and suppressors are shown to have similar effectiveness, with both reducing the sound of gunfire by 20-30 decibels. Kessler*, supra*. The ability of suppressors to reduce the noise of gunfire by this amount is well demonstrated. *See, e.g.*, William J. Murphy et al., *Developing a Method to Assess Noise Reduction of Firearm Suppressors for Small-Caliber Weapons*, 33 POMA 1, 6, tbl. 2 (2019), https://perma.cc/3F7F-ZNCL(showing approximately 20-30 decibel reductions for 13 different firearms). Unfortunately, the effectiveness of PPE is significantly overstated in laboratory testing. Earplug manufacturer 3M recommends that individuals revise claims about the effectiveness of hearing protection devices (like earplugs and earmuffs) by cutting their claimed reduction abilities in half. *How to Use the Noise Reduction Rating (NRR)–Fact and Fiction*, 3M EDUC. (2000), https://perma.cc/WL5V-T85S**.**

29

Suppressors are simply the best—and only truly effective—form of hearing protection for firearms use. The American Academy of Otolaryngology-Head and Neck Surgery ("AAO-HNS"), "one of the world's largest organizations representing specialists who treat the ears," *About Us* at 1, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY, https://perma.cc/T364-YTFL, recently issued a position statement "endors[ing] the use of firearm suppressors as an effective method of reducing the risk of hearing loss, especially when used in conjunction with conventional hearing protective measures." *Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY (Nov. 18, 2024), https://perma.cc/A9EA-Z95P. This position statement recognized that "CDC research has shown that '[t]he *only* potentially effective noise control method to reduce [shooters'] noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel.'" *Id.* (emphasis added). Further, the "benefit" of using a suppressor "is *additive* when used with ear-level hearing protection devices such as circumaural muffs or ear plugs." *Id.* (emphasis added). The endorsement of suppressors by one of the largest groups of specialists in hearing damage further supports the Plaintiffs' argument that suppressors promote the safe use of firearms and are in fact critical in preventing hearing damage.

Other publicly available evidence further bolsters this conclusion. One meta-analysis found that "th[e] review of 20 published studies demonstrated far worse

30

performance than the corrected NRR[(Noise Reduction Ratio) of earmuffs and earplugs] suggests: the laboratory NRRs [Noise Reduction Ratios] consistently overestimated the real-world NRRs by 140% to 2000%." Branch, *supra*, at 951. That same study found that "all suppressors offered significantly greater noise reduction than ear-level protection, usually greater than 50% better," with PPE producing an average reduction of 5-10 decibels compared to 30 decibel reduction by the four suppressors tested. *Id*. at 950. It is no surprise then that the CDC has called suppressors "[t]he *only* potentially effective noise control method to reduce . . . noise exposure from gunfire," Chen & Brueck, *supra*, at 5, and the National Hearing Conservation Association Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise recommends the use of suppressors to reduce the risk of hearing loss. Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*, NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://perma.cc/Q5SK-CLLT.

Suppressors are also necessary for the safest and most effective use of firearms for additional reasons. First, a suppressor, unlike other personal protection equipment, protects *other people*, not just the shooter. Whether a firearm is fired at a shooting range, from a tree stand while hunting, or in a self-defense situation, the suppressor globally reduces the volume of the sound produced by firing a firearm, so that an individual who has removed earplugs and is just leaving the range or a

31

hunting partner who is trying to listen for game is still protected. Indeed, suppressors can be even more effective for bystanders than they are for shooters. *See* Lobarinas et al., *supra*, at S63 (showing greater reduction in decibels one meter to the left of the muzzle than at the shooter's right or left ear).

Second, firearms outfitted with suppressors serve vital self-defense purposes. With a suppressed firearm, the victim of a home invasion can defend self and home without suffering hearing damage (or inflicting hearing damage on family members). In such scenarios, there will rarely be sufficient time to locate earplugs and earmuffs. Even in the rare case where time is not of the essence in such emergency situations, earplugs and earmuffs will often be unsafe or impractical because the defending individual must be able to hear the intruder, call the authorities, and communicate with family members, among other things. These are practical considerations similar to those that *Heller* reasoned lead many Americans to choose handguns for self-defense. *See Heller*, 554 U.S. at 629 (reasoning that "there are many reasons that a citizen may prefer a handgun for home defense," including that "it is easier to store in a location that is readily accessible in an emergency" and "it can be pointed at a burglar with one hand while the other hand dials the police").

Further, even putting aside the long-term harms of hearing damage, avoiding immediate disorientation and momentary deafness is crucial to the effective use of a

firearm and highly beneficial in a self-defense situation. An unsuppressed Glock 17's 162-decibel sound, *see Relative Sound Pressure Levels in Decibels (dB) of Firearms*, NAT'L GUN TRS., (July 21, 2017), https://perma.cc/T6KB-9GWU, is comparable to the 170-decibel sound produced by a "flashbang" grenade used to disable someone with light and sound, *How do flashbangs work?*, CHARLOTTE EYE EAR NOSE & THROAT ASSOCS., P.A. (Mar. 11, 2020), https://perma.cc/3EMX-JBYT. Noises at that volume can cause temporary deafness and disorientation to the point of loss of balance (because the fluid of the inner ear is disrupted). *Id.* A suppressed firearm permits a defending individual to avoid this harm and effectively communicate and coordinate self-defense activities while contacting the authorities. Suppressors also offer crucial protection for individuals engaged in self-defense because, in addition to dampening sound, suppressors reduce recoil and help reduce muzzle flinch, allowing greater control of a firearm and improved accuracy. *Do Suppressors Reduce Recoil?*, SILENCER SHOP, https://perma.cc/K864-N7RF.

In sum, even assuming the State is right that Mr. Sanchez must show some "utility"; or if the district court was right to require that suppressors be broadly "necessary,"—suppressors still satisfy these tests. Suppressors are necessary for the safest and most effective use of firearms; indeed, using a firearm outfitted with a suppressor is the only truly effective method of avoiding hearing damage both for the user of the firearm and for others nearby.

Under any fair application of the Supreme Court's precedents broadly defining "arms," and even under a narrower test based on "necessity" or "utility," firearms with suppressors are covered by the Second Amendment.

## II. Even if Firearms Outfitted with Suppressors Are not Arms, Suppressors Should Still be Protected by the Second Amendment.

Firearms with suppressors are "arms" within the meaning of the Second Amendment under binding Supreme Court precedent. But even were that not the case, suppressors at the very least *facilitate* the exercise of the Second Amendment right. For this reason, it is error to hold that suppressors are entitled to *no* constitutional protection.

Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). This Court has recognized this principle in finding that the Second Amendment must protect the *acquisition* of firearms. *See Yukutake*, 2025 WL 815429, at *11. The Court rejected the idea that "*only* the two discrete, specific actions of (1) '*retain[ing]*' possession of firearms and (2) 'carry[ing]' them in public are protected by the text of the Second Amendment." *Id.* at *12 (emphasis original) (internal quotation marks omitted). Moreover, lower courts are not to overload the straightforward "plain text analysis" to dodge historical scrutiny. As the Supreme Court confirmed again recently: "when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction 'is consistent

34

with the Nation's historical tradition of firearm regulation.' " *Rahimi*, 602 U.S. at

689 (citing *Bruen*, 597 U.S. at 24). There was no reference to any plain text "step"

in *Rahimi*. And *Bruen*'s plain-text analysis was a few short paragraphs. *See* 597 U.S.

at 32–33.

Particularly relevant, this Court expressed skepticism of a view of the Second

Amendment that would permit "all manner of harassing limitations on the

acquisition of firearms, *without any constitutional scrutiny whatsoever*, so long as

those limitations fall short of ultimately preventing a citizen from possessing

firearms for self-defense." *Id.* (emphasis original) As this Court rightly held, "that

makes no sense." *Id.* After all, courts "would not decline to apply *any* First

Amendment scrutiny to laws imposing special temporal or procedural restrictions

on purchases of available copies of expressive works, merely on the ground that the

plaintiff was *ultimately* able to obtain access to the work." *Id.* (emphasis original).

Further, this Court in *Yukutake* explained that bans on firearms purchasing are

exactly the type of wholesale state regulation that raises the Second Amendment's

ire. The Court recognized that previous Ninth Circuit precedent "established

that . . . a *general* regulation of firearms purchasing," *Yukutake*, 2025 WL 815429,

at \*11 (emphasis in original), as opposed to a narrower issue, like the "right to have

a gun store *in a particular location*," *id.* (emphasis in original) (citation omitted)

"would restrict conduct covered by the plain text of the Second Amendment," *id.*

35

The Court distinguished outright bans, like California's at issue here, from more "narrowly focused commercial restrictions on particular means of acquisition," which "implicate the Second Amendment right to keep and bear arms only if the particular challenged regulation *meaningfully impairs* an individual's ability to access firearms." *Id.* (internal quotation marks omitted) (emphasis in original). Thus, because "Hawaii's challenged restriction applie[d] generally to all acquisition of" the relevant arm, "it therefore clearly implicate[d] the plain text of the Second Amendment." *Id*. That is the case here.

The Seventh Circuit in *Ezell v. City of Chicago*, has similarly held that even though the Second Amendment makes no mention of firing ranges or practicing with arms, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." 651 F.3d 684, 704 (7th Cir. 2011); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., dissenting) (the Second Amendment protects "necessary concomitant[s]" to the right to bear arms like training). As the Tennessee Supreme Court held over 150 years ago, "the right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose, a man would have the right to carry them to and from his home,

36

and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution." *Andrews v. State*, 50 Tenn. 165, 178 (1871).

Suppressors likewise facilitate the safe and effective exercise of the Second Amendment right. Just as a firing range provides a place in which the discharge of a firearm is carefully controlled, preventing damage to property or injury to the user or bystanders, a suppressor reduces the sound produced by firing a firearm to a much safer level, permitting the right to be exercised with a reduced risk to one's hearing. In fact, suppressors are key to making firing ranges themselves functional, since those are locations where the sounds of gunfire are concentrated. The noise suppression enabled by suppressors is crucial to realizing the benefits of the "training and practice" that the Seventh Circuit has already held is protected by the Second Amendment

### III.    The State Cannot Justify Its Criminal Ban on Safe and Commonly Used Suppressors.

Because the State's ban on firearms outfitted with suppressors implicates conduct covered by the plain text of the Second Amendment, the State bears the burden to justify the law and show that the ban is consistent with the Nation's history of firearm regulation.

The State cannot meet that heavy burden. Under *Heller* and *Bruen*, the *only* arms that may be banned are "dangerous and unusual weapons." *Bruen*, 597 U.S. at

37

21. Firearms equipped with suppressors are neither. They protect the hearing of firearm users and millions of them are owned by Americans. So too, they are legal to possess and use in the vast majority of States—42 to be exact—and are legal to possess and use (subject to registration requirements) under federal law. ATF White Paper at 6–7. Indeed, as of December 2024, Americans had lawfully registered 4.5 million suppressors with ATF. *See Suppressor Owner Study*, NSSF (2025), https://perma.cc/Q893-JMJT.

This Court's analysis of the historical regulations in *Duncan* further demonstrates why the State will be unable to meet its burden to present an appropriate historical analogue. Again, for purposes of this discussion we accept the *Duncan* majority's analysis on its own terms without forfeiting the right to contest *Duncan*'s analysis in future proceedings in this case. The *Duncan* majority canvassed three broad categories of historical regulations on dangerous firearms and their dangerous uses. "Beginning before the Founding and continuing throughout the Nation's history, legislatures have enacted laws to protect innocent persons from especially dangerous uses of weapons once those perils have become clear." *Duncan*, 2025 WL 867583, at *15. All had in common a concern for "dangerous uses of weapons" that harm "innocent persons." *Id.*

In the first category, the Court considered historic laws regulating the storage of gunpowder. *Id.* "[T]he storage of gunpowder increased the risk of explosions or

fires, which posed an obvious threat to innocent persons. To mitigate the danger to innocent lives, several colonies and states enacted laws restricting the storage of gunpowder." *Id.* (citation omitted). Second, the Court considered "trap guns—the rigging of a firearm to discharge when a person unwittingly trips a string or wire." *Id.* at *16. Historically, "[p]eople typically set trap guns to defend their businesses, homes, or possessions. . . . but their use "inevitably harmed or killed innocent persons." *Id.* "[L]egislatures responded by prohibiting what had proved to be an especially dangerous use of firearms: the setting of trap guns." *Id.* The third category included regulation of "an especially dangerous use of [a] weapon" after criminal activity had exposed the especially dangerous use. *Id.* at *17. For example, Bowie knives, slungshots, pocket pistols, skeins, stilladers, and daggers or dirks. *Id.* The Court focused in particular on "especially dangerous use of those weapons." *Id.* By way of illustration, "Bowie knives were designed to—and did—cause significant harm in fights, with little self-defense value, so legislatures banned their carry outside the home; the slungshot proved incredibly useful to criminals but of minimal value in self-defense, so legislatures banned their carry outside the home; and pistols became easy for criminals to conceal, to the detriment of public safety, so legislatures banned their concealed carry." *Id.* In all cases, what the legislatures sought to do was "prevent a specific type of harm to innocent persons . . . by

39

prohibiting what had proved to be especially dangerous uses of . . . new weapons." *Id.*

     None of these regulations of categories of dangerous firearms or their especially dangerous uses is remotely analogous to a flat criminal prohibition on *suppressors*, which have the opposite effect of *increasing* the safety of firearm use for both the bearer and bystanders. And by contrast to the examples of historically regulated firearms and their uses, suppressors are very rarely used for criminal or harmful purposes. *See* Paul A. Clark, *Criminal Use of Firearm Silencers*, 8(2) W. CRIMINOLOGY REV. 44 (2007), https://perma.cc/75DJ-YP8K. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." *Id.* at 51. One study estimated the number of suppressor-related prosecutions to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions. *Id.* In 2017, acting ATF Deputy Director Ronald B. Turk admitted that suppressors "are very rarely used in criminal shootings." ATF White Paper at 6. In an ATF White Paper, the Deputy Director explained:

     In the past several years, opinions about silencers have changed across the United States. Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized. At present, 42 states generally allow silencers to be used for sporting purposes….

     While DOJ and ATF have historically not supported removal of items from the [National Firearms Act of 1934], the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the [National Firearms Act of 1934] is archaic and

40

historical reluctance to removing them from the [National Firearms Act of 1934] should be reevaluated. ATF's experience with the criminal use of silencers also supports reassessing their inclusion in the [National Firearms Act of 1934]. On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions. Moreover, consistent with this low number of prosecution referrals, *silencers are very rarely used in criminal shootings*. Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not be viewed as a threat to public safety necessitating [National Firearms Act of 1934] classification, and should be considered for reclassification under the [Gun Control Act of 1968].

*Id.* at 6–7 (emphasis added).

This makes sense, as suppressors are not of much use to criminals. After all, suppressed gunshots are by no means "silent." For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren. Fligor, *supra*, at 8. Accordingly, criminals who shoot suppressed weapons can still be easily heard. Moreover, Mr. Sanchez does not challenge the registration, taxation, and accompanying background check requirements of the NFA, which he and all other individuals looking to acquire suppressors would still have to go through if California's ban were enjoined. He merely seeks to be able to go through that process, as residents of over forty other states can.

Unlike the examples of historical regulation, the use of suppressors in no way poses a threat to innocent people. Quite the opposite—suppressors assist innocent people, including both the bearer of a firearm *and* any bystanders, in ensuring their

41

safety and the prevention of permanent injury. Indeed, *requiring* the use of suppressors would be more akin to the historical laws cited by *Duncan* than banning their use. The publicly available evidence is indisputable: suppressors reduce or prevent hearing damage and aid in training, hunting, and self-defense but do not silence or conceal criminal activity. California cannot criminally ban suppressed firearms consistent with the Second Amendment.

## CONCLUSION

For these reasons, this Court should reverse.

March 28, 2025                                    Respectfully submitted,

      C.D. Michel                              /s/David H. Thompson
      Anna M. Barvir
      Konstadinos T. Moros              David H. Thompson
      Michel & Associates, PC            Peter A. Patterson
      180 E Ocean Boulevard            Athanasia O. Livas
      Suite 200                                   COOPER & KIRK, PLLC
      Long Beach, CA 90802            1523 New Hampshire Avenue, N.W.
      cmichel@michellawyers.com    Washington, DC 20036
                                                        (202) 220-9600
                                                        dthompson@cooperkirk.com

*Attorneys for Plaintiff-Appellant Gary R. Sanchez*

42

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system, which will transmit the foregoing document via email to all counsel of record.

Dated: March 28, 2025

/s/David H. Thompson
David H. Thompson
*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5566

I am the attorney or self-represented party.

**This brief contains** | 9,769 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/David H. Thompson | **Date** | 03/28/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*