**Case No. 24-5566**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

GARY R. SANCHEZ,

*Plaintiff-Appellant,*

v.

ROB BONTA,
in his official capacity as Attorney General of the State of California,

*Defendant-Appellee.*

_____

*On Appeal from the United States District Court for the Southern District of California (San Diego),
Case No. 3:24-cv-00767-RSH-MSB • The Honorable Robert Steven Huie, District Judge*

**BRIEF OF NATIONAL ASSOCIATION FOR GUN RIGHTS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

BARRY K. ARRINGTON
**ARRINGTON LAW FIRM**
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Telephone: (303) 205-7870
barry@arringtonpc.com

*Attorney for Amicus Curiae*

  COUNSEL PRESS · (213) 680-2300                                  PRINTED ON RECYCLED PAPER  

## CORPORATE DISCLOSURE STATEMENT

National Association for Gun Rights has no parent corporations. It has no stock. Therefore, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF AMICUS ....................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 2

ARGUMENT ........................................................................................................... 3

    I.     Unfortunately, Sometimes Myths Lead to Laws ..................... 3

        A.     Myth 1: Suppressors Are a Threat to Public Safety ............................................................................................ 3

        B.     Myth 2: Suppressors Literally Silence Firearms .......... 5

    II.    California's Schizophrenic Regulation of Mufflers ................. 7

    III.   European Countries Are More Rational Than California ..................................................................................... 11

CONCLUSION ...................................................................................................... 13

CERTIFICATE OF COMPLIANCE ...................................................................... 14

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Department of Agriculture v. Moreno*,
　　413 U.S. 528 (1973) ....................................................................................... 5

*Innovator Enterprises, Inc. v. Jones*,
　　28 F. Supp. 3d 14 (D.D.C. 2014) ...................................................................... 4

*Romer v. Evans*,
　　517 U.S. 620 (1996) ....................................................................................... 5

**Statutes**

26 U.S.C. § 5845(a)(7) .............................................................................................. 3

Cal. Veh. Code § 27150(a) ...................................................................................... 10

**Other Authorities**

National Firearms Act, Pub. L. No.73-474, 48 Stat. 1236 (1934) ......... 3, 7

Paul A. Clark, *Criminal Use of Firearm Silencers*,
　　8 W. Crim. Review 4 (2007) .......................................................................... 3

Stephen P. Halbrook, *Firearm Sound Moderators:*
　　*Issues of Criminalization and the Second Amendment*,
　　46 Cumb. L. Rev. 33 (2016) ........................................................... 4, 5, 6, 7, 10

ii

## INTEREST OF AMICUS

The right to keep and bear arms is a fundamental right that existed prior to the Constitution. The right is not in any sense granted by the Constitution. Nor does it depend on the Constitution for its existence. Rather, the Second Amendment declares that the pre-existing "right of the people to keep and bear Arms shall not be infringed." The National Association for Gun Rights ("NAGR")[1] is a nonprofit membership and donor-supported organization with hundreds of thousands of members nationwide. The sole reason for NAGR's existence is to defend American citizens' right to keep and bear arms. In pursuit of this goal, NAGR has filed numerous lawsuits seeking to uphold Americans' Second Amendment rights. NAGR has a strong interest in this case because the guidance the Court will provide in its resolution of this matter will have a major impact on NAGR's ongoing litigation efforts in support of Americans' fundamental right to keep and bear arms.

---

[1] No party's counsel authored this brief in whole or in part and other than NAGR no person contributed money to fund its preparation or submission. All parties consent to the submission of this brief.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

The National Firearms Act ("NFA") was enacted by Congress in 1934. The legislative record for the NFA was completely devoid of any evidence that suppressors are a threat to public safety, and no one knows for sure why Congress decided to lump suppressors in with machine guns and sawed-off shotguns. Perhaps it was a result of myths about the use of suppressors by criminals perpetuated by Hollywood since the early days of sound motion pictures.

Hiram Maxim invented both the automobile muffler and the firearm muffler[2] for the same purpose – quiet communities. Even though automobile mufflers and firearm mufflers were invented by the same man for the same purpose, California law requires the former while prohibiting the latter. This, combined with the fact that there is zero evidence that suppressors are a threat to public safety, leads to the conclusion that the only legislative motive for the challenged ban was the California legislature's animus towards and desire to harm a politically unpopular group, i.e. citizens who wish to exercise their Second Amendment rights.

---

[2] The NFA refers to a suppressor as a "muffler or silencer."

2

Finally, the irrationality of California's ban is further demonstrated in that other countries, such as the United Kingdom, affirmatively encourage the use of noise-moderating devices instead of banning them.

**ARGUMENT**

**I. Unfortunately, Sometimes Myths Lead to Laws**

   **A.  Myth 1: Suppressors Are a Threat to Public Safety**

On June 19, 1933, film producer William Burke released the film *Corruption*.[3] The movie uses a plot device in which a criminal secretly murders people by shooting them with a revolver that has a suppressor attached to its barrel.[4] Absurdly, the film depicts the suppressed revolver making an almost inaudible "pfff" sound when it is fired.[5] Almost exactly one year later, on June 26, 1934, Congress enacted the NFA,[6] which regulates "silencers" in the same fashion that it regulates sawed-off shotguns and fully automatic machine guns. 26 U.S.C. § 5845(a)(7).

---

[3] *Corruption* (C. Edward Roberts, dir., 1933).
[4] The shooting scenes can be viewed here: https://bit.ly/4i1KeQi (at timestamps 33:04, 49:08, and 55:25).
[5] The fictional gun makes a sound like a puff of air blown through a straw. These scenes are doubly absurd. Their depiction of the sound a suppressed firearm makes is patently ridiculous. Moreover, suppressors are generally ineffective in suppressing the sound of revolvers (as opposed to semi-automatic firearms).
[6] National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934).

3

There is no direct evidence that Hollywood mythmaking played a role in Congress's decision to regulate suppressors in the NFA. Indeed, the Congressional record is totally devoid of *any* evidence for why Congress chose to regulate suppressors. Certainly, no data were ever set forth in the legislative record suggesting that suppressors were a crime problem. Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 41 (2016). This has led one court to note, "it is difficult to determine what exactly Congress was concerned about in deciding to regulate silencers at the federal level." *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 23 (D.D.C. 2014). See also Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. Crim. Review 44, 48 (2007) ("The 1934 congressional debates provide no explanation about why silencers were licensed.").

Whatever the reason, it is generally assumed that Congress regulated suppressors because lawmakers associated them with criminal activity even though there was no actual evidence that they were. *Firearm Sound Moderators*, at 44. Hollywood myths may have played a role in perpetuating that false idea.

4

The idea that suppressors are in any way associated with criminal activity was a myth in 1934. It is still a myth in 2025. There are 4.5 million registered suppressors in the United States.[7] Yet, according to acting ATF Deputy Director Ronald B. Turk, they are rarely used in criminal shootings and should not be viewed as a threat to public safety.[8]

In summary, California's ban of suppressors cannot be justified as a public safety measure. Indeed, the ban is "inexplicable by anything but animus toward the class it affects," i.e., the California legislature's oft-demonstrated implacable animus toward law-abiding gun owners. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 634–35 (1996) (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973).

### B.     Myth 2: Suppressors Literally Silence Firearms

The term "silencer" is a misnomer. *Firearm Sound Moderators* at 36. "[D]espite movie fantasies—a noise suppressor reduces decibels, but

---

[7] See statistical data on page 6 of Appellant's principal brief.
[8] Ronald B. Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* at 6–7, ATF (Jan. 20, 2017), https://perma.cc/JXF5-CULT.

5

does not actually 'silence' the discharge of a firearm. Noise may be muffled or diminished. . .but it can still be heard." *Id*. As we have already seen, Hollywood was engaging in "fantasies" about suppressors as early as 1934. Nearly 100 years later, it continues to do so. The YouTube channel Debunked "investigates the world's biggest myths and misconceptions." Recently, Debunked investigated how Hollywood has perpetuated the "silencer" myth for literally generations, going back to the time when sound was first introduced to movies in the 1930s. See Debunked, *How Silent Are Gun Silencers?* (July 8, 2023), available at https://www.youtube.com/watch?v=ivL-KHS9IMw. The producers trace the absurd depiction of silencers in the movies from the release of *Corruption* in 1933 to *John Wick: Chapter 2* [9] in 2017.[10]

The difference in sound levels between a firearm with and without a suppressor is demonstrated in this news report. KGUN9, *How "silent" are gun silencers?* (Feb. 28, 2023), available at https://www.youtube.com/watch?app=desktop&v=FbfJ4fsOqDA (see timestamp 1:13 to 1:18 for the comparison). As the reporter notes, "The

---

[9] *John Wick: Chapter 2* (Chad Stahelski, dir. 2017).
[10] *How Silent Are Gun Silencers?* from timestamp 1:08 to 2:13.

6

suppressed guns are quieter, but still so loud ear protection is still a good idea." *Id.* at 1:19.

## II. California's Schizophrenic Regulation of Mufflers.

California regulates two items that were invented by Hiram Percy Maxim. The State affirmatively *requires* its citizens to use one of those inventions, but it absolutely *prohibits* them from using the other, even though the inventions do essentially the same thing, i.e., reduce noise.

Maxim was a mechanical genius who designed some of the first gasoline-powered automobiles.[11] He also invented the firearm suppressor, which grew out of his work to reduce the noise coming from automobiles.[12] It is no coincidence that the NFA originally referred to a suppressor as "a *muffler* or silencer." Pub. L. No. 73-474, §(a) (emphasis added). Maxim's automobile muffler and his firearm muffler were based on similar technology. The similarities between the two devices are obvious from the following advertisements.

---

[11] *Firearm Sound Moderators* at 41 (citing Hiram Percy Maxim, *Horseless-Carriage Days* (Dover Pubs. 1962) (1936)).
[12] *Id.* (citing Stephen B. Goddard, *Colonel Albert Pope and His American Dream Machines* (McFarland & Co. 2000), 227).

7

14    THE MAXIM SILENCER COMPANY

## AUTOMOBILE SILENCERS



Model F. Maxim Silencer for the Ford Car.

Every Ford car needs a Maxim Silencer. Every Maxim Silencer sold increases the efficiency of the Ford car, and is a profitable accessory for you to handle.
The Maxim Silencer makes the Ford motor as quiet running as the most expensive cars. It also increases the engine's efficiency by decreasing back pressure. It saves gasoline, makes the car quicker starting and a better hill-climber.
The fame of the Maxim Gun Silencer and the Maxim Motor Boat Silencer almost instantly established a nation-wide demand for this new Automobile Silencer. The price is so reasonable that it is within the reach of every Ford owner.

Packed One in a Carton.  One Dozen in a Crate.  Price, each .................... $6 00





**MODEL A AUTOMOBILE SILENCERS.**

This model is made for all standard makes of automobiles and surpasses any ordinary muffler construction because it actually silences with the least possible back pressure.
Noise at the outlet is on account of the exhaust gases being liberated at high velocity. These high velocity gases in passing through a Maxim Silencer must travel in a long path, consequently become slowed down through lack of energy, and are then liberated with a low and quiet velocity, effecting its quietness without stopping, thereby relieving the condition of back pressure, superheating, etc.
No muffler construction can equal the Maxim Silencer in providing efficiency, both in power and economy of fuel, which latter item will amply repay for the first slight cost.

Model A-4—with 1½-inch to 2-inch Inlet, and 1¼-inch to 1½-inch Outlet, each ......... $ 8 00
Model A-6—with 2-inch Inlet and 1½-inch Outlet, each ............................ 10 00
Model A-7—with 2½-inch Inlet and 1¾-inch Outlet, each ........................... 11 00
Model A-8—with 3-inch Inlet and 2-inch Outlet, each ............................. 12 00

Special inlet and outlet dimensions can be had with slight delay.

## MAXIM SILENT FIREARMS CO.,
### HARTFORD, CONN.



# MAXIM SILENCER.

## IT WILL PAY YOU TO KNOW ABOUT IT.

### PRESERVE THIS SHEET FOR REFERENCE.

### HOW IT WORKS.

The Silencer checks the muzzle blast. Instead of the powder gases being liberated into the air instantaneously when the bullet emerges from the muzzle, as in the ordinary gun, the gases are caught by the Silencer.

They are made to whirl around inside the Silencer. This whirling forces the gas to fly out from the center by centrifugal force leaving a central space, just the same as when water is whirled around in a set bowl, a hole or space forms in the center. This leaves the space for the bullet to make its passage. The gas cannot pass through this space, until it slows down. This causes it to discharge into the atmosphere gradually. This absolutely prevents report noise and also reduces recoil over two-thirds.

As the hole in the Silencer is much larger than the bullet, the latter does not touch anything in passing through and consequently accuracy of flight is just the same whether the Silencer is off or on.

### THE DIFFERENT SIZES.

Silencers are furnished for every calibre rifle from the .22 up to the .45 inclusive. The only rifles excepted from this list are the large calibre Winchester and Remington auto-loaders. For these we only furnish Silencers by special arrangement.

The .22 auto-loading and all calibres of the Standard auto-loading rifles have regular Silencers especially adapted for them.

Single shot rifles, repeating rifles, carbines and single shot target pistols of any make or calibre can be fitted with Silencer.

Shot-gun Silencers are not yet ready for distribution. Shot loaded cartridges can be used perfectly in rifles fitted with regular rifle Silencers.

Revolvers and automatic pistols are not adapted to be silenced and therefore cannot be fitted.

9

The technology was similar because the purpose of the devices was similar. "'The Maxim Silencer was developed to meet my personal desire to enjoy target practice without creating a disturbance,' wrote Hiram Percy Maxim, inventor of the first successful firearm noise suppressor. 'I have always loved to shoot, but I never thoroughly enjoyed it when I knew that the noise was annoying other people. It occurred to me one day that there was no need for the noise. Why not do away with it and shoot quietly?'" *Firearm Sound Moderators*, at 41 (quoting Hiram Percy Maxim, *Experiences with the Maxim Silencer* 2 (1915), 2).

The California law regarding automobile mufflers states: "Every motor vehicle equipped with an internal combustion engine and subject to registration shall at all times be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise . . ." Cal. Veh. Code § 27150(a).

California does not tolerate excessive noise from automobiles and requires them to have mufflers. At the same time, California refuses to allow law-abiding firearm owners to reduce the noise from their firearms even for their own hearing protection and the protection of the community. Again, the only explanation for this state of affairs is the

10

California legislature's irrational animus against citizens who wish to exercise their Second Amendment rights.

## III. European Countries Are More Rational Than California

Suppressors are far more readily available in many European countries than in the United States. The United Kingdom is a good example. The UK requires a firearms license, but once one obtains a firearms license, suppressors (which are called "sound moderators") are affirmatively encouraged. Section 12.77 of the UK's *Guide on Firearms Licensing Law* states:

> Sound moderators are often used when shooting game, deer, or vermin. In the case of the latter, they might facilitate more effective or less intrusive pest control. They are appropriate for reducing hearing damage to the shooter, or to reduce noise nuisance, for example, for deer control in urban parks, or close to residential properties, to avoid disturbing other sensitive species (especially during the breeding season) or to reduce recoil of the rifle.

Section 12.78 states:

> Some target shooting events where fire and movement is conducted on field firing ranges may require the use of sound moderators, for example, where hearing protection may impede the shooter and where voice commands need to be heard or given by the shooter for safety and continuity.

11

In Norway and Finland suppressors are not separately regulated and are freely available as long as one legally owns a compatible firearm.[13] In Germany, suppressors are allowed for rifles with centerfire ammunition without a separate license and for handguns with a license. Fine Ballistic Tools, *Overview of weapon silencers in the EU*, available at https://bit.ly/4jd3BXt. In France, suppressors for small-caliber pistols can be purchased without official supervision. *Id*. In Poland, hunters are able to use suppressors for the sanitary killing of animals with prior authorization. *Id*. In Portugal, suppressors can be purchased by anyone holding a firearms license. *Id*. In Sweden, anyone who is authorized to own a certain weapon may also own a matching suppressor. *Id*. In the Czech Republic, suppressors are available to holders of a firearms license and subject to registration. *Id*.

---

[13] TFB, *Countries Where The Suppressors Roam Free* (April 13, 2024), available at https://www.thefirearmblog.com/blog/2024/04/13/silencer-saturday-324-countries-where-the-suppressors-roam-free/.

12

## CONCLUSION

NAGR respectfully requests the Court to reverse the district court's ruling.

Respectfully submitted,

/s/ Barry K. Arrington
_____
BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Amicus Curiae*

April 4, 2025

13

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5566

I am the attorney or self-represented party.

**This brief contains** | 2,555 | **words,** including | 614 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Barry K. Arrington          **Date** | April 4, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                           14                           *Rev. 12/01/22*