No. 24-5566

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

GARY SANCHEZ,
*Plaintiff and Appellant*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant and Appellee.*

———————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 24-cv-767-RSH-MSB
Hon. Robert S. Huie, District Judge

———————————

## APPELLEE'S REPLACEMENT ANSWERING BRIEF

———————————

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
  *Supervising Deputy Attorneys General*

KEVIN L. QUADE
  *Deputy Attorney General*
CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7693
E-mail: Kevin.Quade@doj.ca.gov
  *Attorneys for Defendant and Appellee*

May 28, 2025

# TABLE OF CONTENTS

**Page**

Introduction .................................................................... 1

Statement of Jurisdiction ............................................... 3

Statement of the Issues ................................................. 4

Addendum of Statutory Provisions .............................. 4

Statement of the Case .................................................... 4

      A.    History of Firearm Silencers and California's
             Restrictions .............................................. 4

      B.    Procedural History .......................................... 5

Summary of the Argument ............................................ 7

Standard of Review ....................................................... 9

Argument ....................................................................... 9

    I.    Plaintiff Cannot Establish That Silencers Are
          Presumptively Protected by the Second Amendment ............ 10

      A.    Silencers Are Neither "Arms" nor Accessories
             Necessary for the Operation of a Firearm .................... 12

      B.    Silencers are Not in Common Use for Self-Defense .... 20

      C.    Silencers Are Dangerous and Unusual Items That
             May Be Banned ............................................. 23

    II.    California's Prohibition on Silencers Is Consistent with
          This Nation's History and Tradition of Firearms
          Regulation ................................................... 27

      A.    The Supreme Court Clarified the Historical Inquiry
             in *United States v. Rahimi* ................................ 27

      B.    The Historical Record Reflects a Robust Tradition
             of Regulating Particular Weapons That Threaten
             Public Safety ............................................... 30

      C.    California's Prohibition on Silencers Is Consistent
             with Regulatory Tradition ................................. 38

i

## TABLE OF CONTENTS
### (continued)

**Page**

Conclusion ................................................................ 41

# TABLE OF AUTHORITIES

**Page**

CASES

*B & L Prods., Inc. v. Newsom*
104 F.4th 108 (9th Cir. 2024) .................................................... 7, 11, 13, 19

*Bevis v. City of Naperville* (*Bevis I*)
657 F. Supp. 3d 1052 (N.D. Ill. 2023) ...................................... 32, 33, 36, 37

*Bianchi v. Brown*
111 F.4th 438 (4th Cir. 2024) ................................................................... 26

*Caetano v. Massachusetts*
577 U.S. 411 (2016) ................................................................... 18, 22, 23

*Capen v. Campbell*
708 F. Supp. 3d 65 (D. Mass. 2023) ........................................................ 16

*Cox v. United States*
2023 WL 4203261 (D. Alaska June 27, 2023) .......................................... 16

*D'Augusta v. Am. Petroleum Inst.*
117 F.4th 1094 (9th Cir. 2024) .................................................................. 9

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
664 F. Supp. 3d 584 (D. Del. 2023) .............................................. 35, 36, 37

*District of Columbia v. Heller*
554 U.S. 570 (2008) ................................................................... *passim*

*Duncan v. Bonta*
133 F.4th 852 (9th Cir. 2025) ................................................................ *passim*

*Fyock v. Sunnyvale*
779 F.3d 991 (9th Cir. 2015) ......................................................... 13, 24

*Garland v. Cargill*
602 U.S. 406 (2024) .................................................................................. 38

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Hanson v. District of Columbia*
120 F.4th 223 (D.C. Cir. 2024)....................................................24

*Hill v. State*
53 Ga. 472 (1874) .......................................................................36

*Jackson v. City & Cnty. of San Francisco*
746 F.3d 953 (9th Cir. 2014) ......................................................13

*Nat'l Ass'n for Gun Rights v. Lamont*
685 F. Supp. 3d 63 (D. Conn. 2023)...........................................23

*New York State Rifle & Pistol Ass'n v. Bruen*
597 U.S. 1 (2022)..................................................................*passim*

*Nunn v. State*
1 Ga. 243 (1846) .........................................................................36

*Or. Firearms Fed'n v. Kotek*
682 F. Supp. 3d 874 (D. Or. 2023) .......................................23, 36

*Rupp v. Bonta*
723 F. Supp. 3d 837 (C.D. Cal. 2024) ........................................36

*Sonzinsky v. United States*
300 U.S. 506 (1937)......................................................................5

*State v. Reid*
1 Ala. 612 (1840) ........................................................................34

*United States v. Al-Azhari*
2020 WL 7334512 (M.D. Fl. Dec. 14, 2020) .............................16

*United States v. Alaniz*
69 F.4th 1124 (9th Cir. 2023) ...............................................11, 21

*United States v. Berger*
715 F. Supp. 3d 676 (E.D. Pa. 2024).....................................15, 16

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Comeaux*
  2024 WL 115929 (W.D. La. Jan. 10, 2024) ........................................*passim*

*United States v. Cooperman*
  2023 WL 4762710 (N.D. Ill. July 26, 2023) ............................................. 16

*United States v. Cox*
  906 F.3d 1170 (10th Cir. 2018) ........................................................... 15, 16

*United States v. Grey*
  2018 WL 4403979 (C.D. Cal. Sept. 13, 2018) ........................................... 25

*United States v. Hasson*
  2019 WL 4573424 (D. Md. Sept. 20, 2019) ............................................... 17

*United States v. Jernigan*
  2024 WL 4294648 (E.D. Va. Sept. 25, 2024) ............................................ 16

*United States v. McCartney*
  357 F. App'x 73 (9th Cir. 2009) ........................................................... 24, 25

*United States v. Perkins*
  2008 WL 4372821 (D. Neb. Sept. 23, 2008) .............................................. 25

*United States v. Peterson*
  127 F.4th 941 (5th Cir. 2025) ....................................................... 15, 16, 17

*United States v. Peterson*
  2023 WL 5383664 (E.D. La. Aug. 21, 2023) ............................................. 16

*United States v. Rahimi*
  602 U.S. 680 (2024) ...........................................................................*passim*

*United States v. Saleem*
  2024 WL 5084523 (4th Cir. Dec. 12, 2024) .............................................. 16

*United States v. Saleem*
  659 F. Supp. 3d 683 (W.D.N.C. 2023) ..................................................... 16

v

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Villalobos*
2023 WL 3044770 (D. Idaho Apr. 21, 2023) ............................................. 16

*United States v. Wood*
299 U.S. 123 (1936) ......................................................................................... 31

*Wolford v. Lopez*
116 F.4th 959 (9th Cir. 2024) ....................................................................... 41

*Wood v. Arnold*
321 F. Supp. 3d 565 (D. Md. 2018) .............................................................. 6

CONSTITUTIONAL PROVISIONS

United States Constitution Second Amendment ..................................... *passim*

United States Constitution Fourteenth Amendment ............................ 5, 34, 37

STATUTES

FEDERAL

National Firearms Act of 1934 .................................................................... 4, 38

United States Code, Title 18 § 922(g)(8)(C)(i) ........................................ 27, 29

United States Code, Title 28 § 1291 .............................................................. 3

United States Code, Title 28 § 1331 .............................................................. 4

Alabama

1837 Ala. Acts 7, No. 11, § 2 ........................................................................ 36

Arizona

1889 Ariz. Sess. Laws Act 13, §§ 1–2 ..................................................... 35, 37

vi

# TABLE OF AUTHORITIES
### (continued)

**Page**

## Arkansas

1881 Ark. Acts 191, §§ 1–3 ................................................................36

## California

California Penal Code § 17210 ....................................................*passim*

California Penal Code § 33410 ....................................................*passim*

1917 Cal. Stat. 221, Chapter 145, §§ 1–3 .......................................35

1933 Cal. Stat., ch. 39, at 329-30..........................................1, 5, 38

## Florida

1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised
    Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892) ...............35

## Georgia

1837 Ga. Acts 90, § 1..........................................................................36

## Illinois

1881 Ill. Laws 73, § 1 .........................................................................35

## Kentucky

1855 Ky. Acts 96, Chapter 636, § 1..................................................35

## Maine

1909 Me. L., ch. 129, p. 141 .......................................................4, 37

## Massachusetts

1750 Mass. Acts 544, Chapter 17, § 1 ..............................................33

## TABLE OF AUTHORITIES
### (continued)

**Page**

1786 Mass. Acts 87, Chapter 38 ........................................................33

1850 Mass. Gen. Stat. ch. 194, § 2 ...................................................35

1926 Mass. Acts 256, Chapter 261 ...................................................38

**Michigan**

1927 Mich. Pub. Acts, No. 372, pp. 888–89.....................................38

**Minnesota**

1913 Minn. L., ch. 64, p. 55........................................................4, 37

**New Jersey**

An Act Against Wearing Swords (1686) *reprinted in The Grants,*
  *Concessions, and Original Constitutions of the Province of*
  *New Jersey* 289-90 (1881) .........................................................33

An Act to Describe, Apprehend and Punish Disorderly Persons §
  2 (1799) *reprinted in* Laws of the State of New Jersey 474
  (Nettleton ed., 1821) .................................................................33

1911 N.J. Laws, Chapter 128, p. 185...........................................4, 37

**New York**

1849 N.Y. Laws 403–04, Chapter 278, §§ 1–2 ................................35

1916 N.Y. Laws 338–39, Chapter 137, § 1 ......................................37

**North Dakota**

1877 N.D. Laws 794, § 45 ...............................................................35

**Ohio**

1788-1801 Ohio Laws 321, 323........................................................33

## TABLE OF AUTHORITIES
### (continued)

Page

**Oklahoma**

1890 Okla. Sess. Laws 475-76, §§ 18–19 ....................................... 35

**Rhode Island**

1927 R.I. Pub. L., ch. 1052, p. 259 ................................................. 38

**South Carolina**

1903 S.C. Acts 127-28, No. 86 ...................................................... 34

**Tennessee**

1837-1838 Tenn. Pub. Act 200, Chapter 137, § 1 .......................... 36

1879 Tenn. Pub. Acts 135, Chapter 96, § 1 .................................... 34

1883 Tenn. Pub. Acts 17, Chapter 13, § 1 ...................................... 34

**Texas**

1871 Tex. Laws 25, § 1 ........................................................... 35, 37

**Vermont**

1849 Vt. Acts & Resolves 26, No. 36, §§ 1–2 .................................. 35

1912 Vt. Acts & Resolves, No. 237, p. 310 .................................. 4, 37

**England**

7 Rich. 2, ch. 13 (1383) ................................................................. 32

33 Hen. 8, ch. 6, §§ 1-2, 18 (1541) ................................................ 32

**COURT RULES**

Ninth Circuit Rules 28-2.7 ............................................................... 4

ix

## TABLE OF AUTHORITIES
### (continued)

**Page**

OTHER AUTHORITIES

1 Blackstone, *Commentaries on the Laws of England* 139 (1769) ................31

Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016) ........................................................................................24

CNN US <https://www.cnn.com/2018/02/13/us/gun-industry-atf-deregulation-white-paper-brady-center-documents-invs/index.html> (as of May 15, 2025) ......................................25

John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence* ........................................................30

Schwoerer, *Gun Culture in Early Modern England* 59 (2016) ......................32

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17–18 (1782) ...................31

**INTRODUCTION**

California has prohibited the possession of firearm silencers for nearly a century. Cal. Penal Code § 33410; *see* 1933 Cal. Stat., ch. 39, at 329–30. These devices attach to a firearm and are designed to silence, diminish, or muffle the sound associated with discharge of the weapon. Cal. Penal Code § 17210. Given their inherent design and function, silencers render it more difficult for potential victims to detect and flee from a shooting and for law enforcement to locate and neutralize a shooter. Because they are particularly dangerous firearm accessories that exacerbate the lethality of firearms, and lack a counterbalancing self-defense use or utility, silencers have been heavily regulated since the early 1900s.

Plaintiff and Appellant Gary Sanchez filed a pro se complaint in district court challenging the constitutionality of California's prohibition on silencers. He argued that the devices are protected by the Second Amendment and that California's prohibition is contrary to the Nation's history and tradition of permissible firearms regulation. The district court rejected plaintiff's claim and dismissed the complaint without leave to amend.

That judgment was sound and should be affirmed. Under the analytical framework articulated in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)—which asks whether the challenged law burdens presumptively protected conduct and, if so, whether the law is consistent with principles of historical

firearm regulation—the district court correctly held that plaintiff's constitutional challenge failed at the threshold stage of the analysis. Silencers are neither bearable "Arms" nor integral components that are necessary for the operation of a firearm. They have no intrinsic self-defense purpose or utility in the case of confrontation. The district court's dismissal fits squarely within a uniform consensus of the federal courts that silencers are not presumptively protected by the text of the Second Amendment. Indeed, this Court recently observed as much, noting that "a silencer" is an "optional accessor[y]" that "may be attached to a firearm without necessarily falling within the scope of the text of the Second Amendment." *Duncan v. Bonta*, 133 F.4th 852, 869 (9th Cir. 2025) (en banc).

This Court need go no further. Yet plaintiff's challenge was also deficient at the threshold inquiry for reasons not addressed by the district court. The complaint did not plausibly allege that silencers are commonly used for ordinary self-defense. *See Bruen*, 597 U.S. at 32. Although plaintiff contends that millions of silencers are legally owned, the mere prevalence of a particular weapons accessory does not establish its common use for self-defense. *See Duncan*, 133 F.4th at 882-83. Nor do the inherent characteristics of silencers, which simply alter the shooting experience, evidence any utility for armed self-defense, and plaintiff made no allegations to that effect. Moreover, these inherent characteristics demonstrate that

2

silencers are the type of "dangerous and unusual" item that is not covered by the Second Amendment's presumptive protection. *See Bruen*, 597 U.S. at 21.

And even if plaintiff could have shown that silencers are presumptively protected at the first stage of the *Bruen* analysis, California's prohibition fits well within the Nation's historical tradition of firearms regulation. *See Bruen*, 597 U.S. at 19. Like its historical predecessors from the founding era through the twentieth century, the challenged statute rests on the well-established principle that exceedingly dangerous weapons and uses of weapons may be banned, imposing a comparable burden on the right to armed self-defense and promoting comparable public-safety justifications. California's prohibition is thus constitutionally permissible because it is "relevantly similar" to an unbroken chain of historical weapons regulation. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024); *Bruen*, 597 U.S. at 29–30.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal from the district court's final judgment under 28 U.S.C. § 1291. On August 28, 2024, the district court issued an order dismissing plaintiff's constitutional challenge to California Penal Code § 33410 and entered a final judgment. 1-SER-3–9.[1] Plaintiff timely appealed the

---

[1] The Attorney General declines to file replacement supplemental excerpts of record and relies on the previously submitted excerpts. *See* ECF 31.1 at 2.

3

decision and judgment on September 6, 2024. 2-SER-34–39. The district court had subject matter jurisdiction over plaintiff's federal constitutional claims under 28 U.S.C. § 1331.

**STATEMENT OF THE ISSUES**

Whether California's prohibition on the possession of firearm silencers under California Penal Code § 33410 comports with the Second Amendment to the United States Constitution.

**ADDENDUM OF STATUTORY PROVISIONS**

An addendum of pertinent statutory provisions has been filed with this brief. Ninth Cir. R. 28-2.7.

**STATEMENT OF THE CASE**

**A.    History of Firearm Silencers and California's Restrictions**

A firearm silencer, sometimes referred to as a suppressor, is a device that, when attached to a functioning firearm, muffles the sound of the discharge of the firearm. Silencers were first patented in 1908. *United States v. Comeaux*, 2024 WL 115929, at *3 (W.D. La. Jan. 10, 2024). Almost immediately after these devices were patented, states began to ban their sale and possession. *Id.*; *see, e.g.*, 1909 Me. L., ch. 129, p. 141; 1911 N.J. Laws, ch. 128, p. 185; 1912 Vt. Acts & Resolves, No. 237, p. 310; 1913 Minn. L., ch. 64, p. 55. Congress later included restrictions on silencers in the National Firearms Act of 1934, requiring purchasers

4

to pay a fee and pass a background check. *See Sonzinsky v. United States*, 300 U.S. 506, 511–12 (1937); *Comeaux*, 2024 WL 115929, at *3.

In California, possession of a silencer has been prohibited since 1933. *See* 1933 Cal. Stat., ch. 39, pp. 329–30. California Penal Code Section 33410 states, "Any person, firm, or corporation who within this state possesses a silencer is guilty of a felony and upon conviction thereof shall be punished by imprisonment . . . or by a fine not to exceed ten thousand dollars ($10,000), or by both that fine and imprisonment." Under California law, a "silencer" is defined as "any device or attachment of any kind designed, used, or intended for use in silencing, diminishing, or muffling the report [i.e., sound of the discharge] of a firearm," as well as "any combination of parts, designed or redesigned, and intended for use in assembling a silencer or fabricating a silencer and any part intended only for use in assembly or fabrication of a silencer." Cal. Penal Code § 17210.

### B.   Procedural History

In April 2024, plaintiff filed a complaint, alleging that California Penal Code Section 33410 violates the Second and Fourteenth Amendments to the United States Constitution on its face. 2-SER-24. He sought declaratory judgment to that effect, as well as an injunction against enforcement of Section 33410 in its entirety. 2-SER-25. The papers attached to plaintiff's complaint indicated that he sought to

5

create and use a homemade, 3D-printed silencer.  2-SER-26.  The proposed

silencer, which plaintiff unsuccessfully sought federal authorization to fabricate

and register, was intended for use with 5.56mm caliber rounds.  *Id.*[2]  The federal

authorization was denied on the grounds that silencers are unlawful in California

under state law.  2-SER-33.

A few months later, on the Attorney General's motion, the district court

ordered plaintiff's complaint dismissed without leave to amend.  1-SER-3–9.  The

court held that silencers are not "Arms" protected by the Second Amendment.  1-

SER-6–8.  A silencer, the court explained, is neither "a weapon in itself," nor an

accessory that is necessary "to the essential operation of a firearm."  1-SER-8.

Because "silencers are not 'bearable arms' for purposes of the Second

Amendment," the court concluded that plaintiff failed to state a claim.  *Id.*  Final

judgment was entered on the same day.  1-SER-2.

Plaintiff filed a timely notice of appeal in September 2024.  2-SER-34–39.

In February 2025, after plaintiff filed a pro se opening brief and the Attorney

General filed an answering brief, the Court granted plaintiff's request to file

---

[2] 5.56mm NATO rounds are commonly used with the M16 rifle (a fully automatic machinegun) and semiautomatic, assault-style rifles.  *See Wood v. Arnold*, 321 F. Supp. 3d 565, 572 n.6 (D. Md. 2018).

additional briefing prepared by newly retained counsel, encouraging the parties to file replacement briefs.  ECF 31.1.

## SUMMARY OF THE ARGUMENT

The district court properly rejected plaintiff's challenge to California's statutory prohibition on firearm silencers, concluding that the devices are not protected as "Arms" under the Second Amendment's text.  Under *Bruen*'s threshold inquiry, plaintiff was required to establish that possession of a silencer is presumptively protected by the Second Amendment.  *Bruen*, 597 U.S. at 24; *Duncan*, 133 F.4th at 865.  But silencers are not bearable "Arms" under the original understanding of that term because they are not weapons of offense or defense capable of casting at or striking another.  *See District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

Nor are silencers protected by an ancillary right as a component integral to operation of a firearm.  Although the Second Amendment includes certain corollary rights necessary for realization of its core self-defense right, *see Duncan*, 133 F.4th at 866–67; *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024), a silencer is not a component or accessory that is necessary for the ordinary functioning of a firearm.  The device merely diminishes the sound and flash associated with discharging a firearm.  It has no inherent usefulness or purpose related to ordinary self-defense.  Like a multitude of courts both pre- and post-

7

*Bruen*, the district court correctly held that silencers are not presumptively protected by the Second Amendment at the first step of the *Bruen* analysis.

Plaintiff's Second Amendment claim fails at *Bruen* step one for additional reasons not considered by the district court. In his complaint, plaintiff did not plausibly allege that silencers are in common use for self-defense. *See Bruen*, 597 U.S. at 32. While he asserted that over three million silencers are privately owned in the United States, this Court has rejected plaintiff's ownership-estimate approach. *Duncan*, 133 F.4th at 882–83. And despite plaintiff's claim that silencers provide a shooter with various benefits, plaintiff failed to allege that these devices are used with any regularity in self-defense scenarios.

In addition, silencers fit within a category of inherently "dangerous and unusual" items that, whatever their purported self-defense utility, lack presumptively constitutional protection at *Bruen*'s first step. *See Bruen*, 597 U.S. at 21; *Heller*, 554 U.S. at 627. By muffling the sound and flash associated with gunfire, a silencer renders it more difficult for potential victims to identify and flee from a shooter, as well as for law enforcement to locate and confront the threat. *See, e.g.*, *Comeaux*, 2024 WL 115929, at *3. These fundamentally dangerous characteristics have justified regulation and prohibitions on such devices for well over a century.

Even if plaintiff could show that silencers were presumptively protected at *Bruen*'s first step, California's prohibition is consistent with the Nation's historical tradition of firearms regulation. *Bruen*, 597 U.S. at 19. From the colonial and early founding eras, to the antebellum and postbellum period, and into the twentieth century, the historical record demonstrates regulation of weapons in accordance with a uniform principle: that especially dangerous uses of weapons may be banned once their dangers become apparent. California's prohibition on silencers, which is based on the device's exceeding dangerousness, fits well within that tradition. *See Rahimi*, 602 U.S. at 698–99; *Bruen*, 597 U.S. at 29–30; *Duncan*, 133 F.4th at 874–84.

## STANDARD OF REVIEW

The district court entered a final judgment dismissing plaintiff's complaint without leave to amend. 1-SER-3–9. The Court reviews an order granting a motion to dismiss de novo, accepting all nonconclusory factual allegations in the complaint as true. *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100 (9th Cir. 2024).

## ARGUMENT

The district court properly dismissed plaintiff's Second Amendment challenge to California's prohibition on firearm silencers. Plaintiff argues that silencers are covered by the Second Amendment's plain text, both as "Arms"

themselves and because they aid in the safe and effective use of firearms. Replacement Opening Br. (ROB) at 14–34, 34–37.  And he claims that California cannot show that a ban on possession of silencers aligns with historical firearms restrictions.  ROB at 37–42.  Plaintiff's arguments lack merit.

As explained below, the district court's conclusion that possession of silencers is not presumptively protected at *Bruen*'s threshold stage was not only analytically correct, but is consistent with the decisions of every other federal court that has addressed the issue, including recent observations of this Court.  Because plaintiff failed to satisfy his initial burden under the *Bruen* standard, this Court should affirm.  Additionally, even if the Court were to assume that silencers were presumptively protected by the Second Amendment, the State has amply shown that its prohibition is consistent with historical principles of firearm regulation.

## I.    PLAINTIFF CANNOT ESTABLISH THAT SILENCERS ARE PRESUMPTIVELY PROTECTED BY THE SECOND AMENDMENT

The Second Amendment "codified a *pre-existing* right."  *Heller*, 554 U.S. at 592.  "'[L]ike most rights, the right secured by the Second Amendment is not unlimited.'"  *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626).  It has never been understood as "'a right to keep and carry any weapon whatsoever,'" *id.* (quoting *Heller*, 554 U.S. at 626), and *Heller* confirms that certain weapons and instruments "may be banned," *Heller*, 554 U.S. at 627.

10

Under *Bruen*, the threshold question is whether a plaintiff has carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct. *Bruen*, 597 U.S. at 24; *Duncan*, 133 F.4th at 865; *B & L Prods., Inc.*, 104 F.4th at 119. To answer that question, the Court addresses whether "the Second Amendment's plain text covers" the plaintiff's proposed course of conduct. *Bruen*, 597 U.S. at 24. That inquiry considers "the normal and ordinary meaning of the Second Amendment" informed by its "historical background." *Id.* at 20 (internal quotation marks omitted).

Where a plaintiff contends that possession of a prohibited item is covered by the Second Amendment, the plaintiff bears an initial burden to establish that the item fits within the definition of "Arm," as that term was originally understood— either as a weapon itself or a component integral to the operation of a weapon. *See Heller*, 554 U.S. at 581; *Duncan*, 133 F.4th at 866–67. Failure to do so is fatal to the constitutional claim. *Bruen*, 597 U.S. at 18. But even where a plaintiff can meet that burden, the Supreme Court has emphasized that not every "*type of weapon*" is "eligible for Second Amendment protection." *Heller*, 554 U.S. at 622. In determining what types of weapons fall within the scope of the Second Amendment at step one of the *Bruen* framework, the Supreme Court has clarified that only "weapons 'in common use' today for self-defense" are eligible for protection, *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627); *United States*

*v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023), while "'dangerous and unusual weapons'" may be banned, *Heller*, 554 U.S. at 627.  Plaintiff's constitutional challenge fails *Bruen*'s initial inquiry in every respect.

### A.  Silencers Are Neither "Arms" nor Accessories Necessary for the Operation of a Firearm

Silencers are not "presumptively protect[ed]" under the Second Amendment's plain text. *Bruen*, 597 U.S. at 24.  Although the meaning of the term "Arms" is broad, *see Heller*, 554 U.S. at 581, it is "fixed according to its historical understanding," *Bruen*, 597 U.S. at 28.  To that end, *Heller* explained that an instrument need not have existed at the time of the founding to fall within the scope of the Second Amendment, but it still must fit within the founding-era understanding of an "Arm[]." *Heller*, 554 U.S. at 581.  Citing multiple dictionary definitions from the relevant time period, the Supreme Court has defined "Arms" as "'[w]eapons of offence, or armour of defence,'" *id.* (quoting 1 Dictionary of the English Language 106 (4th ed.)), and "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" *id.* (quoting 1 A New and Complete Law Dictionary).  "The meaning of 'Arms' thus broadly includes nearly all weapons used for armed self-defense." *Duncan*, 133 F.3d at 866.

In addition to actual weapons, the Second Amendment's plain text carries "an implicit, corollary right to bear the components or accessories necessary for the

ordinary functioning of a firearm." *Duncan*, 133 F.4th at 868. This implied right is "'necessary to the realization of the core right to possess a firearm for self-defense.'" *B & L Prods., Inc.*, 104 F.4th at 118 (quoting *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc)). Such "[a]ncillary rights are protected to the extent necessary to serve" the interest of keeping and bearing arms "'for lawful purposes, most notably for self-defense.'" *B & L Prods., Inc.*, 104 F.4th at 118 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 781 (2010)); *see Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (recognizing the implied right to possess ammunition), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing "some corollary, albeit not unfettered, right to possess the magazines necessary to render . . . firearms operable"), *abrogated on other grounds by Bruen*, 597 U.S. 1. In contrast, however, where an accessory is not necessary to operate a firearm for self-defense, the Second Amendment does not protect a right to bear that accessory. *Duncan*, 133 F.4th at 867.

This Court's application of these principles in analyzing California's ban on large-capacity magazines provides instructive (indeed, dispositive) guidance. *See Duncan*, 133 F.4th at 865–69. The en banc panel in *Duncan* first held that large-capacity magazines—ammunition-feeding devices capable of accepting more than ten rounds of ammunition—are not "Arms" under the Second Amendment because

they cannot be not "reasonably described . . . as a 'weapon of offense, or armour of defence.'" *Id.* at 867 (quoting *Heller*, 554 U.S. at 581). "Without an accompanying firearm, a large-capacity magazine is benign, useless in combat for either offense or defense." *Duncan*, 133 F.4th at 867.

Nor were such magazines protected under "the corollary right to possess accessories that are necessary for the ordinary operation of a protected weapon." *Duncan*, 133 F.4th at 867. Although it acknowledged an implied Second Amendment right to possess a magazine for firearms that require one, *id.* at 866–68 (citing *Fyock*, 779 F.3d at 998), the *Duncan* Court held that *large-capacity* magazines were "not necessary to operate any firearm," *id.* at 868. "To the contrary, firearms that accept magazines operate as intended when equipped with magazine containing ten or fewer rounds." *Id.* Large-capacity magazines were thus "optional" accessories not encompassed in the Second Amendment's plain text. *Id.*

An identical analysis and result applies here. Silencers indisputably fall outside that historical understanding of the term "Arms." While the complaint below did not articulate a definition of silencers, the term "silencer" is defined by statute as "any device or attachment of any kind designed, used, or intended for use in silencing, diminishing, or muffling the report of a firearm." Cal. Penal Code § 17210 (referencing Cal. Penal Code § 33410). Such a "device or attachment"

14

necessarily cannot constitute an "Arm" within the meaning of the Second
Amendment because it cannot be used to "cast at or strike another" and has no
intrinsic usefulness as a weapon in the case of confrontation. *Heller*, 554 U.S. at
581. A silencer has neither inherent offensive nor defensive capability, but rather,
is a firearm accessory that has no self-defense purpose. *See United States v.
Peterson*, 127 F.4th 941, 946 (5th Cir. 2025) ("Without being attached to a firearm,
[a silencer] would not be of much use for self-defense."); *United States v. Cox*, 906
F.3d 1170, 1186 (10th Cir. 2018) (concluding that silencers are accessories, not
"bearable arms" covered by the Second Amendment).[3]

Nor are silencers protected by the "corollary right to bear the components or
accessories necessary for the ordinary functioning of a firearm." *Duncan*, 133
F.4th at 866. Like large-capacity magazines, these optional accessories are
"unnecessary to the essential operation of a firearm." *United States v. Berger*,
715 F. Supp. 3d 676, 697–702 (E.D. Pa. 2024). Silencers are instead designed only
to muffle the byproduct of normal firearm operation after it has been discharged—
namely, lessening the "report" or sound associated with discharging a firearm. *See*
Cal. Penal Code § 17210. As the Fifth Circuit recently explained in rejecting a
claim that silencers constituted a protected accessory, the devices are unlike

---

[3] Plaintiff explicitly acknowledged in his complaint that silencers are
"accessories for arms." 2-SER-25.

"gunpowder, lead, and cartridges—items *necessary* to a firearm's operations."
*Peterson*, 127 F.4th at 947 (while a silencer is useful in the act of "casting or
striking at another" with a firearm, "that usefulness does not transform a gas
dissipater into a bullet caster").  And while *Duncan* suggested that *some* magazines
may be necessary to operate a firearm, 133 F.4th at 866–68, plaintiff has not
demonstrated that any silencer is necessary to operate any firearm.  Indeed, every
federal court to address this issue—both before and after *Bruen*—has concluded
that silencers are not protected by the Second Amendment, with the vast majority
concluding that silencers are not covered by the plain constitutional text.[4]

---

[4] *See, e.g.*, *Peterson*, 127 F.4th at 946–47; *United States v. Saleem*, 2024 WL
5084523, at *2 (4th Cir. Dec. 12, 2024) ("[W]hile silencers may serve a safety
purpose to dampen sounds and protect the hearing of a firearm user or nearby
bystanders, it fails to serve a core purpose in the arm's function."); *Cox*, 906 F.3d
at 1186 ("[B]ecause silencers are not 'bearable arms,' they are outside the Second
Amendment's guarantee."); *United States v. Jernigan*, 2024 WL 4294648, at *7–8
(E.D. Va. Sept. 25, 2024) ("[A] firearm does not require a silencer to operate, and
without a silencer the right to bear arms would not be rendered meaningless.");
*Berger*, 715 F. Supp. 3d at 697–702 (silencer not covered by text of Second
Amendment "because it is merely an accessory which is unnecessary to the
essential operation of a firearm"); *Capen v. Campbell*, 708 F. Supp. 3d 65, 89 (D.
Mass. 2023) (similar); *United States v. Peterson*, 2023 WL 5383664, at *2 (E.D.
La. Aug. 21, 2023) ("[S]ilencers are not bearable arms within the score of the
Second Amendment even in light of *Bruen* or its progeny.");  *United States v.
Cooperman*, 2023 WL 4762710, at *1 (N.D. Ill. July 26, 2023) ("The plain text of
the Second Amendment does not protect accessories that are not bearable arms,
such as silencers."); *Cox v. United States*, 2023 WL 4203261, at *7 (D. Alaska
June 27, 2023) (similar); *United States v. Villalobos*, 2023 WL 3044770, at *12 (D.
Idaho Apr. 21, 2023) (similar); *United States v. Saleem*, 659 F. Supp. 3d 683, 695
(W.D.N.C. 2023) (similar); *United States v. Al-Azhari*, 2020 WL 7334512, at *3
(continued…)

16

In the face of this unanimous body of authority, plaintiff argues that a "firearm outfitted with a suppressor" is an arm for purposes of Second Amendment protection. ROB at 15; *see id.* at 3, 14, 27. He claims, more specifically, that "a suppressed firearm is the correct object of analysis" because "banning suppressors effectively bans suppressed firearms, which indisputably are arms." ROB 3, 24. That argument would confer Second Amendment protection on any accessory that can be used in conjunction with a firearm. *But see Duncan*, 133 F.4th at 868. Because a silencer "is not necessary for the use of a firearm," this optional accessory is "not protected by the plain text of the Second Amendment." *Peterson*, 127 F.4th at 947.

Plaintiff's amici cite language in *Bruen* explaining that the historical definition of "Arms" covers "modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. They argue for an expansive understanding of the Second Amendment's plain text that encompasses any item that aids in the use of firearms. *See* Amicus Br. of Gun Owners of California, Inc. et al. (GOCA Br.) at 13; Amicus Br. of Firearms Regulatory Accountability Coalition et al. (FRAC Br.) at 4. But in referencing "modern instruments that facilitate armed self-defense," the Supreme Court clearly intended to reiterate a point made earlier in

(M.D. Fl. Dec. 14, 2020) (similar); *United States v. Hasson*, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019) (similar).

*Heller*—that protected "Arms" are not limited only to weapons that existed at the Founding. *See Heller*, 554 U.S. at 582. To that end, the Court cited its earlier decision *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam), where it held that stun guns—a modern instrument used as a weapon for self-defense—are arms that qualify for Second Amendment protection. *See Bruen*, 597 U.S. at 28. *Bruen*'s use of the word "facilitate" does not expand the protections of the Second Amendment to every item that might conceivably aid in the discharge of a firearm.

Curiously, Plaintiff and his amici next argue that this Court's en banc opinion in *Duncan* supports, rather than undermines, plaintiff's constitutional challenge. ROB at 12, 16–21; FRAC Br. at 8. They contend that silencers, unlike large-capacity magazines, are indeed "necessary" for the ordinary operation of firearms under *Duncan* because use of a silencer is the "safest and most effective" way to discharge a firearm. ROB at 17-18; FRAC Brief at 8 (silencers "allow the user to safely fire the gun and more effectively use it for lawful purposes"). But this argument mistakes preference for necessity. *See* ROB at 15 ("[A] suppressor is the preferred method to ensure that a firearm user and any bystanders do not suffer hearing damage from the sound emitted by a firearm."). As an en banc panel of this Court explained in rejecting a similar argument, "the enhancement of a person's ability to fight or to defend is a fundamental attribute of any accessory for

18

a weapon." *Duncan*, 133 F.4th at 868.  But for large-capacity magazines, the "mere fact" that the accessory "undoubtedly provides a benefit for shooter" did not "bring [it] within the scope of the Second Amendment's text." *Id.*  Indeed, in illustrating the point, *Duncan* explicitly referred to silencers as a prototypical example of an "optional accessory" that falls outside the scope of the Second Amendment's text. *Id.* (citing *Cox*, 906 F.3d at 1186).[5]

Here, as recognized by the district court, an en banc panel of this Court, and more than a dozen other federal courts, the use of a silencer, whatever its purported benefits, is not necessary for the functionality of a firearm.  That is the critical inquiry. *Duncan*, 133 F.4th at 868.  The district court correctly explained that "however desirable the silencer may be to a user in reducing noise, flash, or recoil, or in allowing the user to stay hidden while firing," such characteristics are not determinative on whether an item is covered by the text of the Second Amendment.  1-SER-8; *see B & L Prods., Inc.*, 104 F.4th at 119 (quoting *Teixeira*, 873 F.3d at 680) ("'[T]he Second Amendment does not elevate convenience and preference over all other considerations.'").  Plaintiff and the amici's suggestion

---

[5] Plaintiff suggests that this reference is "pure dicta, not a holding" that is binding on this Court.  ROB at 17.  To be sure, the constitutionality of silencer prohibitions was not at issue in *Duncan*.  Even if non-binding, *Duncan*'s illustrative reference to the constitutionality of silencer restrictions is highly persuasive, as it reflects a straightforward application of *Duncan*'s analysis of large-capacity magazines to other accessories.

that silencers are purportedly "necessary," as opposed to "optional," is refuted by over two centuries of effective firearm use without such devices.

Since the district court correctly held that plaintiff's constitutional challenge fails at this threshold step, "the analysis can stop there." *Bruen*, 597 U.S. at 18 (internal quotation marks and citation omitted).

**B.    Silencers are Not in Common Use for Self-Defense**

Even if plaintiff could establish that silencers should otherwise qualify as "Arms" under the constitutional text, he failed to adequately plead that such instruments are self-defense weapons that are "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627).

The Supreme Court has repeatedly emphasized that "individual self-defense is 'the *central component*' of the Second Amendment." *Bruen*, 597 U.S. at 29, 32. Courts must therefore assess whether a weapon is "'in common use' today for self-defense" in determining whether it is presumptively protected. *Id.*; *see id.* at 81 (Kavanaugh, J., concurring) (emphasizing this "important limitation"); *Heller*, 554 U.S. at 624; *Rahimi*, 144 S. Ct. at 1897 (reiterating that "the [Second Amendment] right secures for Americans a means of self-defense"). The Ninth Circuit has followed *Bruen*'s guidance in explaining that part of the "*Bruen* step one" inquiry is "whether the weapon at issue is '"in common use" today for self-defense.'"

20

*Alaniz*, 69 F.4th at 1128; *see Duncan*, 133 F.4th at 866 n.2 (confirming that *Alaniz* is law of the Circuit).

In assessing common use for self-defense, the Supreme Court in *Heller* did not simply consider the *prevalence* of handguns (which was undisputed). *Heller*, 554 U.S. at 629. Instead, it examined the *objective features* of the weapon at issue (the handgun) to explain why it is a "self-defense weapon." 554 U.S. at 629. The Court explained that handguns are "easier to store in a location that is readily accessible in an emergency" due to their small size. *Id.* They are also "easier to use for those without the upper-body strength to lift and aim a long gun"; they "can be pointed at a burglar with one hand while the other hand dials the police"; and they "cannot easily be redirected or wrestled away by an attacker." *Id.* In the same opinion, the Court recognized that some types of weapons fall outside the scope of the Second Amendment—"such as short-barreled shotguns," and "M-16 rifles and the like"—without *any* discussion of their popularity or prevalence. *Id.* at 625, 627. Thus, what mattered to the Court was an "examin[ation]" of "the character of the weapon." *Id.* at 622; *see id.* at 623 ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons.").

In the district court, plaintiff argued that silencers can be used in "defensive situations (such as shooting would be attackers from a protected [and] hidden position while retaining the ability to hear what is going on in your surroundings)."

21

2-SER-12.  On appeal, plaintiff maintains that "firearms outfitted with suppressors serve vital self-defense purposes," specifically allowing for defense of self and home without suffering hearing damage or momentary deafness and disorientation in a self-defense situation.  ROB at 32–33.

But plaintiff has not alleged, here or in the district court, that silencers are typically used for "ordinary self-defense needs."  *Bruen*, 597 U.S. at 60.  Although plaintiff and the amici cite statistics showing that 4.5 million silencers have been registered with the Bureau of Alcohol, Tobacco, and Firearms, *see* ROB at 6; FRAC Brief at 4-5; Amicus Brief of National Association for Gun Rights (NAGR Brief) at 5, the common-use inquiry looks at more than mere prevalence of an item in society.  *See Heller*, 554 U.S. at 629.  To be covered by the text of the Second Amendment, an arm must not only be commonly possessed or in common use generally, but be commonly used for self-defense purposes.  *Bruen*, 597 U.S. at 32; *see Caetano*, 577 U.S. at 420 (Alito, J., concurring) (stun guns protected by the Second Amendment because they are "widely owned and accepted as a legitimate means of self-defense across the country"); *Duncan*, 133 F.4th at 883 (rejecting approach that "any time an undefined number of people own an undefined number of any optional accessory to any weapon, no legislature may ban that accessory, no matter how rarely that accessory is used in armed self-defense").

Unlike the handguns at issue in *Heller* or the stun guns at issue in *Caetano*, a silencer is not itself a weapon.  It simply alters the experience of firing an otherwise operable firearm.  And even assuming the truth of plaintiff's arguments concerning silencers' usefulness in a self-defense scenario, such benefits do not inevitably establish that silencers are in common use for "ordinary self-defense." *Bruen*, 597 U.S. at 60; *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 919 (D. Or. 2023) ("This Court reads the qualifier of 'ordinary self-defense needs' to include some consideration of how and why firearms or firearm accessories are actually used in typical self-defense scenarios.").  Regardless of how many silencers may be lawfully possessed throughout the country, plaintiff has failed to plausibly allege that these devices are commonly used to facilitate self-defense.

### C.    Silencers Are Dangerous and Unusual Items That May Be Banned

Plaintiff's constitutional challenge also fails at the threshold stage of the *Bruen* inquiry because silencers are a type of "dangerous and unusual" item that may be banned.  *See Bruen*, 597 U.S. at 21; *Heller*, 554 U.S. at 627.  These devices "fall outside of the Second Amendment's protections" at the initial stage of the *Bruen* framework.  *Or. Firearms Fed'n*, 682 F. Supp. 3d at 922 (citing *Bruen*, 597 U.S. at 21); *see Nat'l Ass'n for Gun Rights (NAGR) v. Lamont*, 685 F. Supp. 3d 63, 91 (D. Conn. 2023) (conducting "dangerous and unusual" inquiry at *Bruen* step one); *see also Heller*, 554 U.S. at 627 (discussing "dangerous and unusual"

principle as part of its threshold discussion of what "sorts of weapons [are] protected" by the Second Amendment).

The phrase "dangerous and unusual" in describing this historical tradition is a hendiadys:  a rhetorical device where "two terms separated by a conjunction work together as a single complex expression."  Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016).  In "dangerous and unusual," "unusual" conveys some heightened "level of lethality or capacity for injury" that makes a particular type of weapon "uncommonly dangerous," *Hanson v. District of Columbia*, 120 F.4th 223, 238 n.7 (D.C. Cir. 2024), not a numerical limit that bars prohibitions on a weapon as soon as a minimum number are in circulation.  Silencers are "dangerous and unusual" devices that fall outside the scope of the Second Amendment.  *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009); *Comeaux*, 2024 WL 115929, at *3.[6]

Plaintiff and his amici argue that silencers are rarely used during criminal activity and pose a minimal threat to public safety.  ROB at 18–20 (citing Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* at 6–7,

---

[6] Even if the "dangerous and unusual" inquiry requires a separate showing that the weapon in question is not "commonly possessed," *Fyock*, 779 F.3d at 997, plaintiff here did not allege that silencers are commonly possessed by law-abiding citizens for ordinary self-defense, *Bruen*, 597 U.S. at 32.

ATF (Jan. 20, 2017)); NAGR Br. at 4–5 (same); FRAC Br. at 5 (same).[7]  But even if silencers are not often used for criminal purposes, that would not dissipate the uniquely heightened danger they pose.  Indeed, an en banc panel of this Court recognized the unusual dangerousness associated with large-capacity magazines, even if mass shootings using such magazines were infrequent events.  *Duncan*, 133 F.4th at 877–78.  As several courts have previously recognized, silencers are likewise dangerous and unusual, and thus undeserving of constitutional protection.  *See, e.g.*, *McCartney*, 357 F. App'x at 76 (silencers fit within category of unusually dangerous weapons); *Comeaux*, 2024 WL 115929, at *3 (various devices, including silencers, have "the potential to substantially increase the level of violence when used in connection with criminal activity"); *United States v. Grey*, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018) ("[T]he Second Amendment does not extend to 'dangerous and unusual weapons' such as silencers."); *United States v. Perkins*, 2008 WL 4372821, at *4 (D. Neb. Sept. 23, 2008) (similar).

While focusing on the rarity of shootings committed with silencers, plaintiff and the amici fail to address the characteristics of silencers that pose a heightened

---

[7] The credibility of the ATF White Paper cited by plaintiff and the amici has come under substantial scrutiny.  *See* <https://www.cnn.com/2018/02/13/us/gun-industry-atf-deregulation-white-paper-brady-center-documents-invs/index.html> ("Gun lobbyist helped write ATF official's proposal to deregulate") (as of May 15, 2025).

risk to public safety. The function of a silencer—"silencing, diminishing, or muffling the report of a firearm," Cal. Penal Code § 17210—increases the device's capability for lethality. As one court explained, a silencer "has the potential to allow a criminal to fire more shots without detection, avoid apprehension after shooting someone, or both." *Comeaux*, 2024 WL 115929, at *3. Where the sound of gunshots is muffled by a silencer, common sense dictates that it is necessarily more difficult to identify the location of a shooter, which in turn, makes it more difficult for potential victims to flee and for law enforcement to neutralize the danger. Moreover, according to plaintiff's own arguments, *see* 2-SER-12, silencers not only affect the sound of gunfire, they also diminish a firearm's muzzle flash, further aiding a shooter in concealing the location of gunfire and avoiding detection, *see Bianchi v. Brown*, 111 F.4th 438, 455 (4th Cir. 2024) (en banc) (devices that suppress a firearm's flash help conceal the shooter's position). These public safety risks are akin to those identified in *Duncan*, where the Court explained that large-capacity magazines reduced "[t]he short pauses when a shooter must reload a firearm [that] afford intended victims and law enforcement officers a precious opportunity to flee, take cover, and fight back." *Duncan*, 133 F.4th at 877–78. Indeed, the characteristics and function of silencers have justified their heavy regulation at the federal and state level since the early 1900s. *See infra*

26

p. 38.  For these reasons, silencers are among the dangerous and unusual items that are not covered by the Second Amendment's text.

## II.   CALIFORNIA'S PROHIBITION ON SILENCERS IS CONSISTENT WITH THIS NATION'S HISTORY AND TRADITION OF FIREARMS REGULATION

Even if plaintiff could satisfy his burden at the first stage of the *Bruen* inquiry to adequately allege that silencers are presumptively protected by the Second Amendment, California's prohibition on silencers is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 597 U.S. at 19.  In conducting this "analogical inquiry"—at step two of the *Bruen* framework—a modern regulation "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29–30).  Modern laws that are "relevantly similar" to historical regulations, in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified," are constitutional.  *Bruen*, 597 U.S. at 29.

### A.   The Supreme Court Clarified the Historical Inquiry in *United States v. Rahimi*

The Supreme Court recently expounded on step two of the *Bruen* framework. *See Rahimi*, 602 U.S. at 690–702.  In *Rahimi*, by an 8-1 vote, the Supreme Court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8)(C)(i), which prohibits individuals subject to certain domestic violence restraining orders from

possessing a firearm. 602 U.S. at 702. *Rahimi* reiterated that "'the right secured by the Second Amendment is not unlimited,'" does not "sweep indiscriminately," and is "not a right to keep and carry any weapon whatsoever." *Id*. at 690–91. The Court recognized that "some courts have misunderstood the methodology of [*Bruen* and *Heller*]," which "were not meant to suggest a law trapped in amber." *Id*. at 691. It criticized the Fifth Circuit (and the dissent) for committing the "error[]" of "read[ing] *Bruen* to require a 'historical twin' rather than a 'historical analogue.'" *Id*. at 701; *see also id.* at 739 (Barrett, J., concurring) ("[I]mposing a test that demands overly specific analogues has serious problems.").

The Court also explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (majority opinion); *see also id*. at 740 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold."). In ascertaining those principles, moreover, it is appropriate to consider post-ratification laws and practices. *See, e.g.*, *id*. at 695–97 (majority opinion); *id*. at 723–24 (Kavanaugh, J., concurring) ("post-ratification history" can "be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights"). Indeed, *Rahimi* relied on surety laws enacted in the mid-nineteenth century, long after ratification of the Second Amendment, to define the relevant regulatory

28

principle in that case.  *See id.* at 695–97 (majority opinion) (citing *Bruen*, 597 U.S. at 56 & n.23 (citing laws enacted between 1838 and 1868)).

Applying this methodology, the *Rahimi* Court had "no trouble concluding" that the historical analogues invoked by the government were sufficient to justify the challenged law, *Rahimi*, 602 U.S. at 700 (majority opinion), even though those analogues were "by no means identical" to section 922(g)(8)(C)(i), *id.* at 698; *see also id* at 691–92 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.").  Among those analogues, the Court relied on territorial regulations, confirming that such laws may be appropriately relied on in *Bruen*'s historical analysis.  *Id.* at 696 (citing *Bruen*, 597 U.S. at 56 & n.23).

In her concurrence, Justice Barrett outlined two "serious problems" with an overly strict approach to *Bruen*'s historical analysis:  (1) it "forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber'" and (2) "it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority."  *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring); *see also id.* at 705–06 (Sotomayor, J., concurring) (recognizing that under the dissent's more rigid approach, "the legislatures of today would be limited not by a distant

generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary").

### B. The Historical Record Reflects a Robust Tradition of Regulating Particular Weapons That Threaten Public Safety

As explained, the district court below held that silencers were not presumptively protected by the Second Amendment, thus finding it unnecessary to evaluate California's prohibition under the second step of the *Bruen* framework. 1-SER-8 n.3. Still, the historical record reveals that California's law fits well within the Nation's regulatory tradition.[8]  Governments have long adopted historical regulations that either curtail use or outright ban possession of particular weapons and accessories, where the instrument poses a heightened danger to society, so long as the restriction did not destroy the right to armed self-defense by leaving available other weapons for constitutionally protected uses.[9]

---

[8] As addressed above and acknowledged by plaintiff before the district court, *see* 2-SER-25, this case concerns a firearm accessory.  In conducting *Bruen*'s "analogical inquiry," where the Nation's historical tradition shows a robust state police power to limit or ban dangerous and unusual weapons, it necessarily follows that a State may also, consistent with the Second Amendment, ban an *accessory* that enhances the lethality of a firearm or renders it prone to criminal misuse.  *See Duncan*, 133 F.4th at 878–82.

[9] *See* John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874) ("It would seem to follow that . . . while society may *regulate* this right . . . so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and most odious form of tyranny."); *id.* at 287 ("On the one hand . . . society cannot justly require the individual to surrender and lay aside

(continued…)

In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599). That "*pre-existing* right" was "not unlimited." *Id.* at 20-21 (quoting *Heller*, 554 U.S. at 592, 626). As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to protect the peace. 1 Blackstone, *Commentaries on the Laws of England* 139 (1769).[10] The English Bill of Rights—"the predecessor to our Second Amendment"—guaranteed a right for certain subjects to "'have Arms for their Defence suitable to their Conditions, *and as allowed by Law*.'" *Heller*, 554 U.S. at 593 (quoting 1 Wm. & Mary, ch. 2, § 7 (1689)) (emphasis added); *see also* 1 Blackstone, *Commentaries* 139. The phrase "as allowed by law" authorized governments to "restrain the use of *some particular sort of arms*." Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17–18 (1782).

---

the means of self-protection in seasons of personal danger . . . . On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.").

[10] *See also United States v. Wood*, 299 U.S. 123, 138 (1936) ("Undoubtedly, as we have frequently said, the framers of the Constitution were familiar with Blackstone's Commentaries.").

For example, the Crown restricted especially dangerous weapons like launcegays, pocket pistols, and crossbows to preserve the public order. *Bruen*, 597 U.S. at 41–42; *see, e.g.*, 7 Rich. 2, ch. 13 (1383); 33 Hen. 8, ch. 6, §§ 1–2, 18 (1541). The focus on launcegays in medieval England "ma[de] sense" given that "lances were generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute [of Northampton] show—to breach the peace." *Bruen*, 597 U.S. at 41. And Henry VIII's ban on the possession of crossbows and pocket pistols sought "to protect the public" from the proliferation of those weapons and their use in "detestable and shameful murders, robberies, felonies, riot and route." Schwoerer, *Gun Culture in Early Modern England* 59 (2016) (internal quotation marks omitted); *see also id.* at 55 (noting Henry VIII's concern with "the newfangled and wanton pleasure that men now have in using of crossbows and handguns" (internal quotation marks omitted)).

That English tradition continued in America throughout each of the periods that *Bruen* identified as relevant to its historical inquiry. *See Bruen*, 597 U.S. at 46–70. Colonial and state governments imposed regulations on firearms hardware, accessories, and other weapons deemed to pose threats to public safety at the time. During the colonial and founding era, most violent crimes were committed with weapons such as clubs, dirks, and daggers. *See Bevis v. City of Naperville* (*Bevis I*), 657 F. Supp. 3d 1052, 1070 (N.D. Ill. 2023) ("As early guns proved

32

unreliable, many citizens resorted to clubs and other blunt weapons.").[11]  States

and colonies "responded to the proliferation of these weapons." *Id.*  In 1686, for

example, after a period of internal "strife and excitement," *Bruen*, 597 U.S. at 48

(internal quotation marks omitted), East New Jersey prohibited the concealed

carrying of "pocket pistol[s], skeins, stilladers, daggers or dirks, or other unusual

or unlawful weapons," An Act Against Wearing Swords (1686), *reprinted in The*

*Grants, Concessions, and Original Constitutions of the Province of New Jersey*

289–90 (1881).  Other colonies and early States prohibited the carrying of clubs

and similar weapons increasingly used as fighting instruments.  *See Bevis I*, 657 F.

Supp. 3d at 1070 (detailing restrictions).[12]  The Conductor Generalis—a founding-

era guide for justices of the peace, sheriffs, and constables that relied heavily on

the 1791 treatise of William Hawkins on English law—provided that the public

offense of an "affray" could be committed "where there is no actual violence,"

---

[11] During the colonial and founding period, governments also heavily
regulated certain firearms and firearm components when those items posed
heightened dangers to public safety.  *See Duncan*, 133 F.4th at 874–78 (discussing
18th and 19th century regulations of gunpowder and trap guns).

[12] *See*, *e.g.*, 1750 Mass. Acts 544, ch. 17, § 1 (prohibited the carry of "clubs
or other weapons" in a group of 12 or more); 1786 Mass. Acts 87, ch. 38 (same);
1788-1801 Ohio Laws 321, 323 (prohibited the carry of any "dangerous weapon"
while committing a burglary); An Act to Describe, Apprehend and Punish
Disorderly Persons § 2 (1799), *reprinted in* Laws of the State of New Jersey 474
(Nettleton ed., 1821) (prohibited the carry of any pistol, hanger, cutlass, bludgeon,
or other "offensive weapon" with intent to commit assault).

such as "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[13]

Similar restrictions on particularly dangerous uses of weapons and devices existed during the antebellum and postbellum period, around the time that the Fourteenth Amendment was ratified. As explained in one of the most important early American firearms cases, *State v. Reid*, 1 Ala. 612 (1840), the Second Amendment left "with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals." *Id.* at 616. The Supreme Court in *Bruen* recognized as much, citing the Arkansas Supreme Court's approval of a state law (modeled on an earlier approach taken in Tennessee) that prohibited public carry of handguns broadly based on their dangerousness, while reserving an explicit exception that allowed for carry of military-style revolvers. *Bruen*, 597 U.S. at 53 n.20 (citing *Fife v. State*, 31 Ark. 455 (1876)).[14]

---

[13] The Conductor Generalis: Or, the Office, Duty, and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-Men, and Overseers of the Poor, and also The Office of Clerks of Assize, and of the Peace, & c., Albany, 1794, at 26.

[14] *See* 1879 Tenn. Pub. Acts 135, ch. 96, § 1 (banning types of pistols); 1883 Tenn. Pub. Acts 17, ch. 13, § 1 (banning the conveying of pistol cartridges); 1903 S.C. Acts 127–28, No. 86 (banning the carry of certain short pistols).

This era also saw widespread limitations on the carry and possession of particular "melee weapons" as they became prevalent and imperiled public safety due their unique dangerousness. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 664 F. Supp. 3d 584, 600–01 (D. Del. 2023). For example, among other melee weapons regulated during the nineteenth century, states heavily regulated the sale and possession of slungshots—hand-held impact weapons with a weighted object at the end of a flexible strap. New York and Vermont passed laws in 1849 prohibiting the manufacture, sale, and possession of slungshots.[15] Massachusetts banned the manufacture or sale of slungshots in 1850, followed by Kentucky in 1855, Florida in 1868, and the Dakota Territory in 1877.[16] Texas and Arizona banned carry of slungshots in 1871 and 1889 respectively, while Illinois banned possession and sale in 1881, and Oklahoma banned both manufacture and carry in 1890.[17]

---

[15] 1849 N.Y. Laws 403–04, ch. 278, §§ 1–2; 1849 Vt. Acts & Resolves 26, No. 36, §§ 1–2.

[16] 1850 Mass. Gen. Stat. ch. 194, § 2; 1855 Ky. Acts 96, ch. 636, § 1; 1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892); 1877 N.D. Laws 794, § 45.

[17] 1871 Tex. Laws 25, § 1; 1889 Ariz. Sess. Laws Act 13, §§ 1–2; 1881 Ill. Laws 73, § 1; 1890 Okla. Sess. Laws 475-76, §§ 18–19; *see* 1917 Cal. Stat. 221, ch. 145, §§ 1–3 (banning manufacture and possession of certain weapons, including slungshots).

Another melee weapon that rose to prominence during this period was the "Bowie knife," a weapon used by Jim Bowie in a duel that later became widespread in the 1830s. *See DSSA*, 664 F. Supp. 3d at 600. The Bowie knife "gained notoriety as a 'fighting knife.'" *Bevis I*, 657 F. Supp. 3d at 1068; *see also Or. Firearms Fed'n*, 682 F. Supp. 3d at 930–31. By 1840, at least five states or territories had enacted laws restricting the carrying of Bowie knives or other fighting knives. *Bevis I*, 657 F. Supp. 3d at 1068–69. A 1837 Georgia law made it unlawful "to sell, or offer to sell" a "Bowie" knife, "or to keep, or have [such a knife] about their person or elsewhere."[18] Other laws substantially restricted the use of Bowie knives, such as bans on sale in Tennessee and Arkansas, and an Alabama law that taxed them at a prohibitive rate.[19] Nearly every state enacted a law restricting Bowie knives by the end of the nineteenth century, whether by

---

[18] 1837 Ga. Acts 90, § 1. Although the George Supreme Court held that the law's carry restrictions as to pistols violated the Second Amendment in *Nunn v. State*, 1 Ga. 243 (1846), "*Nunn* did not concern, let alone mention, the law's separate prohibition addressing the sale of weapons; nor did it reach beyond 'pistols' to address dangerous-and-unusual weapons like bowie knives. Therefore, this separate clause of the Georgia law remains a valid analogue to modern-day regulations on modern-day dangerous-and-unusual weapons." *Rupp v. Bonta*, 723 F. Supp. 3d 837, 868 (C.D. Cal. 2024); *see also Hill v. State*, 53 Ga. 472 (1874) (disagreeing with *Nunn* and concluding that pocket pistols, dirks, Bowie knives, and "those other weapons of like character" fall outside the scope of the right to keep and bear arms).

[19] *See* 1837-1838 Tenn. Pub. Act 200, ch. 137, § 1; 1881 Ark. Acts 191, §§ 1–3; 1837 Ala. Acts 7, No. 11, § 2.

outlawing their possession, carry, or sale; enhancing criminal penalties; or taxing their ownership. *See Bevis I*, 657 F. Supp. 3d at 1069; *DSSA*, 664 F. Supp. 3d at 601–02 (Bowie knife regulations were "extensive and ubiquitous" after such knives "proliferated in civil society" (internal quotation marks omitted)).[20]

As new technologies developed, twentieth century laws continued this historical tradition of restricting access to particular weapons and accessories with heightened lethality.[21]  As to silencers specifically, the historical record indicates that such devices were considered particularly dangerous from the outset of their invention.  As the court in *Comeaux* recounted, states began to ban their sale or possession shortly after they were patented in 1908.  *Comeaux*, 2024 WL 115929, at *3; *see, e.g.*, 1909 Me. L., ch. 129, p. 141; 1911 N.J. Laws, ch. 128, p. 185; 1912 Vt. Acts & Resolves, No. 237, p. 310; 1913 Minn. L., ch. 64, p. 55; 1916 N.Y.

---

[20] *See e.g.*, 1871 Tex. Laws 25, § 1 (banning carry); 1889 Ariz. Sess. Laws Act 13, §§ 1–2 (same).

[21] In *Bruen*, the Supreme Court focused its historical analysis on the periods surrounding the ratification of the Second and Fourteenth Amendments, specifically rejecting the probative value of public carry laws passed in the twentieth century as contradictory of evidence from those earlier times.  *See Bruen*, 597 U.S. at 66 n.28.  Because there is no such contradiction with respect to dangerous and unusual weapons regulations, restrictions on newly invented twentieth century weaponry, including silencers, are relevant here.  *See Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring) (where "reasonably consistent and longstanding," "post-ratification history—sometimes referred to as tradition—can also be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights").

Laws 338–39, ch. 137, § 1; 1926 Mass. Acts 256, ch. 261; 1927 Mich. Pub. Acts, No. 372, pp. 888–89; 1927 R.I. Pub. L., ch. 1052, p. 259. California followed suit in 1933, enacting the predecessor to the ban now challenged in this lawsuit. *See* 1933 Cal. Stat., ch. 39, pp. 329–30. By the time the National Firearms Act was enacted in 1934—a law that, itself, placed strict restrictions on various dangerous weapons, including silencers—at least 15 states had imposed restrictions on the sale or possession of silencers. *Comeaux*, 2024 WL 115929, at *3.[22]

### C. California's Prohibition on Silencers Is Consistent with Regulatory Tradition

The historical regulation of particularly dangerous weapons confirms the principle that governments can, consistent with the Second Amendment, regulate particularly dangerous weapons and uses of weapons that imperil public safety, so long as alternative weapons remain available for self-defense. California's prohibition on silencers is consistent with that principle because it is "relevantly similar" to this unbroken history of restrictions on possession and use of particular weapons as they emerged and threatened public safety. *Bruen*, 597 U.S. at 29; *see id.* at 21; *see Duncan*, 133 F.4th at 874–84 (concluding historical regulations of especially dangerous uses of weapons were "relevantly similar" to modern ban on large-capacity magazines).

---

[22] Among other weapons, the National Firearms Act banned possession of fully automatic machineguns. *See Garland v. Cargill*, 602 U.S. 406, 410 (2024).

To the extent California Penal Code Section 33410 imposes any burden at all on the right to armed self-defense, that burden is no greater than that imposed by the historical analogues detailed above because it restricts possession of a particularly dangerous item, but otherwise allows law-abiding citizens access to a range of other weapons to exercise their right to armed self-defense. *See Bruen*, 597 U.S. at 29. The prohibition's justification is likewise "comparable" to this body of historical regulations because, like these analogues, the prohibition turns on the unique dangerousness of the regulated item, especially when used for criminal purposes. *Id.*; *see Duncan* 133 F.4th at 877–80 (holding that California's ban on large-capacity magazine was "relevantly similar" to historical laws that burdened armed self-defense "by prohibiting a specific, especially dangerous use of a weapon"). Indeed, as explained above, the innate characteristics and function of a silencer implicate a substantially heightened risk of lethality, because when used as designed, a silencer helps conceal the shooter's location and the fact that shots have been fired. *Comeaux*, 2024 WL 115929, at *3. The purpose of regulating silencers is thus highly analogous to the commonplace regulations of particularly dangerous types and uses of weapons that posed a risk to innocent persons in the eighteenth and nineteenth centuries. *See Duncan*, 133 F.4th at 878–79.

Plaintiff disagrees, arguing that the analogical reasoning in *Duncan* instead "demonstrates why the State will be unable to meet its burden" at step two of the *Bruen* analysis. ROB at 38. In purporting to distinguish the historical analogues identified in *Duncan*, however, plaintiff simply rehashes his view that silencers pose no safety risk and "have the opposite effect of *increasing* the safety of firearm use for both the bearer and bystanders." ROB at 40. But plaintiff again wholly ignores the obvious and uniquely heightened dangers associated with criminal misuse of silencers. These inherent dangers, which provide the basis for California's restrictions, link the challenged law to the regulations of past centuries. Possession bans on slungshots, for instance, are "relevantly similar" to California's silencer prohibition because both stem from legislative determinations that the item in question is exceedingly dangerous and should not be possessed by members of the public. *Rahimi*, 602 U.S. at 698; *Bruen*, 597 U.S. at 29–30. The fact that silencers may have certain benefits or may not be frequently used for criminal activity does not negate the justification for their prohibition or its comparable similarity to the basis for historical firearm regulations. *See Duncan*, 133 F.4th at 877–80 (large-capacity magazine ban "relevantly similar" to historical prohibitions on possession or use of Bowie knives, slungshots, and concealable pistols, even though the harm justifying the ban (mass shootings) occurs infrequently). Moreover, even if California's prohibition were not squarely similar

40

to the historical analogues outlined above, silencers—which were first patented in 1908—constituted the type of "'dramatic technological change[]'" in firearm accessories that calls for a "'more nuanced approach'" to *Bruen*'s historical inquiry. *Duncan*, 133 F.4th at 872–74 (quoting *Bruen*, 597 U.S. at 27); *accord Wolford v. Lopez*, 116 F.4th 959, 977 (9th Cir. 2024). As with California's ban on the possession of large-capacity magazines upheld in *Duncan*, "any difference" in the regulatory approach to silencers "is precisely because of the factors that *Bruen* mentioned" that may require a more nuanced analysis. *Duncan*, 133 F.4th at 881 (citing *Bruen*, 597 U.S. at 27). In short, the challenged prohibition is consistent with regulatory tradition because it stands on a principle common among all of the historical analogues: exceedingly dangerous weapons and uses of weapons may be restricted and banned.

Accordingly, the historical record demonstrates that California's ban on silencers—to the extent it poses any burden on the right to armed self-defense—is constitutionally permissible. *Bruen*, 597 U.S. at 26–31. Plaintiff's Second Amendment challenge to California's restrictions on silencers cannot succeed as a matter of law.

## CONCLUSION

The Court should affirm the district court's judgment dismissing plaintiff's complaint.

Dated:  May 28, 2025

Respectfully submitted,

*/s/ Kevin L. Quade*

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
*Supervising Deputy Attorneys General*
KEVIN L. QUADE
*Deputy Attorney General*
*Attorneys for Defendant and Appellee*

42

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

Dated:  May 28, 2025                    Respectfully submitted,

_/s/ Kevin L. Quade_

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
*Supervising Deputy Attorneys General*
KEVIN L. QUADE
*Deputy Attorney General*
*Attorneys for Defendant and Appellee*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5566

I am the attorney or self-represented party.

**This brief contains** | 10,135 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [            ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Kevin L. Quade | **Date** | May, 28, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

---

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)**  24-5566

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[ X ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Appellee's Replacement Answering Brief

**Signature**  /s/ Kevin L. Quade          **Date**  May 28, 2025