No. 24-5566

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GARY R. SANCHEZ,

*Plaintiff-Appellant*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California

*Defendant-Appellee*.

Appeal from the Southern District of California
Civil Case No. 3:24-cv-00767-RSH-MSB
(Honorable Robert S. Huie)

## REPLACEMENT REPLY BRIEF OF PLAINTIFF-APPELLANT

C.D. Michel
Anna M. Barvir
Konstadinos T. Moros
MICHEL & ASSOCIATES, PC
180 E Ocean Boulevard
Suite 200
Long Beach, CA 90802
cmichel@michellawyers.com

June 18, 2025

David H. Thompson
Peter A. Patterson
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiff Gary R. Sanchez*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ...........................................................................1

ARGUMENT ..................................................................................4

I.   Firearms Outfitted with Suppressors Are Entitled to Second
     Amendment Protection. ..........................................................4

     A. The State Muddles and Misconstrues the Supreme Court's
        Framework. ......................................................................4

     B. Firearms Outfitted With Suppressors Satisfy Even the State's
        Heightened Test Focusing Only on Self-Defense, and the State's
        Remaining Arguments Fail. ..................................................8

II.  The State Cannot Justify Its Outright Criminal Ban on the Peaceable
     Possession of Safe and Commonly Used Suppressors. ................17

     A. Suppressors Cannot Be Banned Because Suppressors Are Not
        Dangerous And Unusual Weapons..........................................17

     B. None of the State's Cited Historical Regulations Are Relevantly
        Similar to Its Criminal Ban on All Possession of Firearms Outfitted
        with Suppressors..............................................................24

CONCLUSION ..............................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016)................................................................................19

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)............................................ 4, 5, 7, 11, 12, 17, 20, 22, 23

*Duncan v. Bonta,*
    133 F.4th 852 (9th Cir. 2025)..................................... 6, 13, 14, 15, 16, 17, 18

*English v. State,*
    35 Tex. 473 (1871) .................................................................................21

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020)................................................................................29

*Ferdik v. Bonzelet,*
    963 F.2d 1258 (9th Cir. 1992) ................................................................13

*Karim-Panahi v. L.A. Police Dep't,*
    839 F.2d 621 (9th Cir. 1988) ..................................................................13

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022).................................................... 1, 4, 5, 7, 10, 17, 24, 25, 29

*Snope v. Brown,*
    No. 24-203, 2025 WL 1550126 (U.S. June 2, 2025) ....................................18

*Teter v. Lopez,*
    76 F.4th 938 (9th Cir. 2023) ...............................................................26, 27

*Teter v. Lopez,*
    93 F.4th 1150 (9th Cir. 2024) .................................................................26

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023) ...................................................................6

*United States v. Rahimi,*
    602 U.S. 680 (2024)................................................................................29

**Statutes**

U.S. CONST. amend. II...............................................................................8

26 U.S.C

§§ 5811–12 ...................................................................................19

§ 5845(a) ......................................................................................19

27 C.F.R. §§ 479.84–86 .............................................................................19

Cal. Penal Code § 26165(a)(6) ................................................................3

§ 97, ch. 83, 1921 Wyo. Sess. Laws 112–13 ...........................................28

1750 Mass. Acts 544, ch. 17,

§ 1 ................................................................................................25

§ 2 ...........................................................................................25, 26

1786 Mass. Acts 87, ch. 38 ..................................................................25, 26

Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185 ...................................28

Act of July 3, 1918, no. 88, § 3, 1918 La. Acts 131 .................................28

Act of Mar. 29, 1927, ch. 169, 35 Del. Laws 516 (1927)..........................28

Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529 .................28

Act of Mar. 18, 1929, ch. 84, § 14, 1929 Ariz. Sess. Laws 235, 246-247 .............28

Act of May 8, 1792, ch. 33, 1 Stat. 271, § 1 ...........................................21

Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359 .......................28

## Other Authorities

Court Directive, *Peterson*, No. 24-30043 (5th Cir. June 17, 2025), Doc. 141........15

Demographics, Am. Bar Ass'n,
https://tinyurl.com/2yke7bj9.......................................................11

Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations*,
Bureau of Alcohol, Tobacco, Firearms & Explosives (2017),
https://perma.cc/AP6R-VZFA ...............................................22, 23

Paul A. Clark, *Criminal Use of Firearm Silencers*,
8(2) W. Criminology Rev. 44 (2007), https://perma.cc/75DJ-YP8K.. 21, 22

Robert J. Spitzer, *Gun Accessories and the Second Amendment:
Assault Weapons, Magazines, and Silencers*,
83 L. & Contemp. Probs. 231 (2020)........................................27

*Suppressor Owner Study*, NSSF (2025), https://perma.cc/8D85-VJPU................. 11

U.S. Br., *United States v. Peterson*, No. 24-30043 (5th Cir. May 23, 2025),
Doc. 129-2 ....................................................1, 12, 15, 22, 23, 24

United States' Mem. of Law, *United States v. Comeaux*, 2024 WL 115929 (W.D. La. Jan. 5, 2024), Doc. 27..............................................................27

**INTRODUCTION**

Firearms outfitted with suppressors "facilitate armed self-defense," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022), by reducing, but by no means silencing, the sound produced by a firearm and therefore offering several safety enhancing benefits to firearm users and those around them. Suppressed firearms are therefore protected by the plain text of the Constitution, and there is no historical tradition that justifies California's law banning suppressors.

Indeed, in another case relied on by the State, *see* Appellee's Answering Br., Doc. 49.1 at 15–17 (May 28, 2025) ("Cal. Br.") (citing *United States v. Peterson*, 127 F.4th 941 (5th Cir. 2025)), the Federal Government has now conceded that suppressors are entitled to Second Amendment protection. *See* U.S. Br. at 4, *Peterson*, No. 24-30043 (5th Cir. May 23, 2025), Doc. 129-2 ("U.S. Br."). "As a result," the Federal Government has insisted, "a ban on the possession of suppressors"—like California's ban at issue here—"would be unconstitutional." *Id.* That view is correct and commanded by any fair application of the Supreme Court's Second Amendment jurisprudence. California's suppressor ban is unconstitutional.

Firearms outfitted with suppressors should be the relevant focus of the Court's analysis. The State's only justification for banning suppressors—metal or plastic tubes that have no purpose when not integrated or affixed to a firearm—is their function in the shooting mechanism of a firearm. The State impliedly admits as much

1

by attempting to analogize suppressors to dangerous and unusual weapons regulated throughout history—an analogy that fails in any case, but only arguably makes sense when considering firearms outfitted with suppressors, not suppressors removed from their only real-world use. Firearms outfitted with suppressors are indisputably arms, and they therefore are presumptively entitled to constitutional protection. Accordingly, they may only be banned outright if they are dangerous and unusual. They are neither. Suppressed firearms are in widespread common use for lawful purposes in the United States, including self-defense. Thus, they may not be banned consistent with the Constitution.

The State's responses to this straightforward application of Supreme Court precedent are unpersuasive. As the State cannot overcome the straightforward conclusion that firearms outfitted with suppressors fall well within the realm of the Second Amendment's coverage, it attempts instead to muddle the Supreme Court's tests. In particular, the State would render the right null and void if an individual seeks to exercise the right for any activity other than self-defense, or if the State permits *some* means by which an individual can exercise the right while banning others. The State's strained reading of the Second Amendment right is foreclosed by Supreme Court precedent and would make little sense. In the State's world, Americans would enjoy no Second Amendment protection for lawful activities like

2

hunting or target practice and could not choose to defend themselves with the arms of their choice, to name just two of the flaws with this reasoning.

In any case, even if self-defense were the only justifiable basis for exercising the Second Amendment right, the State is mistaken when it asserts that suppressors serve no self-defense purpose or are in any manner dangerous. Despite the State's quibbling with the precise wording in Sanchez's pro se complaint, he has established that suppressors serve a vital self-defense purpose in protecting the defending individual from deafness, disorientation, and muzzle flash and in fact *enhance* safety for both the bearer and bystanders. The State has provided zero evidence to the contrary. It simply disregards this evidence and baldly asserts that suppressors serve no purpose in self-defense and aid criminals, despite no statistical or even *anecdotal* evidence in support. What is more, suppressors facilitate training with firearms by providing hearing protection, and training in turn facilitates the use of firearms for self-defense. Indeed, California conditions the issuance of concealed carry licenses on the completion of training that includes "live-fire shooting exercises on a firing range." CAL. PENAL CODE § 26165(a)(6).

The State has failed to carry its burden to put forth a sufficient historical case to establish that its outright ban on the peaceable possession and use of suppressors is consistent with this country's historical tradition of firearm regulation. The State's collection of inapposite purported historical analogs reveals the opposite: there is

3

nothing close to a historical tradition of broadly banning and criminalizing the possession of arms that are in common use for lawful purposes.

In sum, by enforcing an outright criminal ban on all peaceable possession of suppressed firearms, the State violates the Second Amendment's constitutional guarantees. The district court should be reversed.

## ARGUMENT

### I. Firearms Outfitted with Suppressors Are Entitled to Second Amendment Protection.

#### A. The State Muddles and Misconstrues the Supreme Court's Framework.

As an initial matter, the State muddles the Supreme Court's Second Amendment test, seeking to make the Constitution's protections narrower than they are. This effort should be rejected.

First, the Supreme Court made clear in *Bruen* that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. Full stop. And as a matter of plain text, the Second Amendment's protection extends to all firearms, including, as relevant here, suppressed firearms. Indeed, in *District of Columbia v. Heller* the Supreme Court surveyed historical sources and found that almost without exception the term "arms" was defined to include *all* weapons. 554 U.S. 570, 581 (2008). The one source that had a narrower definition still "stated that all firearms constituted

4

'arms.' " *Id*. Based on the weight of the historical lexical evidence, the Court concluded that "the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms;" i.e., that the "textual elements" of the Second Amendment "guarantee the individual right to possess and carry *weapons* in case of confrontation." *Id*. at 582, 592 (emphases added). *Bruen* repeated this holding as an illustration of how the text-and-history methodology it was elaborating works. *See* 597 U.S. at 28.

The State seeks to limit the Second Amendment's presumptive, textual protection to encompass only those "weapons 'in common use' today" by cherry-picking words from *Bruen* out of context. Cal. Br. at 11 (quoting *Bruen*, 597 U.S. at 32). But this makes little sense. Under the State's understanding, a weapon that is not in common use somehow ceases to be a weapon. And the cited passage in *Bruen* confirms *Plaintiff's* understanding of the constitutional test. Before turning to a plain-text analysis of "bear," the term primarily at issue in *Bruen*, the Court paused to consider whether the handguns at issue were protected by the Second Amendment. And it concluded that they were because all parties agreed that they are "in common use today for self-defense." *Bruen*, 597 U.S. at 32 (internal quotation marks omitted). Because self-defense is a lawful purpose, the Court therefore concluded that handguns were protected by the Second Amendment—not presumptively, as a matter of plain text, but *definitively*, as a matter of text and

5

history. In other words, that short passage in *Bruen* constituted the *entirety* of the Court's analysis of the types of arms at issue, not just a preliminary, plain-text analysis.

To be sure, this Court in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023), stated that *Bruen*'s "textual analysis" includes "determining whether … the weapon at issue is in common use today for self-defense"—misconstruing the *Bruen* page-32 discussion in the same way the State does. *Id*. at 1128 (quotation marks omitted). But that statement was dicta—the Court in that case "assume[d], without deciding, that step one of the *Bruen* test is met." *Id*. at 1129. *Duncan* too "d[id] not reach the issue," and it stated that "therefore, *Alaniz* remains good law." *Duncan v. Bonta*, 133 F.4th 852, 866 n.2 (9th Cir. 2025) (en banc). *Alaniz*'s statement on this issue therefore remains good law for what it is—non-binding dicta.

In any case, Sanchez has established that firearms outfitted with suppressors are in common use for peaceable and safety-enhancing purposes, *see* Appellant Replacement Opening Br., at 6, 21, 37, Doc. 34.1 (Mar. 28, 2025), including self-defense, *see id.* at 1 ("The hearing protection of a firearm outfitted with a suppressor serves critical self-defense functions, ensuring that an individual defending self, family, and home can prevent the temporary deafness or disorientation caused by a firearm blast."); *see also, e.g.*, *id.* at 4, 9, 11, 12.

Second, the State is wrong to suggest that the Supreme Court has ever cabined the Second Amendment *only* to the use of arms for self-defense. To be sure, the Supreme Court has stated that "individual self-defense is the central component of the Second Amendment right." *Bruen*, 597 U.S. at 3 (quoting *McDonald v. Chicago*, 561 U.S. 742, 767 (2010) (emphasis omitted)). But the Court has never held that "central component" in this context means *sole* or *exclusive*, rendering all other uses of arms constitutionally unprotected.

To the contrary, the Court has been clear that *all* lawful uses of firearms are relevant, not just self-defense uses, even if self-defense uses are particularly important to most citizens. In describing the "historical understanding of the scope of the right," the Court explained that it was not understood to protect "those weapons not typically possessed by law-abiding citizens for *lawful purposes*." *Heller*, 554 U.S. at 625 (emphasis added). And in explaining the lawful purposes served by the right, in addition to individual self-defense the Court also discussed promoting "train[ing] in arms" and "hunting." *Id.* at 598–99. Even the dissenters in *Bruen* seemed to agree: "Some Americans use guns for legitimate purposes, such as sport (e.g., hunting or target shooting), certain types of employment (e.g., as a private security guard), or self-defense." 597 U.S. at 89 (Breyer J., dissenting). To be sure, *Heller* and *Bruen* held that handguns are protected because they are in common use for self-defense. *See id.* at 628; *Bruen*, 597 U.S. at 32. But that simply means that

7

common use for that purpose is *sufficient* to establish constitutional protection, not that it is *necessary*.

### B. Firearms Outfitted With Suppressors Satisfy Even the State's Heightened Test Focusing Only on Self-Defense, and the State's Remaining Arguments Fail.

In any case, firearms outfitted with suppressors *do* serve the "central component" of Second Amendment by aiding in self-defense, and they are in common use for that purpose.

To begin, the State attempts to reframe the relevant conduct at issue, considering suppressors as non-usable objects floating in isolation, rather than analyzing the relevant conduct in which the banned suppressors are in fact used. *See* Cal. Br. at 15 ("A silencer has neither inherent offensive nor defensive capability, but rather, is a firearm accessory that has no self-defense purpose."). This reasoning is flawed for several reasons. First, the Second Amendment grants rights to people, not inanimate objects. *See* U.S. CONST. amend. II ("[T]he right of the people to keep and bear Arms, shall not be infringed"). And people use firearm suppressors for their only intended and only logical purpose—to suppress the sound of a firearm. A firearm suppressor simply has no other use. Second, the State only criminalized suppressors *because* of their integral use in the shooting mechanism of a firearm. Otherwise, the State would have no rational basis by which to criminalize the possession of useless metal or plastic tubes, nor does it criminalize another similar

8

use of sound-suppressing technology: car mufflers. Third, the State's own arguments establish that possessing a firearm outfitted with a suppressor is the relevant focus. In attempting to meet its burden to justify its ban with analogies to historical regulation, the State chose to analogize its ban to regulations on "particularly dangerous weapons and uses of weapons that imperil public safety." Cal. Br. at 38. In so doing, the State implicitly *concedes* that the relevant focus should be on firearms outfitted with suppressors. After all, as the State elsewhere admits, a suppressor in isolation and not used for its intended purpose "has neither inherent offensive nor defensive capability," *id.* at 15, and thus could never be analogous to "particularly dangerous" weapons, *id.* at 38.

For these reasons, the State is wrong to speculate that Sanchez's reasoning "would confer Second Amendment protection on any accessory that can be used in conjunction with a firearm." *Id.* at 17. This Court need not decide what if any Second Amendment protection would be afforded accessories that *do not* affect the functionality of a firearm, such as slings or weapon skins. A suppressor is either integral or physically affixed to the firearm itself and affects the actual firing process and functionality of a firearm, distinguishing it from other items some may consider "accessories."

As Sanchez has demonstrated at length, suppressed firearms serve a vital self-defense purpose. *See* Replacement Opening Br. at 1, 4, 9, 11–12, 16, 19, 24–26, 32–

9

33, 41. The State seems to acknowledge as much, noting that Sanchez argues that " 'firearms outfitted with suppressors serve vital self-defense purposes,' specifically allowing for defense of self and home without suffering hearing damage or momentary deafness and disorientation in a self-defense situation." Cal. Br. at 21–22 (quoting Replacement Opening Br. at 32–33). Even in his pro se complaint in the district court, Sanchez alleged that suppressors are important in "defensive situations (such as shooting would be attackers from a protected [and] hidden position while retaining the ability to hear what is going on in your surroundings)." *Id.* (quoting 2-SER-12).

Puzzlingly, despite quoting these passages, the State goes on to say—without explanation—that Sanchez "has not alleged, here or in the district court, that silencers are typically used for 'ordinary self-defense needs.' " *Id*. at 22. (quoting *Bruen*, 597 U.S. at 60). The State takes the quoted phrase from *Bruen* out of context; there, it only served to contrast New York's unconstitutional regime in that case, which required an individual to show a *heightened* self-defense need to exercise certain Second Amendment rights. *See* 597 U.S. at 5 ("New York presumes that individuals have no public carry right without a showing of heightened need.") Whatever the State may mean, it is difficult to imagine a more "ordinary self-defense need[]," *id.* at 60, than the ability to carry out *every aspect* of that defense without suffering incapacitation from the temporary deafness and disorientation caused by a

10

dangerously loud firearm, especially when fired in an enclosed indoor space without the time to secure other forms of ear protection and with a pressing need to hear one's surroundings. Replacement Opening Br. at 32–33. Indeed, this "self-defense need," Cal Br. at 22, is fundamental to all other self-defense activities.

So too, suppressed firearms are in common use for self-defense. The lawful possession of suppressors—subject to the Federal Government's extensive registration and taxation scheme—numbers in the millions. Replacement Opening Br. at 37–38. To illustrate, the number of suppressors owned lawfully in the United States is nearly *triple* the number of attorneys. *Compare Suppressor Owner Study* at 29, NSSF (2025), https://perma.cc/8D85-VJPU (displaying ATF data showing that approximately 4.1 million suppressors are registered to non-governmental individuals or entities), *with* Demographics, AM. BAR ASS'N (2024), https://tinyurl.com/2yke7bj9 ("There are more than 1.3 million lawyers in the United States."). And suppressors are lawful to possess both federally and in the vast majority of States, with 42 States permitting their use. Replacement Opening Br. at 38.

The State attempts to overcome this overwhelming evidence by undermining *Heller*'s focus on "prevalence." Cal. Br. at 21. But this is a misreading of *Heller*. Although the Court speculated about the reasons why so many Americans might prefer handguns, *Heller*, 554 U.S. at 629 (noting that "there are many reasons that a

citizen may prefer a handgun"), the Court concluded by stating that *whatever the reason* for their popularity, Americans do commonly use handguns—therefore they must not be banned. *See id.* ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.").

Regardless, even if the State were right in its reading of *Heller*, its reasoning would apply just as well here, where there are very "many reasons that a citizen may prefer," *id.*, a suppressed firearm. The United States explained many of these reasons in its *Peterson* brief: suppressors' reduction of noise "helps shooters avoid permanent hearing damage and facilitates communication with others"; suppressors "appear to improve accuracy and aid in target re-acquisition by reducing recoil and muzzle rise"; and suppressors "aid in target shooting … by reducing noise pollution and providing additional hearing protection beyond personal protective equipment." *Peterson*, U.S. Br. at 4. These are all reasons why suppressors' "beneficial use is overwhelming in relation to their criminal use," *id.* at 7, and why, as Sanchez alleged, suppressors are "overwhelmingly used by law abiding citizens for lawful purposes." 2-SER-025.

The State's remaining arguments likewise fail. The State points to alleged inartful wording in Sanchez's pro se complaint in the district court. *See* Cal. Br. at 15 n.3 ("Plaintiff explicitly acknowledged in his complaint that silencers are

'accessories for arms.' "). Even assuming that it is proper to parse a pro se complaint in such a way, *contra Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988) ("In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."), the State fails to mention that Sanchez *did* in fact refer to suppressors as "arms" in his complaint, and overall clearly brought a claim invoking the Second Amendment. *See, e.g.*, 2-SER-025 (alleging that suppressors are "arms").

It would be particularly unwarranted to give significance to Sanchez's use of the term "accessory" in the complaint because the filing of the complaint predated this Court's decision in *Duncan*, which introduced the "accessory" versus arms dichotomy in this Circuit and gave the term "accessory" legal import in this context. 133 F.4th at 860.

Regardless, if the State's selective nitpicking of a pro se complaint has any bearing whatsoever on the Court's constitutional analysis in a case comprised entirely of legislative facts, the right remedy is to remand for the district court to provide leave to amend, not the denial of constitutional relief on this basis. *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) ("[B]efore dismissing a pro se complaint the district court must provide the litigant with notice of the deficiencies in his complaint in order to ensure that the litigant uses the opportunity to amend effectively.").

13

Next, this Court's en banc decision in *Duncan* does not decide this case in the State's favor, since suppressors differ critically from the 11+-round magazines at issue there. 133 F.4th 852; Replacement Opening Br. at 12–13, 16–20, 23, 37–38. (Sanchez, of course, reserves the right to argue *Duncan* was incorrectly decided in future proceedings.) First, *Duncan* establishes that the district court here erred in affording *anything* that can be categorized as an "accessory" zero constitutional protection, as the Court recognized the existence of "[p]rotected [a]ccessories." 133 F.4th at 865. Further, the *Duncan* majority based its holding on its conclusions that "a large-capacity magazine has little function in armed self-defense, but its use by mass shooters has exacerbated the harm of those horrific events." *Id.* at 859. The Court applied a "more nuanced approach" because of these "unprecedented societal concerns *and* dramatic technological changes." *Id.* at 873 (emphasis in original). None of those factual premises is true as to suppressors, regardless of their accuracy as to magazines. Suppressors are rarely used in crime, and their moderate noise reduction does not qualify as a "dramatic technological change" in the capacity of firearms. *Compare id.* ("Semi-automatic firearms equipped with large-capacity magazines fire with an accuracy, speed, and capacity that *differ completely* from the accuracy, speed, and capacity of firearms from earlier generations." (emphasis added)). As for *Duncan*'s brief aside about "silencers," *id.* at 868, the State agrees that the reference was dicta and is not binding on this Court, Cal. Br. at 19 & n.5.

14

The issue of suppressors was not presented, and there is little reason to believe *Duncan* had the full suite of arguments before it when it referenced "silencers" in passing. 133 F.4th at 868.

The State also cites a series of cases from other circuits. *See* Cal. Br. at 16 n.4. But as Sanchez has explained, many of those cases are distinguishable, and none are persuasive. Replacement Opening Br. at 22–23. In particular, the many cases that either predate *Bruen* or rely reflexively on other cases that predate *Bruen* are of virtually no value in assessing whether suppressed firearms satisfy *Bruen*'s threshold textual test. *Id.* at 22. In *United States v. Peterson*, the principal out-of-circuit authority the State cites, the United States recently informed the Court that it now *agrees* that suppressors are constitutionally protected. *Peterson*, U.S. Br. at 4. "As a result," the United States concluded, "restrictions on the possession of suppressors burden the right to bear arms, and a ban on the possession of suppressors or other similar accessories would be unconstitutional." *Id.* And the Fifth Circuit has now withdrawn its opinion holding that suppressors are not protected. *See* Court Directive, *Peterson*, No. 24-30043 (5th Cir. June 17, 2025), Doc. 141.

Finally, the State largely sidesteps Sanchez's alternative argument that even if firearms outfitted with suppressors are not themselves arms (or if the relevant conduct is the possession of an isolated suppressor, not a suppressed firearm), suppressors are still protected by the Second Amendment as a corollary to protected

conduct. *Duncan* reaffirmed this important constitutional protection. The Court recognized that "for the right to bear arms to have meaning, the Amendment's text must carry an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm." *Duncan*, 133 F.4th at 866 (citing *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)). All the State can muster is a bare assertion that suppressors are not necessary. To that end, the State claims that affording suppressed firearms some constitutional protection would "mistake[] preference for necessity." Cal. Br. at 18.

The State's argument fails to account for how damaging firearm use without a suppressor can be—to both the bearer of the firearm and to innocent bystanders. Suppressors do not simply make a firearm more comfortable or more powerful, as the Court found was the case for certain magazines, *Duncan*, 133 F.4th at 866, and as may be the case for other "accessories." According to the Federal Government and leading health authorities on hearing damage, suppressors are the *only* potentially effective means of avoiding permanent hearing damage from firearm use. *See* Replacement Opening Br. at 29–30. The State cites no authority for the extraordinary proposition that individuals should have to subject themselves to permanent physical harm to exercise their constitutional rights.

What is more, other aspects of *Duncan* reinforce that this case is distinct. There, the Court emphasized that a magazine essentially is a "box" that holds

16

ammunition. *Duncan*, 133 F.4th at 867. Regardless of the soundness of that conclusion, suppressors cannot be dismissed as mere containers that do not affect how a gun fires. Further, while finding that the State could limit magazine capacity, the Court conceded that "the Second Amendment's text necessarily encompasses the corollary right to possess a magazine" of *some* size "for firearms that require one." *Id.* at 867–68. Here, firearms "require" a suppressor, whether integral or attached, to fire in a suppressed manner. California's ban on all suppressors is the equivalent of a ban on all magazines, which the *Duncan* Court indicated would be untenable.

## II. The State Cannot Justify Its Outright Criminal Ban on the Peaceable Possession of Safe and Commonly Used Suppressors.

Because the State's ban on firearms outfitted with suppressors criminalizes conduct covered by the plain text of the Second Amendment, the State bears the burden to justify its ban. Under the Supreme Court's framework, the State must show that its ban is consistent with the Nation's history of firearm regulation. *Bruen*, 597 U.S. at 19. The State does not meet its burden.

### A. Suppressors Cannot Be Banned Because Suppressors Are Not Dangerous And Unusual Weapons.

1. The only historical tradition that even "fairly support[s]" a ban on a type of arm is "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 627. It follows that arms that are in common use cannot be banned, because such items—by definition—are not dangerous and

17

unusual. Justice Kavanaugh recently confirmed this reading of *Heller*. In a statement respecting the denial of certiorari in *Snope v. Brown*, No. 24-203, 2025 WL 1550126 (U.S. June 2, 2025), Justice Kavanaugh explained that "[b]ecause handguns are in common use by law-abiding citizens, the Court [in *Heller*] held that the District of Columbia's ban on handguns violated the Second Amendment." *Id*. at *1. He continued that "[t]he Court's later Second Amendment decisions in *Bruen* and *Rahimi* did not disturb the historically based 'common use' test with respect to the possession of particular weapons." *Id*. He further continued, that "the Fourth Circuit would have erred by holding that Maryland's ban on AR-15 [rifles] complies with the Second Amendment" if "AR-15s are in 'common use' by law-abiding citizens." *Id*.

There can be no doubt that suppressors are in common use by law-abiding citizens. Millions of them are registered by law-abiding Americans, they are lawful to use in the vast majority of the States, their beneficial uses overwhelm their criminal uses, and they are very rarely used in crime. What is more, this is not a mere "ownership-statistics theory." *Duncan*, 133 F.4th at 883. We know without a doubt that the suppressors owned by law-abiding Americans are "truly chosen" for lawful purposes like self-defense or activities such as target shooting that facilitate self-defense, because people in this country do not obtain a suppressor "simply because [it] comes as standard equipment with the purchase of a firearm." *See id*. at 883 n.12.

18

Because of the National Firearms Act, individuals generally can only acquire a suppressor with the payment of a $200 transfer tax and the approval of the federal government. *See* 26 U.S.C §§ 5811–12, 5845(a); 27 C.F.R. §§ 479.84–86.

2. The State suggests that the word "and" should be read out of *Heller*'s and *Bruen*'s use of the conjunctive phrase "dangerous and unusual." Cal. Br. at 24. Justice Alito's concurrence in *Caetano v. Massachusetts*, on which the State otherwise relies, Cal. Br. at 22, confirms that "this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." 577 U.S. 411, 417 (2016) (Alito, J., concurring). The State cites only a law review article for its contrary atextual reading. In any event, little difference is made by whether the test is conjunctive or disjunctive. For an item to be "dangerous" in a constitutionally significant sense, it must be dangerous in some manner *beyond* that of commonly possessed arms, because *all* arms are dangerous. And an arm that *is* commonly possessed cannot be dangerous in this sense. In addition to making logical sense, this is the only interpretation that makes sense of the Supreme Court's repeated holdings that arms in common use are constitutionally protected and cannot be banned.

The State makes an additional threshold error in urging the Court to consider the availability of alternative options for individuals to exercise their Second Amendment rights despite the State's ban. *See, e.g.*, Cal. Br. at 30 ("Governments have long adopted historical regulations that either curtail use or outright ban

19

possession of particular weapons and accessories . . . so long as the restriction did not destroy the right to armed self-defense by leaving available other weapons for constitutionally protected uses."). This argument is foreclosed by *Heller*, where the Supreme Court considered and rejected the very same argument: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." 554 U.S. at 629. Just so here. The Second Amendment does not permit the State to pick and choose its preferred form for an individual's exercise of the constitutional right to keep and bear arms. *Id.*

Even putting these threshold errors aside, the State's argument fails because suppressors are neither dangerous nor unusual, so the State's attempt to amass historical support for the regulation of "particularly dangerous weapons," Cal. Br. at 38, is irrelevant. Similarly, the State's focus on "the unique dangerousness of the regulated item, especially when used for criminal purposes" is inapposite when it is undisputed that suppressors are very rarely used in criminal activity. *Id.* at 39. The State has not identified not a single instance in which a crime was made more lethal because of the use of a suppressor.

The State's reliance on laws dealing with "especially dangerous weapons like launcegays, pocket pistols, and crossbows," *Id.* at 32, "clubs, dirks, and daggers," *id.*, with which "most violent crimes were committed" in "the colonial and founding

era," *id.*, "skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons," *id.* at 33, "melee weapons," *id.* at 35, and the "bowie knife," *id.* at 36, are thus completely inapplicable. Indeed, a more apt analog to suppressors during the founding era was not restricted: bayonets that were made to be attached to muskets. In one sense, bayonets go even further than suppressors in that they are an attachment that allows an arm to be used lethally in total silence. Yet not one state banned using muskets equipped with bayonets (whether by banning such muskets or the bayonets made to be attached to them). And in the Militia Act of 1792 Congress *required* the male citizens of the Nation to provide themselves with bayonets upon turning 18. Act of May 8, 1792, ch. 33, 1 Stat. 271, § 1. There thus can be no doubt that muskets equipped with bayonets were protected arms at the founding. Indeed, while the Texas Supreme Court took too *narrow* a view of the Second Amendment in *English v. State*, 35 Tex. 473 (1871), even that court held that "the musket *and bayonet*," unlike weapons such as "dirks, daggers, slungshots, sword-canes, brass-knuckles, and bowie knives," were protected arms, *see id.* at 476 (emphasis added).

By contrast to the examples of historically regulated firearms and their uses, suppressors are very rarely used for criminal or harmful purposes. *See* Paul A. Clark, *Criminal Use of Firearm Silencers*, 8(2) W. CRIMINOLOGY REV. 44 (2007), https://perma.cc/75DJ-YP8K. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." *Id.* at 51. One study estimated the number

of suppressor-related prosecutions to be just 30 to 40 cases (most of them cases of illegal possession, without any additional crime) per year out of a total of 75,000 to 80,000 federal criminal prosecutions. *Id.* In 2017, acting ATF Deputy Director Ronald B. Turk admitted that suppressors "are very rarely used in criminal shootings." Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES at 6–7 (2017), https://perma.cc/AP6R-VZFA ("ATF White Paper"). While the State cites an article criticizing the alleged motives behind the ATF Deputy Director's White Paper, Cal. Br. at 25 n.7, the State provides nothing to call into question the veracity of the crime statistics therein nor does it provide any competing evidence.

The limited criminal use of suppressors should not be surprising when one understands how suppressors function. Suppressed gunshots are nowhere near silent. To illustrate, the 127-decibel sound generated by a 9mm pistol outfitted with a suppressor is comparable to the noise from a firecracker or an ambulance siren. Replacement Opening Br. at 7. That level of noise hardly enables a would-be stealthy criminal to fire a shot and avoid detection.

And the mere theoretical potential for an arm's criminal misuse is not sufficient under binding Supreme Court precedent. Such a test would permit states to ban virtually all firearms, including handguns, which the Supreme Court has already held may not be banned outright. *Heller*, 554 U.S. 570. Indeed, the

portability and concealability of handguns are features much *more* susceptible to criminal misuse than the hearing-protective but modest reduction in the sound of firing offered by suppressors. *See Peterson*, U.S. Br. at 1 n.1. As Justice Breyer explained in dissent in *Heller*, "the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous"—attributes such as being "maneuverable" and "concealable." 554 U.S. at 711 (Breyer, J., dissenting).

And handguns in fact *have* been criminally misused to a degree orders of magnitude greater than suppressors. Handguns "are the overwhelmingly favorite weapon of armed criminals." *Id.* at 862. Justice Breyer elaborated on this point in painstaking detail. Examples include that "[f]rom 1993 to 1997, 81% of firearm-homicide victims were killed by handgun," *id.* at 697, "in the same period, for the 41% of firearm injuries for which the weapon type is known, 82% of them were from handguns," *id.*, and in "a 1997 survey of inmates who were armed during the crime for which they were incarcerated, 83.2% of state inmates and 86.7% of federal inmates said that they were armed with a handgun," *id.* at 698.

Compare that to the State's presentation in this case, which consists of nothing but bare assertions that suppressors can theoretically aid criminals. Meanwhile, the Federal Government has explained that suppressors "are very rarely used in criminal shootings," ATF White Paper at 6–7, and recently concluded that the "beneficial

use" of suppressors "is *overwhelming* in relation to their criminal use," *Peterson*, U.S. Br. at 7. It would make no sense to say that suppressed firearms are unusually dangerous weapons if handguns are not.

Furthermore, unlike the State's historical regulation examples, the use of suppressors does not threaten innocent bystanders. Quite the opposite—suppressors *protect* innocent bystanders by ensuring they do not suffer permanent injury from the sound emitted by a gunshot.

The publicly available evidence is indisputable, and the State did not even seriously attempt to dispute it: suppressors reduce or prevent hearing damage and aid in training, hunting, and self-defense but do not silence or substantially conceal criminal activity. As *Heller* and *Bruen* establish, arms that are in common use for lawful purposes are protected, full stop. Applying the right test, suppressors are entitled to constitutional protection and cannot be banned.

### B. None of the State's Cited Historical Regulations Are Relevantly Similar to Its Criminal Ban on All Possession of Firearms Outfitted with Suppressors.

Because suppressors are not dangerous and unusual weapons, that is the end of the matter. But even if it were open to the State to prove some alternative historical tradition that would support its ban, it has failed to do so. The State bears the burden of identifying a "well-established and representative historical analogue." *Bruen*, 597 U.S. at 30. To determine whether the modern regulation and the historical

analogue are "relevantly similar," the Court looks to the "how and why" of the two regulations. *Id*. at 29. Here, the State's historical analogues fail on both counts. None of the State's cited laws regulate peaceable possession like the State's criminal ban on the possession of suppressors, and none concern analogous arms.

The State first points to a 1686 East New Jersey law restricting the carrying of certain arms, but *Bruen* for a variety of reasons (including that it generally only regulated concealed carry, that it applied to unusual or unlawful weapons, and that it was an ephemeral law from half a colony over a hundred years before ratification of the constitution) declined to give it "meaningful weight" in the carry context. *Id*. at 48–49. It deserves even less weight in the possession context.

The State next relies on a pair of Massachusetts laws that prohibited the carrying of "clubs or other weapons" in groups of twelve or more. Cal. Br. at 33 n.12. But these proffered statutes both regulated different conduct (the possession of arms in large groups) and regulated that conduct for different reasons (to prevent large groups from "unlawfully, riotously or tumultuously assembl[ing]." 1750 Mass. Acts 544, ch. 17, § 1; 1786 Mass. Acts 87, ch. 38). And even then, the laws only empowered a justice of the peace or analogous public official to order the group to disperse. *See* 1750 Mass. Acts 544, ch. 17, § 1; 1786 Mass. Acts 87, ch. 38. Only if the group continued to "unlawfully . . . riotously and tumultuously continue together" for an hour were they subjected to criminal punishment. 1750 Mass. Acts

544, ch. 17, § 2; 1786 Mass. Acts 87, ch. 38. Such laws do not concern peaceable, individual possession, and thus lend the State's ban no support whatsoever.

The State also points in vain to state criminal laws that prohibited arms possession during the commission of burglary or assault. Cal. Br. at 33 n.12 (citing 1788–1801 Ohio Laws 321, 323 (prohibiting individuals from carrying a dangerous weapon when "breaking and entering any dwellinghouse, shop, store or [like] vessel") *and* An Act to Describe, Apprehend and Punish Disorderly Persons § 2 (1799), *reprinted in* LAWS OF THE STATE OF NEW JERSEY 474 (Nettleton ed., 1821) (banning possession of a "pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person")). Such laws are not analogous to the State's criminalization of Sanchez's desire to peaceably possess a suppressor and use it for lawful purposes.

Nor can the State's cited nineteenth-century bans on slungshots justify the State's criminal ban on firearms outfitted with suppressors. Although later vacated upon rehearing en banc, this Court's analysis of this issue in *Teter v. Lopez* remains persuasive. 76 F.4th 938 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024). In *Teter*, this Court found laws regulating slungshots to be improper historical analogues. "As *Bruen* put it, the 'how' of the proffered state statutes is different—they regulate different conduct." *Id*. at 951. So too here. Just as the "vast majority of the statutes cited by Hawaii" in *Teter* "did not ban the

26

possession of knives" and "regulated only their *carry*," the "vast majority of the statutes cited by" California regulated only the manufacture and sale of slungshots and not their peaceable possession. *Id*. (emphasis in original). The regulations presented here likewise cannot evince the historical tradition necessary to save the State's criminal ban.

The State's brief reference to alleged historical regulation of suppressors likewise fails. Despite the State's claim of "strict restrictions" on the possession of suppressors, Cal. Br. at 38, most of these historical laws focused on only one, discrete use of suppressors: certain types of hunting. Only fifteen states had regulated suppressors in any manner by 1934, when the National Firearms Act's ("NFA") was enacted. *See id.* (citing *United States v. Comeaux*, No. 6:23-CR-00183, 2024 WL 115929, at *3 (W.D. La. Jan. 10, 2024)). The State relies on the district court opinion in *Comeaux*, which in turn relied on a party's brief, *see* United States' Mem. of Law at *7, *Comeaux*, 2024 WL 115929 (W.D. La. Jan. 5, 2024), Doc. 27, which in turn cited a law review article, *see* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 L. & CONTEMP. PROBS. 231, 246–49 (2020). And that article noted—in the very same sentence—that the *majority* of those fifteen states barred the use of suppressors *only in hunting*. *Id.* at 248 & n.124.

Indeed, even New Jersey, which the State hails as an early adopter of a suppressor restriction in 1911, *see* Cal. Br. at 37–38 (citing Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185), limited its regulation to certain forms of hunting. *See* Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185 ("It shall be unlawful to use any silencer, when hunting for game or fowl").

Similarly, North Carolina prohibited the use of suppressors only "to trap for bear or to run or hunt deer with dogs or . . . while hunting." Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529, 530. Pennsylvania made it illegal to use suppressors to "hunt for, or catch or take or kill or wound, or attempt to catch or take or kill or wound, game of any kind, excepting raccoons." Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359, 386. Given that one of the few states that regulated suppressors included a carveout to hunt racoons, it begs credulity to argue that suppressor restrictions were part of a "historical tradition of restricting access to particular weapons and accessories with heightened lethality." Cal. Br. at 37; *see also*, *e.g.*, Act of Mar. 29, 1927, ch. 169, 35 Del. Laws 516 (1927) (restricting suppressor use in hunting); Act of July 3, 1918, no. 88, § 3, 1918 La. Acts 131, 132 (same); § 97, ch. 83, 1921 Wyo. Sess. Laws 112-13 (same); Act of Mar. 18, 1929, ch. 84, § 14, 1929 Ariz. Sess. Laws 235, 246–47 (same).

In any event, a minority regime starting in the 20th Century is too little and too late to have any significance in understanding the original meaning of the Second

28

Amendment. *See Bruen*, 597 U.S. at 66 n.28 (declining to consider 20th century evidence); *United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (holding that laws from "more than 30 States" from the second half of the 19th century are insufficient to "establish an early American tradition").

## CONCLUSION

For these reasons, this Court should reverse.

June 18, 2025                                   Respectfully submitted,

C.D. Michel                                     /s/David H. Thompson
Anna M. Barvir
Konstadinos T. Moros                            David H. Thompson
MICHEL & ASSOCIATES, PC                         Peter A. Patterson
180 E Ocean Boulevard                           Athanasia O. Livas
Suite 200                                       COOPER & KIRK, PLLC
Long Beach, CA 90802                            1523 New Hampshire Avenue, N.W.
cmichel@michellawyers.com                       Washington, DC 20036
                                                (202) 220-9600
March 28, 2025                                  dthompson@cooperkirk.com


*Attorneys for Plaintiff-Appellant Gary R. Sanchez*

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system, which will transmit the foregoing document via email to all counsel of record.

Dated: June 18, 2025

/s/David H. Thompson
David H. Thompson
*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5566

I am the attorney or self-represented party.

**This brief contains** | 6,986 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ David H. Thompson | **Date** | 06/18/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*